THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
8            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   NICOMEDES TUBAR, III,

                                              No.  C05-1154JCC
10                          Plaintiff,

                                              DEFENDANTS' MOTION
11        v.                                  FOR PARTIAL SUMMARY
                                              JUDGMENT
12   JASON CLIFT; and THE CITY OF KENT,
     WASHINGTON, a municipal corporation,
13                                            **NOTE ON MOTION CALENDAR:**
                            Defendants.       **APRIL 7, 2006**

14

15
                    I.      RELIEF REQUESTED
16

17        This is Defendants City of Kent's and Jason Clift's Motion for Summary Judgment

18   requesting dismissal of plaintiff's federal civil rights claims because no violation of

19   plaintiff's civil rights occurred.  In the alternative, if a violation can be made out on these

20   facts, Clift is entitled to qualified immunity from suit.

21        This lawsuit arose from an incident which occurred just after midnight on June 26,

22   2003, during which Officer Jason Clift fired three shots at a stolen vehicle being driven at

23   him by Heather Morehouse.  Plaintiff Nicomedes Tubar, a passenger in the vehicle, was

24   inadvertently injured when a bullet fired at Ms. Morehouse missed and struck plaintiff in

25   the shoulder.  Ms. Morehouse was prosecuted and pleaded guilty to assaulting Officer Clift.

26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE:  (206) 623-8861
FAX:  (206) 223-9423

## II.      STATEMENT OF FACTS

**A.      Defendant Officer Clift's Statement.**

Shortly before midnight on June 25, 2003, Officer Clift was on routine patrol in the City of Kent driving a fully marked police vehicle and wearing a Kent Police Department uniform.  Some months previously, a business owner in the neighborhood had reported a stolen vehicle, and the owner had asked for additional patrols of his parking lot due to this theft experience.  Officer Clift drove into the parking lot area and located a 2001 Kia automobile parked near a chain link fence in the lot.  The car was parked near a business complex the upper floor of which contained rental apartments.  A records check of the license plate showed the car had been reported stolen one day before. *Declaration of Jason Clift, Exhibit A, p. 1.*

Officer Clift approached the vehicle and noticed a glass pipe on the front passenger seat like that used to smoke illegal narcotics.  He also noticed a license plate on the passenger side floor.  He checked the front of the vehicle and observed that the front license plate was missing.  Officer Clift knew from his experience with stolen vehicles that it was common for car thieves to remove front license plates.  He noted that the hood of the vehicle was still warm, indicating that it had recently been driven. *Id.*

Officer Clift advised dispatch of his location, and the dispatcher confirmed that the vehicle was indeed stolen.  He decided to watch the vehicle for a while since it had only recently been driven.  He put a small mechanical device known as a "rat trap" under the passenger side tire.  This device is used to flatten a vehicle tire when it is driven over.  He moved his patrol car to a location that was out of sight and waited in a corner of the lot where he could observe the car without being seen. *Id.*

At 12:16 a.m., Officer Clift observed a male and female walk from the business complex through an opening in the chain link fence and approach the vehicle.  Clift advised

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX:  (206) 223-9423

1  dispatch of these events, and observed the female enter the driver's side of the car and the

2  male, the front passenger's side. *Id., 1-2.*

3        Officer Clift heard the vehicle engine start, and began to approach the vehicle from

4  the rear.  He was expecting backup officers to arrive, but decided to make his presence

5  known to the driver of the vehicle.  As he walked toward the vehicle, he drew his service

6  weapon, which is common practice when dealing with occupied stolen vehicles.  The

7  parking lot was dark, and with his flashlight in his other hand, he shined it toward and into

8  the stolen vehicle. *Id., 2.*

9        As he approached the vehicle, he yelled "Police.  Stop." and he saw both occupants

10  of the car turn their heads backward toward him.  The vehicle began to back up and again

11  he yelled "Police.  Stop."  He then heard a loud noise and the sound of air escaping, which

12  he believed to be the front tire being punctured by the "rat trap".  He yelled again "Police.

13  Stop." but the vehicle continued to back toward him.  The vehicle was being backed slowly,

14  but did not come within ten feet of the officer's location. *Id.*  His report then recounts:

15        The vehicle then accelerated forward and made a sharp turn to the right
        and did a sharp U-Turn.  At this point I was on the passenger side of the
16        vehicle, approximately fifty feet away.  I was still backing through the
        parking lot with my flashlight and duty weapon pointed at the vehicle.  I
17        continued to yell for the vehicle to stop.  The vehicle then accelerated
        through the parking lot.  It appeared that the vehicle was going to drive past
18        me and towards the exit of the parking lot on my right side.  I was
        continuing to walk backwards through the parking lot at a fast pace.  The
19        vehicle then suddenly turned directly towards me and accelerated.  I
        continued to yell for the vehicle to stop and the vehicle continued towards
20        me.  It appeared that the vehicle was traveling at approx. 15-20 miles per
        hour.  I could hear the vehicle motor revving as it continued to get closer to
21        my location.  I could see that the female driver was looking directly at me.  It
        was very apparent to me that the suspect was now trying to hit me with the
22        vehicle.  If the vehicle would have continued on its route without turning
        towards me, the vehicle would have been able to drive safely around me and
23        reach S.E. Kent Kangley Road.

24        As the driver continued to accelerate driving directly toward me, I
        feared that the driver was going to hit me with the vehicle and either
25        seriously injure or kill me, so I began firing my duty weapon at the vehicle.
        At that point the vehicle was approx. 10-15 feet of my location and
26        approaching quickly.  When I began firing, the vehicle swerved to the right.

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

When the vehicle came to a stop, I was standing approx. 10 feet directly east of the driver's side door.

*Id.*

In an interview with investigators, Officer Clift stated:

> . . . She backs up a little bit as I keep yelling reversing my direction . . .I don't know how far she backs up, but then she whips a u-turn, comes this way (pointing at diagram) as I'm backing up through here, at this point she's coming through the lot, I notice that she's way on my right side. Just assume that she's just gonna drive around me, and head towards the, uh, entrance. And she just turns her vehicle and comes directly at me.

*Exhibit B, 5.* He explained that as the vehicle was moving, and he was walking backwards, "Just trying to get away." *Id., 6-7.* He was not trying to block her exit or get to his car. At some point as the car moved through the lot, he believed she (the driver) "turn[ed] right at me." *Id., 7.* Indeed, in a radio transmission he made as events were unfolding, Clift said "[T]he tire's flat and they're driving right at me." *Exhibit C, 8.* He felt he had to shoot at the driver to either stop the vehicle or get it to change direction.

Officer Clift aimed at the driver; specifically, at the driver's upper body. *Exhibit D, 24.* Clift believes the shots were fired in rapid succession in "[p]robably a second." *Exhibit D, 23.* He was aware, after the fact, that he shot through the driver's window, but stated "in my mind she was still a threat to me," when he fired the third shot. He explained:

> **Q.** Why would you shoot at the car when it's not coming at you?
> **A.** It's all action and reaction. I'm reacting to her action and I'm shooting. I'm still moving, she's moving and I just, the last one just went through the window.
> **Q.** When you say reactions and actions and reactions, what actions were there that caused you to shoot through the driver's side window when she is no longer coming at you?
> **A.** I'm continuing to fire, she's moving and I'm moving. This is an event that's not me and you standing here. This is moving, she's driving at me, I'm trying to get out of the way. It all happened probably within a second.

*Id., 49.* He stopped firing because the driver was no longer a threat. *Id., 48.*

Shortly after he fired the shots, Officer Clift radioed and advised that shots had been fired and requested medics. Seconds later, Officer Clift's backup officers arrived. Plaintiff

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

and Ms. Morehouse were taken from the vehicle and provided medical treatment.  *Exhibit A, 2.*

Officer Rodd Joseph was the first backup officer to arrive at the scene.  As he was driving into the parking lot, he heard a series of 3 shots in rapid succession.  He estimates that all 3 shots were fired in 2 seconds or less.  *Declaration of Rodd Joseph, p. 2.*  Sgt. Bob Crouch, an accident reconstructionist with the Auburn Police Department, calculated that at the point the vehicle began to turn toward the direction of Officer Clift, it was only 1.6 – 2.1 seconds from Clift's location.  Thus, Officer Clift had very little time to react to the imminent danger of being run over by the approaching vehicle.  *Declaration of Bob Crouch.*

**B.**     **Deposition of Plaintiff Tubar.**

Plaintiff Nicomedes Tubar was deposed on January 19, 2006.  He testified that he lived in an apartment near the parking lot where the shooting occurred.  *Tubar dep.,* 6, 8. Heather Morehouse, the driver of the stolen vehicle, also lived at the complex near where Tubar lived.  *Tubar* dep., 8 – 9.  Tubar would occasionally see Morehouse and had watched television in her apartment.  *Tubar dep.,* 10 – 11.  Plaintiff reviewed a statement he gave police prior to his recent deposition and agreed that its contents were true and correct to the best of his knowledge.  *Tubar dep.,* 14 – 16 (11 – 15).  On the day before the shooting, Morehouse told Tubar she had a "new car".  *Tubar* deposition exhibit 1, p. 1.  Later that night, he returned around 11:30 p.m. and found Morehouse outside smoking.  *Id.*  He accepted her invitation to come to her apartment for a drink.  *Id.,* 2.  Shortly, the conversation turned to cigarettes, and Morehouse asked whether Tubar would go with her to a nearby store to buy some, commenting "We'll take my car, it's fast."  *Id.,* 2.

They walked toward her car parked on the "other side of the complex" and got in. Morehouse removed some items from the front passenger seat so Tubar could sit there, as the Officer described.  *Tubar dep.,* 17.  As Morehouse was backing up, plaintiff saw a bright light and thought it was a security guard "directing [them] out of the parking lot."

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

*Tubar* dep., Exhibit 1, p. 3.  The person was wearing dark clothes, holding a flashlight "just above the shoulder", but Tubar "didn't really pay attention to it."  *Id.*, 17 – 18.

He describes lighting in the parking lot as "minimal lighting" and "kind of dark."  *Id.,* 28.  He could not recall whether Morehouse was using the car's headlights.  *Id.*, 29.  He testified that he was not aware the car's tire was punctured or flat as the car was moving.  He described the driving as a "typical" drive.  He could not say how fast Morehouse was driving.  *Id.*, 36 – 39.  Plaintiff agrees with the officer's description that before the car moved, he turned around and looked back at the officer ("security guard") as the flashlight was shining into the car.  He had no recollection of seeing the officer/security guard after the car began moving forward until after he was shot.  *Id.,* 37, 43.

Morehouse then drove forward and Tubar heard "a shot" and "blurrily" saw the officer standing by the driver's door.  Tubar stated he "heard no warning shot."  He heard "a minimum of one, maybe two, shots".  *Id*., p. 4.  Tubar clearly states that *after* he heard the noises, which by the time of his deposition he described as "two noises, two or three", then Morehouse slammed on the brakes:

> After those noises, she slammed on the brakes, glasses were flying everywhere.  She seemed startled really kind of freaked out and surprised.

*Tubar* dep., 18 (11-18).

It took a few moments for Tubar to realize he had been shot.  He claims he did not realize until later that the person he had seen was a police officer.  *Id.*, 18 – 19.  Tubar was shot in the upper back, shoulder area.

At the hospital, a police who was sent to interview plaintiff reports that Tubar stated that Morehouse accelerated toward the uniformed male and that it seemed Morehouse was trying to hit him.  Tubar denied making this statement in his deposition, claiming that he did not see the person after the car began moving forward and before he was shot.  *Id.,* 59 –

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE:  (206) 623-8861
FAX:  (206) 223-9423

60.   Tubar's descriptions of the gun shots are indicative of sounds which, from his perspective, came very close together.

> **A.**   . . . I don't even recall, you know, the noises, how many exactly.  All I remember is noises were heard, she slammed the brakes, and then I can't move.  That's the only thing I can clearly remember.
> **Q.**   Did this all happen pretty quickly?
> **A.**   Yeah, that's correct.

*Tubar dep.,* 39.

Ms. Morehouse's braking was significant enough for Tubar's body to be moved "forward."  *Id.*, 39.  He has no recollection of how much time elapsed between the first and second gun shots.  He really could not say whether there was a third shot or not.  *Id.*, 40.  He has no knowledge whatsoever of which shot may have hit him.  He describes the time that elapsed from when the car moved from its parked location to being stopped after shots were fired as not long and not far.

> **Q.**   Do you know the amount of time it took for the car to get from where it was parked to where it was stopped?
> **A.**   I don't know.
> **Q.**   And that includes the back up time?
> **A.**   Yeah.
> **Q.**   You don't know?
> **A.**   It didn't seem that long to me, it didn't seem that far, yeah.

*Tubar* dep., 44; *see also, Tubar* dep., 46.

**C.**   **Physical Evidence at the Scene.**

Auburn Police Department investigators obtained a "total station" of the incident scene, including precise measurements of the area and placement of objects and evidence at the scene.   *Declaration of Randey Clark.*   Investigators prepared a to-scale diagram depicting information at the scene, including a visible mark on the pavement left by the rim of the flattened tire that provides evidence of the path the vehicle took from near where Morehouse began to drive forward, after backing the car.  *Id.*  Physical evidence of the vehicle establishes that one of the shots Officer Clift fired hit the hood of the car on the driver's side.  Another bullet entered the windshield on the driver's side, and proceeded at

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

an angle somewhat less than 90 degrees to the front of the vehicle.  *Id.*  The bullet impacted through the vehicle's back seat behind the driver, evidently missing Ms. Morehouse by inches.  The third shot was fired just as the car rapidly turned to its right as described by Officer Clift.  The last bullet entered the driver's side window, missing Ms. Morehouse, but presumably hitting plaintiff in the left shoulder.  *Id.*

As the vehicle was backing, it was not a threat to Officer Clift.  And, as it began moving forward and turning to its right (in the process of making a u-turn), it was not initially a threat.  Indeed, Officer Clift thought the vehicle would exit the parking lot by going around him to his right.  Suddenly, everything changed.  The vehicle turned and began traveling directly at him.  At that point, even assuming normal acceleration, Officer Clift had only 2 seconds until the car would hit him.  He had no way of predicting the driver's behavior, and no means of protecting himself – except firing in an attempt to stop the driver.

### III.    ISSUES PRESENTED

1.    Has Plaintiff alleged a Fourth Amendment "seizure" since Officer Clift did not intentionally fire his weapon at Plaintiff?

2.    If no Fourth Amendment "seizure" occurred may Plaintiff nevertheless proceed on a Fourteenth Amendment substantive due process theory?

3.    If the Court concludes a Fourth Amendment seizure occurred, is Officer Clift nevertheless entitled to qualified immunity from suit?

### IV.    EVIDENCE RELIED UPON

1.    Declaration of Mary Ann McConaughy, with excerpts from deposition of Nicomedes Tubar, III

2.    Declaration of Jason Clift, with Exhibits as follows:

A.  3-page statement of Officer Jason Clift;

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

B.   Excerpts from transcribed interview with Officer Jason Clift conducted by Detective Randey Clark;

C.   Transcript of radio transmissions by Officer Clift and others; and

D.   Excerpts from transcript of criminal defense attorney Todd Maybrown's March 16, 2004 interview with Jason Clift.

3.   Declaration of Randey Clark;

4.   Declaration of Bob Crouch; and

5.   Declaration of Rodd Joseph.

## V.   AUTHORITY

### A.   The First Step in Applying Qualified Immunity Relies upon a Precise Identification of the Constitutional Violation Alleged.

To succeed in a §1983 civil rights action, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right.   *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).

However, not every constitutional violation automatically results in liability. Government officials performing discretionary functions are protected from liability for civil rights violations except when their conduct violates "clearly established" constitutional rights about which a reasonable official should know.   *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982).   The Supreme Court has outlined a two-step process for applying qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged," and second, assuming the violation could be proved, whether the rights was "clearly established" under the law at the time. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001).

The Supreme Court has repeatedly stated that proper sequence of analysis in determining qualified immunity is first to establish whether the plaintiff has alleged a deprivation of a constitutional right at all.   Only when it can conclude that a constitutional

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   violation can be made out on the facts alleged, does the court then address whether or not

2   the "right allegedly implicated was clearly established at the time of the events in question."

3   *Siegert v. Gilley*, 500 U.S. 226, 232, 114 L.Ed.2d 277, 111 S. Ct. 1789 (1991).

4   **B.    Plaintiff Has Not Alleged a Viable Fourth Amendment Claim Because Officer**

5   **Clift Did Not Intentionally Fire His Weapon at Plaintiff.**

6          Plaintiff's complaint alleges claims under both the Fourth and Fourteenth

7   Amendments.    The first step in any 42 U.S.C. §1983 is to identify the specific,

8   constitutional right allegedly infringed.  *Armendariz v. Penman,* 75 F.3d 1311, 1319-20 (9th

9   Cir. 1996).  The Supreme Court held in *Graham v. Connor*, 490 U.S. 386, 104 L.Ed.2d 443,

10  109 S. Ct. 1865 (1989) that, generally, claims of excessive force against officers engaged in

11  apprehending law violators are properly analyzed under the Fourth Amendment, not the

12  more subjective standard of Fourteenth Amendment substantive due process.  *Armendariz,*

13  *supra* at 319.  The Fourth Amendment provides that the "right of the people to be secure in

14  their persons . . . against unreasonable . . . seizures, shall not be violated . . ."

15         The Fourth Amendment does not apply to persons unintentionally injured by police

16  force.  The Supreme Court has ruled a Fourth Amendment "seizure" only occurs when the

17  government actor takes deliberate action and effectively seizes the plaintiff through "means

18  intentionally applied."  *Brower v. County of Inyo*, 489 U.S. 593, 596-7, 103 L.Ed.2d 628,

19  109 S. Ct. 1378 (1989).  The actions of the officer "must be willful."  *Id.*  That is, "through

20  means intentionally applied."  *Id.,* at 597.  Thus, when an officer accidentally struck and

21  killed two persons on a motorcycle who were fleeing police apprehension, no seizure

22  occurred even though the officer was engaged in trying to apprehend the fleeing subjects.

23  *Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998).

24         In this case, the officer was aiming at the driver, Ms. Morehouse, not the passenger

25  plaintiff Tubar, when the bullet intended for Ms. Morehouse broke through the driver's side

26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1    window, narrowly missed Morehouse, simultaneously with Morehouse's rapid turning and

2    braking of the car as described by both Tubar and Officer Clift.

3        If Officer Clift did not "seize" plaintiff Tubar in a manner consistent with the

4    meaning of the term in the Fourth Amendment, then no violation of Fourth Amendment

5    rights occurred.  The question presented by this case is whether the officer's shooting at the

6    driver, Ms. Morehouse, and accidentally striking the passenger, plaintiff Tubar resulted in a

7    Fourth Amendment "seizure."  It did not.

8        Officers who intentionally shoot at a suspect, but miss and hit an uninvolved

9    bystander, are not liable to the bystander for Fourth Amendment violation.  *See*, *Rucker v.*

10   *Harford County*, 946 F.2d 278, 281 (4th Cir. 1991).

11       [O]ne is "seized" within the fourth amendment's meaning only when one is
         the *intended object* of a physical restraint by an agent of the state.  [emphasis
12       in original]

13       Similarly, when shots fired at a suspect outside a vehicle penetrated into the car and

14   hit a person the officers did not know was present in the car, there was not a "seizure."

15   *Claybrook v. Birchwell,* 199 F.3d 350 (6th Cir. 2000).  *But see*, *Fisher v. Memphis*, 234 F.3d

16   312 (6th Cir. 2000) (an officer shooting at a suspect vehicle, missing the driver but hitting a

17   passenger, had seized the passenger); *Vaughan v. Cox,* 264 F.3d 1027 (11th Cir. 2001).

18       In *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000), hostages in a

19   vehicle were injured when police officers attempted to stop the vehicle by firing shots.  The

20   court rejected plaintiffs' arguments that the officers' deliberate firing into the vehicle,

21   knowing of the presence of the woman and her toddler daughter, was a "seizure" even

22   though the shooting was willful.  The court observed that the officers intended to restrain

23   the mini-van and the fugitives, not the plaintiffs.  The injuries to plaintiffs were not

24   unconstitutional but were "accidental effects of otherwise lawful conduct." *Id.*, at 1157.

25       A similar result was reached in *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir.

26   1998) and in *Landol-Rivera v. Cosme*, 906 F.2d 791 (1st Cir. 1990), where the court noted

27

DFTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 11
USDC Cause No. C05-1154JCC
U:\CLinder\slt\wcia03107\p-031406-Partial SJ Motion.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

that officers unquestionably had a Fourth Amendment right to seize an armed robber by shooting him after he had taken plaintiff hostage.  Nevertheless, the court concluded that accidentally shooting plaintiff, who was in the vehicle with the robber, did not constitute a seizure of plaintiff, thus rejecting plaintiff's Fourth Amendment claim.

> We reject the notion that the "intention" requirement is met by the deliberateness with which an action is taken.  A police officer's deliberate decision to shoot at a car containing a robber and a hostage *for the purpose of stopping the robber's flight* does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern.

*Landol-Rivera, supra* at 795.

The Court referred to language in *Brower v. County of Inyo, supra* where in the Supreme Court noted the Fourth Amendment "addresses misuse of power" and not accidental effects of otherwise lawful government conduct.  109 S. Ct., at 1381.

In summarizing the application of these principles, the *Landol-Rivera* court noted that what is "significant" about the cases is that intervention directed at a specific individual furnishes the basis for a Fourth Amendment claim.  *Landol-Rivera*, at 796.

The results in these cases may fuel an argument that when the unintended target of a bullet is a hostage, there is no Fourth Amendment seizure; but when he or she is a suspect (which the officer did not know concerning Tubar) or any other non-hostage, a seizure occurs.  The trouble with this analysis is that it is wholly arbitrary.  It seems preposterous to suggest that in the scant seconds when Officer Clift perceived the car to be a threat and began firing that he had reason or opportunity to evaluate his options based upon the passenger's status.   Why should the initial determination that a Fourth Amendment violation has, or may have occurred, rest on such a haphazard (and often not ascertainable) distinction?

In this case, Officer Clift was attempting to protect his own life when he shot at the driver, Ms. Morehouse.  He shot at Morehouse to end the threat posed by her driving, a purpose not served by shooting the passenger.  Plaintiff Tubar, the unintended recipient of

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   force, was not seized within the meaning of the Fourth Amendment.  It cannot be said that

2   the Fourth Amendment's "purpose" to address "misuse of power" is served when an

3   unintended consequence, i.e., hitting Tubar, is redressed by §1983 liability.

4       Here, Clift did not intend to shoot Tubar; he intended to shoot the driver, Ms.

5   Morehouse, to stop the car that was bearing down on him.  The reasoning of *Brower v. Inyo*

6   and *Sacramento v. Lewis*, is consistent with a determination that, here, the passenger Mr.

7   Tubar was not seized because he was not the intended target of the officer's shot.

8   **C.     If No Fourth Amendment "Seizure" Occurred, the Court Must Still Determine**

9   **Whether a Fourteenth Amendment Claim is Alleged on These Facts.**

10      If this Court concludes that no "seizure" occurred, that does not end the

11  constitutional inquiry.  The Court must then consider if plaintiff has a claim under the

12  Fourteenth Amendment, which provides "no State shall … deprive any person of life,

13  liberty, or property, without due process of law."

14      Substantive due process considerations must be addressed when the Court has

15  deemed that the Fourth Amendment does not apply to the facts presented.  *Sacramento v.*

16  *Lewis*, 523 U.S. 833, 843-844, 118 S. Ct. 1708,140 L.Ed.2d 1043 (1998).

17          [I]n a due process challenge to executive action, the threshold question is
            whether the behavior of the governmental officer is so egregious, so
18          outrageous, that it may fairly be said to shock the contemporary conscious.

19          Only the most egregious circumstances can be deemed violative of the
            Fourteenth Amendment.  The constitution does not guarantee "due care on
20          the part of state officials" and negligently inflicted harm is below the
            threshold of constitutional due process.
21

22      The Supreme Court has repeatedly expressed a reluctance to "expand the concept of

23  [Fourteenth Amendment] substantive due process."  *Sacramento v. Lewis*, 118 S. Ct. at

24  1715.  In *Lewis,* 118 S. Ct. at 1711-1712, the Court ruled that an officer who crashed into a

25  fleeing suspect, killing him was not liable for violation of Fourteenth Amendment rights,

26  even if he did act in "conscious disregard" for the young man's life.  Instead, the Court held

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1    that "in such circumstances, only a *purpose to cause harm unrelated to the legitimate object*

2    *of arrest* will satisfy the element of arbitrary conduct shocking to the conscience, necessary

3    for a due process violation." (emphasis supplied).

4            In this case, the officer's actions took place in a rapidly-evolving circumstance

5    where careful consideration was not practical.  *See Lewis,* 118 S. Ct. at 1719 ("As the very

6    term "deliberate indifference" implies, the standard is sensibly employed only when actual

7    deliberation is practical.")  Police officers responding to situations of extreme emergency

8    who do not intend to commit harm, unrelated to the legitimate use of force necessary to

9    protect the public or themselves, do not commit Fourteenth Amendment violations.

10   *Moreland v. Las Vegas Police,* 159 F.3d 365, 372 (9th Cir. 1998).  Officer Clift's actions do

11   not rise to the level of a Fourteenth Amendment violation.  He responded to an extreme

12   emergency (reasonable fear of being run over by Morehouse) with legitimate use of force to

13   protect himself and with no intent whatever to harm plaintiff or anyone beyond this use of

14   force against Morehouse.

15   **D.      Even if a Fourth Amendment "Seizure" Occurred, Officer Clift is Entitled to**

16   **Qualified Immunity From Suit.**

17           If the Court finds a "seizure" of Mr. Tubar occurred, the issue then turns to whether

18   the officer's use of force under the circumstances was nevertheless "reasonable."  If it was,

19   no violation occurred and there is no need to consider whether qualified immunity applies.

20   Yet, even if the officer decision is constitutionally "unreasonable," he may nevertheless be

21   entitled to qualified immunity if he "reasonably misapprehends the law governing the

22   circumstances [he] confronted."  *Brosseau v. Haugen,* 543 U.S. 194, 125 S. Ct. 596, 599,

23   160 L.Ed.2d 583 (2004).  And if the law did not put the officer on notice, his conduct in a

24   particular situation would be <u>clearly</u> unlawful, summary judgment based on qualified

25   immunity is appropriate.  *Id.; see, Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89

26

27

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX:  (206) 223-9423

L.Ed.2d 271 (1986)(qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.")

Clearly, it is not *any* use of force by an officer that results in a Fourth Amendment violation, but only the use of force is unreasonable under the circumstances presented.  The Court must consider the "threshold question:"  "Taken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272.  Where an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 125 S. Ct. at 598.

The undisputed facts taken in a light most favorable to plaintiff are as follows: Shortly before midnight on June 25, 2003, Officer Clift confirmed the presence of a stolen Kia automobile near where another stolen car had been recovered previously.  The Kia had been stolen one day before.  He observed that the front license plate had been removed (consistent with the officer's experience of practices of car theft suspects).  A license plate was visible inside the car.  Drug paraphernalia was visible in the car, and the car was warm having been driven recently.  Officer Clift placed a tire deflation device under the front passenger tire.

A short time later, Morehouse and Tubar approached and got in the car.  The time was just after midnight on June 26.  The officer notified back up officers that persons were approaching the car, and learned that back up officers were nearby and en route.  The officer approached the rear of the car from a hidden position some distance away.  He carried his flashlight which he shined into the rear windshield, and he had his service weapon drawn which is common practice when confronting an occupied stolen car.

It is undisputed that both occupants were aware of the presence of a person with a light in the parking lot.  Both occupants of the car noticed the light, and the officer knew he

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

had been seen because Mr. Tubar admits he turned and looked in the officer's direction, as the officer described. The officer loudly announced "Stop. Police." Neither occupant of the vehicle heard this command to stop, but Officer Clift did not know this and thought the vehicle's occupants did hear his command because they had looked back at him. The officer was wearing his department-issued police uniform. Neither occupant of the car realized he was a police officer, but the officer did not know this.

The car was backed out slowly for some distance. The officer was not apprehensive about the backing maneuver. When the car had been backed far enough to permit Ms. Morehouse to drive forward, she did so driving in a right-turning motion. During backing, the front passenger tire was punctured by the deflation device and flattened quickly enough that the tire rim made a visible mark on the pavement that documents most of the vehicle's path of travel as it was driven forward to the point where it stopped.

As the car began to back up, Officer Clift stopped moving toward the vehicle and began to walk backwards away from the car. The officer noticed the car turning to its right, and initially he was located on the passenger side of the vehicle. At first, the officer believed the car was going to drive around him staying to his right and that it would drive out the parking lot exit. Suddenly, the officer perceived that the car was being driven directly toward him. The driver Ms. Morehouse was aware the flashlight was directed into the front windshield of the car, although she denies driving at the officer intentionally. Officer Clift had at most about two seconds to decide what to do and to act.

He radioed that the car was coming right at him, and shortly thereafter fired three bullets at the car. The first two bullets struck the front of the car, and confirm the officer's description that the car was driving in his direction. Both occupants of the car testified that Ms. Morehouse began braking due to the noise of gunshots or because glass was breaking. She slammed on the brakes and Tubar was thrown forward by the braking action. While he was firing, the officer perceived that the car swerved to its right (as he moved to his right)

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

and thus veered away from him.  The third bullet broke the driver's window somehow missing Ms. Morehouse and striking Mr. Tubar in the upper back of his shoulder — perhaps because he was thrown forward by the braking action.  This is consistent with a pattern of events occurring in rapid succession in a split-second time period.  The officer stopped firing when he perceived the car was no longer a threat to him.

Tubar and Morehouse also concede everything happened quickly.  They also admit that parking lot was relatively small and the distances involved were, as Tubar stated, not "that far."

According to the officer, the car was accelerating toward him.  This fact is disputed; Tubar states the car was accelerating in a normal fashion.  Viewing the facts in Tubar's favor, and assuming normal acceleration, as the car traveled toward the officer, he had only seconds to react once he perceived it to be a threat.

The standard applied to the officer's conduct is the "objective reasonableness" standard set forth in *Graham v. Connor*, 490 U.S. 386, 104 L.Ed.2d 443, 109 S. Ct. 1865 (1989).  Determining whether the officer's conduct was reasonable "is not capable of precise definition or mechanical application."  And, because "police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation" the reasonableness of the officer's belief as to the appropriate level of force should be judged from the on-scene perspective.  *Graham v. Connor*, at 396-397; *see also, Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001).  The Supreme Court "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."  *Saucier v. Katz, supra*, 533 U.S. at 205.

Here, there is no dispute that the car was being driven directly at the officer when he fired the initial shots.  Plaintiff will certainly argue that the final shot, into the driver's side window, was not reasonable because of the officer's position with respect to the car.  Office

DFTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 17
USDC Cause No. C05-1154JCC
U:\CLinder\slt\wcia03107\p-031406-Partial SJ Motion.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

Joseph states that all shots were fired in two seconds or less.  Nevertheless, it is obvious that given the extremely brief time period in which the officer was forced to act, distinguishing the third shot from the first two shots is not a reasonable basis for pinning the officer with a Fourth Amendment Constitutional violation given the realities of perception - reaction time and the obvious stress of the events.  The officer's actions, under the circumstances of this case, were not unreasonable and thus did not violate Mr. Tubar's constitutional rights.  Officer Clift was faced with what he perceived to be a life or death situation that took place in mere seconds.

If the Court concludes that no constitutional violation is made out on these facts, the inquiry stops here.  If the Court, instead, determines that a constitutional violation may have occurred, the Court must still consider whether the officer is entitled to qualified immunity.

Even if an officer has violated a subject's constitutional rights, the law relating to the circumstances was clearly established such that a reasonable officer in Officer Clift's position would have known he was violating Mr. Tubar's rights.  The Supreme Court has specifically stated that the reasonableness inquiry for determining whether a violation may have occurred is not "merely duplicative" to the qualified immunity question.  "The inquiries for qualified immunity and excessive force remain distinct." *Saucier v. Katz*, 533 U.S. at 204.

> The qualified immunity inquiry, on the other hand, has a further dimension.  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz,* 533 U.S. *supra* at 205.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

Because the Court must determine whether or not the officer had "fair notice" that his conduct was unlawful, reasonableness must be judged "against the backdrop of the law at the time of the conduct. Careful attention must be paid to the facts and circumstances of each particular case." *Id.* "If an officer, reasonably but mistakenly believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.*

If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.,* at 599. Plaintiff bears the burden of showing that the right claimed to have been violated was "clearly established" at the time of the alleged action. *Collins v. Jordan,* 110 F.3d 1363, 1369-79 (9th Cir. 1997).

The Supreme Court has repeatedly stressed the importance of looking at "the specific context of the case." *Id.* This is so because the "contours of the right" in question must be sufficiently clear that "a reasonable official would understand that what he is doing violates that right". *Brosseau v. Haugen*, *supra,* 125 S. Ct. at 599, (citing *Anderson v. Creighton,* 483 U.S. 635, 97 L.Ed.2d 523, 107 S. Ct. 3034 (1987)).

Thus, in this context, plaintiff must cite factual scenarios closely similar to this case decided before June 26, 2003 (the date of this incident) which demonstrate that, at the time Officer Clift fired, any reasonable officer should have known he was violating Mr. Tubar's rights. Plaintiff cannot do so.

*Brosseau v. Haugen, supra,* is instructive although factually distinct. It demonstrates the requisite factual specificity for the application of qualified immunity. Officer Brosseau shot at (and hit) a suspect in an escaping vehicle because she feared his driving would injure nearby persons. The officer was not fearful for her own safety. The Ninth Circuit concluded the officer violated the suspect's Fourth Amendment right, and that

DFTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 19
USDC Cause No. C05-1154JCC
U:\CLinder\slt\wcia03107\p-031406-Partial SJ Motion.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   she was not entitled to qualified immunity.  The Supreme Court reversed the decision on

2   qualified immunity.

3         The Court commented that it "expressed no view as to the correctness of the [Ninth

4   Circuit] decision on the constitutional question itself'' — whether a Fourth Amendment

5   violation occurred. *Brosseau v. Haugen,* 125 S. Ct. at 598.  The Court reviewed three cases

6   involving officers shooting at cars prior to the Haugen shooting to determine whether the

7   law was "clearly established."  It noted that the cases "taken together undoubtedly show

8   that this area is one in which the result depends very much on the facts of each case.  None

9   of them squarely governs the case here; they do suggest that Brosseau's actions fell in the

10  'hazy border between excessive and acceptable force.'" *Brosseau v. Haugen,* 125 S. Ct. at

11  600.

12        The only reasonably close case on its facts to this case is a Fourth Circuit case

13  decided more than two years *after* this shooting.  In *Waterman v. Batton,* 393 F.3d 471 (4th

14  Cir. 2005), a suspect was shot as he traveled at a relatively low speed through a toll plaza.

15  Before entering the plaza, he failed to stop for a traffic stop then led officers on a ten

16  minute high speed chase during which he tried to run an officer off the road.

17        Police officers at the toll plaza were advised the car was coming their way.  The

18  vehicle entered the toll plaza at a "normal speed" despite the prior pursuit. Officers at the

19  toll plaza emerged on foot from behind a concrete barrier with their weapons drawn.  They

20  approached the vehicle from the front and passenger's side, yelling for the driver to stop.

21        The scene was videotaped and showed that the car coasted for about one second at

22  11 mph; and when the vehicle ahead of it moved forward, the rear end of the suspect's

23  vehicle "dipped down" and rose back up, indicating acceleration.  At the time of the

24  acceleration, the officers' distance from the vehicle varied from 16 to 72 feet.  Although all

25  of the officers were positioned somewhat out of the vehicle's direct path, "they stood only a

26  few feet to the passenger side" of the vehicle's projected path.   When the vehicle

27

DFTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 20
USDC Cause No. C05-1154JCC
U:\CLinder\slt\wcia03107\p-031406-Partial SJ Motion.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

accelerated, the officers began to fire their weapons.  The top speed attained by the vehicle was 15 mph.  The vehicle passed all the officers, avoiding them by several feet.  The officers continued to fire their weapons at the passenger side of the vehicle from behind.  In the approximate six-second period after the vehicle lurched forward, three officers fired a total of eight rounds.  The driver was killed by the gun fire.

The Fourth Circuit granted qualified immunity for the officers noting that numerous considerations governed the perceived threat facing the officers.  Nevertheless, "the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors." *Waterman, supra,* at 478.  The Court went on to hold that given all the factors and "particularly the split-second nature of the decision", the officers "had probable cause to believe that Waterman's oncoming vehicle posed an immediate threat of serious physical harm" to at least some of the officers.  *Id.*  The Court reasoned that although the officers could not be clear as to the driver's intentions, just as Officer Clift could not have known in this case, waiting to find out *could* have resulted in serious injury or death, quoting another case – "the Constitution simply does not require police to gamble with their lives in the face of a serious threat." *Elliott v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1991).  Of course, Clift's situation was more compelling in one regard — the Morehouse vehicle clearly *was* being driven directly at him when he fired the first two shots.

The *Waterman* court recognized that despite the relatively slow speed of the vehicle, depending on whether the driver would continue to accelerate or make a steering maneuver, even a moment's hesitation by officers would have meant the loss of a chance to defend themselves.  That was precisely Officer Clift's dilemma.

The Court concluded that for the reasons stated, the officers' perception of an immediate threat – whether correct or not – "was clearly reasonable and therefore their initial use of deadly force was justified."

DFTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 21
USDC Cause No. C05-1154JCC
U:\CLinder\slt\wcia03107\p-031406-Partial SJ Motion.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

The Court then addressed the shots fired after the vehicle had passed the officers. *Waterman* and this case differ, however, because in this case another issue is present: whether the split second timing of events and the fact that human perception-reaction is not instantaneous accounts for Clift's firing the third shot instead of representing a deliberate choice to fire when the threat was passed. The Court reviewed case law from a variety of circuits and addressed whether a separate analysis should be applied to later shots or whether such analysis represented an "artificial division in the sequence" of events that should not occur. The Court concluded that a separate analysis was appropriate without any consideration of perception – reaction time which is an issue in this case. The *Waterman* Court held that the unconstitutionality of subsequently fired shots was not clearly established at the time of the shooting.

After noting that "the existing authority must be such that the unlawfulness of the [police] conduct is manifest", the Court noted that whether or not the law is clearly established must be based on controlling authority in the jurisdiction in question or on a "consensus of cases of persuasive authority such that a reasonable officer would not have believed that his actions were unlawful." *Wilson v. Layne*, 526 U.S. 603, 617, 143 L.Ed.2d 818, 119 S. Ct. 1692 (1999). No such authority exists in this case. Plaintiff cannot carry his burden of showing the law was "clearly established" when this shooting occurred and that any reasonable officer had "fair notice" that shooting under these circumstances violated Tubar's rights.

**E.** **Plaintiff Cannot Bootstrap His Claim That A Constitutional Violation Occurred Arguing That Some "Negligence" Or Allegedly Improper Police Activity Before The Shooting Resulted In A Situation Where The Force Was Required.**

Defendants anticipate that plaintiff may argue that even if the officer's decision to shoot was reasonable, decisions he made prior to the shooting got him into the situation, and for that reason his reasonable use of force becomes "unreasonable". In *Billington v.*

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   *Smith*, 292 F.3d 1177 (2001), the Ninth Circuit addressed a case where an off-duty police

2   officer decided to try to apprehend an extremely intoxicated suspect of a hit-and-run who

3   had just crashed his car, even though backup was not on-scene.   The suspect became

4   extremely combative and a physical fight ensued during which the suspect grabbed the

5   officer's gun.   During the melee, the office shot and killed the suspect.

6        The Ninth Circuit agreed with the trial court's assessment that the officer had no

7   choice but to shoot, given the undisputed facts that the suspect was trying to gain control of

8   his weapon at that moment.   But the Ninth Circuit went on to address the trial court's

9   determination that a genuine issue of material fact existed as to whether tactical errors made

10   by the detective *before the shooting* "made his reasonable use of force at that moment

11   unreasonable."   *Id.,* at 1185.   The Ninth Circuit reviewed its own prior authority and that of

12   other circuits.   *Billington v. Smith,* supra at 1188-1191.   The court noted that under some

13   circumstances an officer's provocative actions may be so unreasonable that they taint the

14   officer's subsequent use of force in the circumstances.   *See, Alexander v. San Francisco*, 29

15   F.3d 1355, (9th Cir.1994).   Such liability will only be imposed in rare and egregious

16   circumstances.

17        Officers are not required to always "avail themselves of the least intrusive means of

18   responding" at the risk of being saddled with civil rights liability.   Plaintiff cannot avoid

19   summary judgment "by simply producing an expert's report that an officer's conduct

20   leading up to a deadly confrontation was imprudent, inappropriate, or even reckless."   *Id.,*

21   at 1189.   Recognizing the admonition in *Graham v. Conner, supra,* the court acknowledged

22   that the officer's actions must be judged from "the perspective of a reasonable officer on

23   the scene, rather than with the 20/20 vision of hindsight":

24        Our precedents do not forbid *any* consideration of events leading up to a
        shooting.   But neither do they permit a plaintiff to establish a Fourth
25        Amendment violation based merely on bad tactics that result in a deadly
        confrontation that could have been avoided.

26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1   *Billington v. Smith, supra,* at 1190.

2       Even if the officer's pre-shooting decision-making could be deemed negligent and

3 could be considered a provocation that led to the use of force, this would still "not

4 transform an otherwise reasonable subsequent use of force into a Fourth Amendment

5 violation." *Id.*

6                **VI.    CONCLUSION**

7       For reasons stated herein, the Court should rule that no violation of Plaintiff's civil

8 rights occurred under the facts alleged by Plaintiff.  No Fourth Amendment "seizure"

9 occurred here.  For this reason, all civil rights claims, including municipal liability claims,

10 should be dismissed at this time.  The case could then be remanded to state court for

11 resolution of state tort liability claims.

12       If the Court disagrees and believes that seizure did occur, Officer Clift acted

13 reasonably and therefore did not violate Plaintiff's Fourth Amendment rights.  Finally,

14 qualified immunity should be applied to protect the officer from liability under the

15 unquestionably tense and rapidly-evolving circumstances of this case.

16       RESPECTFULLY submitted this 16th day of March, 2006.

17                KEATING, BUCKLIN & McCORMACK, INC., P.S.

18                s/ Mary Ann McConaughy
                 Steven L. Thorsrud, WSBA # 12841

19                Mary Ann McConaughy, WSBA # 8406
                 Attorneys for Defendants

20                Keating Bucklin & McCormack, Inc., P.S.
                 800 Fifth Avenue, #4141

21                (206) 623-8861
                 (206) 223-9423 Facsimile

22                mmcconaughy@kbmlawyers.com

23

24

25

26

27

**KEATING, BUCKLIN & McCORMACK, INC., P.S.**
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423

1

## DECLARATION OF SERVICE

2          I hereby certify that on March 16, 2006, I electronically filed Defendants' Motion

3   For Partial Summary Judgment  with the Clerk of the Court using the CM/ECF system

4   which will send notification of such filing to the following:

5          Timothy K. Ford.

6

7                                    s/ Jean Young
                                     Keating Bucklin & McCormack, Inc., P.S.
8                                    800 Fifth Avenue, #4141
                                     Seattle, WA  98104
9                                    (206) 623-8861
                                     (206) 223-9423 Facsimile
10                                   jyoung@kbmlawyers.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE:  (206) 623-8861
FAX:  (206) 223-9423