# EXHIBIT D

EXHIBIT "D"

# IACP National Law Enforcement Policy Center

# Use of Force

Concepts and Issues Paper

Originally Published: February 1989

Revised: December 1995; October 1998; April 1999; August 2001

## I. INTRODUCTION

### A. Purpose of the Document

This paper is designed to accompany the *Model Policy on Use of Force* established by the IACP National Law Enforcement Policy Center. The paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their community and their law enforcement agency.

This is the fourth revision of the *Model Policy on Use of Force* published originally in 1989. These revisions are due largely to sometimes subtle changes in law governing use of force. It is also a response to the ever-increasing number of non-deadly force alternatives that are being introduced to law enforcement agencies, thus increasing both the options and flexibility of alternatives to the use of deadly force.

In this respect, a recurring inquiry of the National Law Enforcement Policy Center has involved the availability and/or wisdom of developing a "non-deadly force" policy in addition to this use-of-force model policy. The Policy Board has considered this issue each time revisions to this policy have been undertaken and has arrived at the same conclusion. That is, police use of both deadly and non-deadly force is governed by the same legal principles on the use of force. Certainly, there are differences in the means of applying the varied types of force options and these should be addressed in policies, procedures, rules, and training associated with each method, technique, or force device (Taser, Kubotan, PR-24, pepper aerosol spray, pain compliance techniques, and the like).

Police agencies may select to develop non-deadly force policies and procedures for prudent and sound reasons relevant to their own jurisdiction and department. Development of individual policies on the use of specialized force equipment is also a prudent approach. However, the legal grounds for selection, application, and removal of any force option applied against a subject should be based on the same legal principles cited in this model policy.

### B. Background

Officers must be provided with a clear and concise departmental policy that establishes guidelines and limitations on the use of force generally and the use of deadly force in particular. Officers also require training in the appropriate and proficient use of all force options, not just firearms. But probably the most important component of regulating the use of force by police officers is first-line supervision. Policies and procedures on use of force are of little value without the oversight of line supervisors in particular and command-level personnel in general to ensure officer compliance and conformity with such directives. This latter concern also makes it very important that law enforcement administrators create formal procedures for reporting and reviewing use-of-force incidents.

Issues relating to reporting use-of-force incidents, training of officers in the handling, maintenance, and use of firearms, investigation of officer-involved shooting incidents, officer postshooting trauma, and early warning systems to identify potential personnel problems are dealt with separately in other model polices. This concepts and issues paper on use of force refers interested readers to the model policies associated with these important issues and does not reiterate the information and recommendations of these other documents.[1]

In constructing an agency policy on the use of force, the foregoing related issues are often included. However, a strong argument can be made to keep a use-of-force policy as short and simple as possible. It is essential that officers have a complete understanding and recall knowledge of their agency policy on this critical issue. But the longer and more complex the policy the less likely that this is possible. A use-of-force policy can and should be concise and incorporate only the essential principles to adequately guide officer decision making. The remainder of procedural matters can be addressed through agency training and by providing links to other agency policies that address corollary issues of concern in use of force.

Managing uses of force by officers is one of the more difficult challenges facing law enforcement agencies. The ability of police officers to enforce the law, protect the public, and guard their own safety and that of innocent bystanders is very difficult in the United States where violent crime is commonplace and firearms

A publication of the IACP National Law Enforcement Policy Center
515 N. Washington St., Alexandria, VA 22314-2357

This document is the result of work performed by the IACP National Law Enforcement Policy Center. The views and opinions expressed in this document are sanctioned by the center's advisory board and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

are widely available for both legal and illegal purposes.

The FBI's annual report of police officers killed and assaulted reflects part of the vast scope of this problem. In the year 2000, for example, official statistics indicated that 51 law enforcement officers were feloniously killed, an increase of nine from the prior year. While preliminary figures were not yet available on officers assaulted in the line of duty in the same year, typically this involves 45,000 to 50,000 officers annually.

These statistics, as serious as they are, do not reflect the vast number of unreported and more typical cases in which police officers confront uncooperative suspects who are physically resistant. Unless managed properly, such situations can, and often do, escalate into more serious confrontations. An officer's use of force in these or other circumstances, if justified, must not exceed that which is reasonably necessary to gain control and compliance of suspects.

## C. Scope of Policy

The public generally associates police use of force with the discharge of a firearm. However, officers recognize that use of force includes a much wider range of non-consensual compliance techniques and devices. These less coercive but more common uses of force may range from command presence to hand control procedures such as a firm grip, escort or pain/pressure compliance holds, or the use of other more aggressive measures involving a stun gun, Taser, pepper spray, or other non-deadly force equipment or tactics.

The variety of coercive options available to police officers in a confrontational setting is generally referred to as the "force continuum." From options on this continuum, ranging from so-called verbal judo and command presence to the use of a deadly weapon, officers are expected to employ only the level of force that is objectively reasonable to gain control and compliance of suspects. The decision to employ any force, including the use of firearms, may be considered excessive by statutory law and/or departmental policy if it exceeds a degree of force that reasonably appears necessary in a specific situation. Such use-of-force decisions are made under exceedingly varied scenarios and often on a split-second basis. Based on this fact, state and federal courts have recognized that police officers must be provided with the necessary knowledge and training to make such decisions, in addition to attaining proficiency with firearms and other non-deadly force equipment and force techniques that may be used in the line of duty.

## D. Definitions

The model policy employs the terms deadly force and non-deadly force. Deadly force is defined as "force that is reasonably likely to cause death." The most common example of deadly force is that which employs the use of a handgun or other firearm in an encounter with a violently resistant individual. The vast majority of officers killed in the line of duty during 2000, for example, were shot to death—33 with handguns, 10 with rifles, and 4 with shotguns.

Non-deadly force is "any force other than that which is considered deadly force." The model policy sets a threshold for force at "any physical effort used to control or restrain another, or to overcome the resistance of another." This would include but is not limited to an officer's use of come-along holds, pain compliance techniques, manual restraint, and handcuffs. It would not include verbal commands or so-called verbal judo.

The difference between deadly and non-deadly force is not determined simply by the nature of the force technique or instrument that is employed by an officer. Many force options may result in the death of a suspect under certain circumstances. For example, a police baton, if used properly in accordance with professionally accepted training guidelines, is not likely to cause death. But it can, and has, resulted in the death of suspects when used inappropriately by an officer who lacks training, or in situations that are chaotic or desperate where blows are accidentally or even intentionally struck to the head or other vulnerable area of the body. The same could be said for a variety of other items in the police arsenal. Therefore, a key to understanding what separates deadly force from non-deadly force has to do with the likelihood that a given level of force will result in death, whether it involves a handgun or other weapon or even an object that may be close at hand.

Force that is likely to cause death is properly judged through the eyes of a reasonably prudent and well-trained police officer under the same or similar circumstances. This "reasonable man" or, more accurately, reasonable officer standard is an objective test. That is, it is not based on the intent or motivation of the officer or other subjective factors at the time of the incident. It is based solely on the objective circumstances of the event and the conclusion that would be drawn by any "reasonable officer at the scene."[2]

The courts have made it clear that determination of the need for deadly force as well as the need for and appropriateness of any level of force is to be judged on the basis of objective facts in a given situation. The model policy states in this regard that "in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community."

In determining the proper level of force to use, the model policy states that officers are authorized to use deadly force to protect the themselves or others from what is reasonably believed to be a threat of death or serious bodily harm. Officers must use non-deadly force options where deadly force is not authorized and may use only that level of force that is objectively reasonable to bring the incident under control.

## E. Legal Considerations

1. *Scope of Remedies.* Use of force may have potential civil and criminal consequences in either state or federal courts or both. As scores of such actions have demonstrated, the scope and the wording of departmental policy can be crucial to the final outcome of such cases.

At a minimum, departmental policy should meet state and federal court requirements and limitations on the use of force. The U.S. Constitution forms the base line for civil rights in this and other circumstances. While the states cannot take away or diminish rights under the U.S. Constitution, they can, and often do, expand upon those rights. In such cases, law enforcement administrators must establish a departmental policy that meets the more stringent use-of-force guidelines of their state constitution and statutory or case law. It should be emphasized, however, that it is sometimes possible for action to be initiated against an officer, police department, police administrator(s), and in some cases, the governing jurisdiction in state or federal courts either or both.

In particular, a police officer may be found criminally liable under 18 U.S.C. 241 where it can be demonstrated that the officer

intentionally violated an individual's civil rights. Action may also be initiated under 18 U.S.C. 242 to establish criminal conspiracy where two or more officers may have been involved in the same incident.

Typically, plaintiffs pursue civil action under 42 U.S.C. 1983 and/or section 1985 as a civil rights violation of the due-process clause of the 14th Amendment, as cruel and unusual punishment in violation of the Eighth Amendment, or as a violation of Fourth Amendment restrictions on seizure of persons. A municipal or county government may also be named as a defendant under section 1983. A plaintiff need not exhaust state and local remedies before pursuing these forms of relief in federal court. Many attorneys prefer to pursue relief in federal, as opposed to state, court as federal guidelines allow for the independent award of attorney's fees that are often beyond those contingency fees that would be gleaned from plaintiffs' awards for damages.

2. *Use of Policy in Court.* Courts vary on their interpretation of the propriety of allowing departmental policy to be introduced as a standard of conduct analogous to statutory law. Generally, the fact that an officer failed to comply with agency policy is important only in determining agency-imposed discipline. However, in some cases, it may be permissible to enter at trial the issue of officer noncompliance for whatever weight and significance a jury feels appropriate. Police administrators should not be hesitant to develop comprehensive, strong, and definitive policies and procedures for fear that they may prove prejudicial to a future court assessment of an officer's conduct. In fact, failure to adopt a use-of-force policy in clear and unequivocal terms will almost certainly have more serious consequences for the officer's agency and employing jurisdiction.

3. *Federal Guidelines for Use of Force.* In drafting policy on the use of force, police administrators should be aware of the benchmark 1985 decision of the U.S. Supreme Court in *Tennessee v. Garner.* This decision held unconstitutional the Tennessee deadly-force statute that permitted police officers to use deadly force to arrest nondangerous fleeing felons.[3]

In *Garner,* a Memphis, Tennessee, police officer, acting in conformance with state law, shot and killed an unarmed youth fleeing over a fence at night in the backyard of a house he was suspected of burglarizing. The Court held the officer's action unconstitutional under 42 U.S.C. 1983 stating that ". . . such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[4]

The Court ruled that apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. Thus, even where an officer has probable cause to arrest someone, it may be unreasonable to do so through the use of deadly force. The principles of this case are essential in the formation of a sound contemporary use-of-force policy. For example, the model policy sanctions use of deadly force "to protect the officer and others from what is reasonably believed to be a threat of death or serious bodily harm," (or) "if it is necessary to prevent the escape of a fleeing violent felon whom the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others."

4. *Defining a Reasonable Use of Force.* The ominous, ever-present potential of civil or criminal litigation involving deadly-force incidents also necessitates close scrutiny of the language employed in use-of-force policy by legal authorities. Police administrators should work closely with knowledgeable attor-

neys in determining the suitability of use-of-force policy to their local conditions, needs, and perspectives. The deliberations over individual phrases or word usage may on the surface appear inconsequential or excessive. However, such terms can, and do, have significant consequences in an adversarial court setting.

For example, the model policy employs the "reasonableness" standard in describing the limitations on the use of force: "officers shall use only the force that is objectively reasonable to bring an incident under control."

A commonly used alternative wording (which is not recommended) may direct officers to use only the "minimum force" necessary to control such an incident. The literal wording of this latter directive, however, can impose an unacceptable burden upon a police officer in a deadly-force confrontation. For example, attempts to assess minimum force responses may result in a decision to use less force than would be legally permissible or effective to control the situation. These restricted actions could result in the death or serious injury of the officer or other persons.

On the other end of the spectrum, the subjectiveness of the minimum-force standard could support an officer's belief or contention that his actual excessive use of force was the minimum force required to deal effectively with the situation. More importantly, the minimum-force standard requires an analysis based on knowledge of all relevant facts. Officers in a shooting incident may not have all these facts at hand. Generally, all relevant facts come to light at a later time. Under questioning in court and with all the facts then available through investigation of the incident, the officer may be forced to admit that, in hindsight, he or she did not use the "minimum" force that was necessary as directed by the policy even though at the time the force that was used appeared necessary.

Thus, while most police officers would understand the underlying meaning of "minimum force," its literal interpretation in an adversarial court setting could prove detrimental to a fair determination of an officer's actions.

The use of other commonly employed terms and phrases, even though well intentioned, can cause unexpected and unnecessary consequences for the officer and the agency. Use of such phrases as "officers shall exhaust all means before resorting to the use of deadly force" present additional obstacles to effective defense of legitimate and justifiable uses of force. These and similar terms and phrases impose additional burdens on officers above those required by law.

The use of some preambles to policy statements can have the same effect if not properly constructed and limited. Preambles to use-of-force policies often impart such messages as "the taking of a human life is the ultimate step in the use of force and represents a measure that may only be taken if unavoidable, justifiable, and legal." While there are few who would argue with the basic intent of this statement, it establishes standards of care and mandatory precautions for officers that need not, and should not, be imposed on them by departmental policy. First, the sanctity of human life should be self-evident to all officers and should, in fact, be part of the basis upon which officers are screened, selected, and trained. The significance of using deadly force should also be readily apparent to officers. This issue can also be reemphasized in departmental training and is more appropriately documented in the agency's statement of values, statement of ethics, and/or code of conduct. These issues need not, and should not, be incorporated into the agency's use-of-force policy.

The foregoing discussion is not meant to suggest that law enforcement agency policy must be established only with poten-

tial litigation in mind. On the contrary, police administrators should seek language that helps to properly guide officer decisions consistent with departmental desires and values while also protecting the officer, the department, and the community from unnecessary litigation. But this discussion is meant to reemphasize the importance of word selection in establishing policies in general and a use-of-force policy in particular. It is strongly recommended that this and other policies undergo informed, professional legal review before they are sanctioned by the agency.

It should also be recognized that a considerable proportion of officer guidance and direction is established in the training process. Training should effectively translate the general guiding principles of agency policy and operational procedures into real-world scenarios through explication and practice. Training shares an equal, if not greater, responsibility in departmental efforts to control and manage the use of force and, as such, can have an independently dramatic impact on an agency's attempts to justify actions involving the use of force in court or other contexts.

## II. MODEL POLICY DIRECTIVES

### A. Structure of the Policy

As noted in the introduction to this policy, many police agencies prefer to develop separate deadly force and non-deadly force policies. In addition to the comments previously made on this topic, there are several other reasons why the model policy combines these into a single use of force policy.

The first reason pertains to policy organization. That is, a common problem among law enforcement agencies is that their policies and procedures are not organized in a manner that enhances policy usefulness for the officer. Policies that are interrelated may not be cross-referenced, or may appear separately under different topical areas. Differing promulgation dates may create a conflict where revisions are not continuously made to both policies. Under such conditions, policies and procedures can prove hard to digest, integrate, and implement.

Second, and more importantly, integrating both deadly and non-deadly force guidelines into one policy serves to illustrate and reinforce for the officer the concept of the use of force as a continuum. The use-of-force continuum illustrates the range of uses of force and the appropriate force necessary to match a given incident. By placing both sets of guidelines under one heading, an officer consulting the policy is encouraged to view force on a broader, more integrated conceptual basis.

As noted earlier, determining whether a use of force is deadly can be problematic. Even the use of a firearm in a hostile confrontation results in death in only 50 percent of shootings. On the other hand, presumably non-deadly force incidents have on numerous occasions resulted in death. Therefore, it is the position of the policy center that use of force is an issue that is best dealt with from this integrated perspective, recognizing that non-deadly force situations can, and often do, escalate into deadly force confrontations. Effective guidance for police officers on use of force, whether with firearms or by other means or tactics, must recognize and deal with force in all its forms and applications.

Finally, from a legal perspective, any use of force, whether inherently deadly or not, is governed by the same standard: an officer can only use that level of force that is objectively reasonable to bring a subject under control.

### B. Authorized Uses of Deadly Force

The model policy identifies two general circumstances in which the use of deadly force may be warranted. The first instance is to protect police officers or others from what is reasonably believed to be a threat of death or serious bodily harm. A prior revision of this model policy eliminated use of the term "imminent" in reference to the threat that a suspect may pose to the officer or others in order to justify the use of deadly force. The term "imminent threat" is commonly used by law enforcement agencies in this context to underscore the need to withhold using deadly force until certain of the threat. However, this may impose an added burden upon officers by requiring them to ascertain how this applies and what "imminent" means in specific situations. It may also impose a burden of proof upon officers in court settings that is unnecessary.

Second, police officers may use deadly force to prevent the escape of a fleeing violent felon who the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others. In this case, the more demanding test of probable cause must be employed before deadly force can be used. In such cases, a threat of further violence and/or death must impose clear justification to use deadly force; use for this reason the model policy of the term "violent felon."

For example, use of deadly force would be justified in instances where an officer attempts to stop the escape of a fleeing violent felon whom the officer has identified as one who had just committed a homicide, and who is armed or is likely to be armed in light of the crime. However, the potential escape of nonviolent felons may not pose the same degree of risk to the public or the officer, and use of deadly force to prevent his or her escape would not be justifiable under the model policy.

Because there can be a greater risk of error in these circumstances, some agencies prefer to disallow or seriously limit the use of deadly force in the case of fleeing felons. Those who prefer this approach point to the problem associated with positive identification of suspects and that, even in the case of repeat violent offenders, one often cannot predict an offender's future behavior. Given these and related problems, this approach assumes that if an error is to be made, it is best that it be made on the side of restraining the use of deadly force where fleeing felons are concerned.

If a decision has been made to employ deadly force, a police officer should, whenever possible, identify himself or herself and demand that the subject stop. This requirement was made clear in the *Garner* decision. Typically, the phrase "stop—police" can be used, although similar commands that make an officer's intent clear can be employed.

### C. Shooting to Stop Aggressive Behavior

Where the use of deadly force is justified, training should teach an officer to fire his or her weapon to stop a subject from completing a potentially deadly act. The phrase "shoot to kill" is not only inaccurate in practice but generally proves insensitive and prejudicial to the layman and inflammatory and misleading in a court action where the policy of the agency is called into question.

The popular cinematic and television characterization of the police does not reflect the abilities of most officers under actual combat shooting conditions. Research in major metropolitan police departments, in fact, reveals miss rates of between 42 and

82 percent of rounds fired during actual deadly force confrontations.

Statistics also reveal that about 90 percent of shooting incidents last three seconds or less. Within this period, a police officer takes appropriate steps to stop the threat and rarely, if ever, has the chance to engage in decision making about the degree of injury that will be inflicted. The realistic motivation is primarily reactive and designed to stop the threat or the aggressive behavior and protect one's life.

Attempts to shoot to wound, injure, or otherwise incapacitate a suspect are unrealistic and, because of high miss rates and poor stopping effectiveness, can prove dangerous for police officers and others. Under special conditions, however, it may be necessary to permit or even direct that shots be fired to kill. Sniper teams used to extricate a hostage from an armed suspect and other related scenarios employing special weapons and tactics may be among those circumstances that constitute such an exception. Therefore, with these factors in mind, for maximum stopping effectiveness and minimal danger to innocent bystanders, the officer should shoot to stop at center body mass.

When using deadly force, the officer must always consider the potential risk to innocent bystanders. It is unacceptable to knowingly risk injury or death to bystanders in order to apprehend a suspect. On the other hand, in this as in other cases of use of deadly force, police officers must be able to balance the ultimate good of action versus inaction. For example, rare instances may develop in which failure to react to a serious threat would likely result in the loss of life. Under such circumstances, it may be justifiable to accept reasonable risks to others rather than accept the probable loss of life if no actions are taken.

Officers should not be expected to, nor should they, act in a manner that will likely result in their or another's death or serious injury solely because of concern over the potential risk to bystanders. Reasonable prudence to protect innocent bystanders should underlie all use-of-force confrontations.

## D. Warning Shots

Earlier versions of the *Model Policy on Use of Force* advocated the prohibition of warning shots. This and the previous revision of the original model policy, while discouraging the use of warning shots, take the position that there are circumstances in which warning shots may be justified and a blanket prohibition is not justifiable. With this recognition, it is more prudent to provide allowances for such contingencies in a use-of-force policy along with appropriate safeguards.

However, before proceeding, it should be emphasized that warning shots are a highly risky undertaking and they should be used only under the most extreme circumstances. Nothing in the position of the model policy is meant to imply that warning shots should be considered as a generally acceptable and reasonable option for use-of-force encounters. On the contrary, warning shots, while permitted under the model policy, should be regarded as extreme measures that may only be taken under highly unusual circumstances and generally when all other reasonable alternatives have been exhausted or would be perceived as unacceptable.

While a large majority of police departments prohibit warning shots, some permit their use under restricted conditions. In many cases, these are agencies that operate in rural environments where the potential harm to innocent bystanders from warning shots is minimal. A shot fired in the air may also serve as a call for assistance by an officer where a life-threatening situation

exists or when attempts are being made to prevent the escape of a dangerous felon. In addition, in extraordinary situations, warning shots have been used to successfully defuse escalating and potentially life-threatening assault situations. One example is the use of a warning shot to impress upon a hostile crowd an officer's intent to employ deadly force to protect himself or herself or others.

Police departments that permit warning shots must provide sufficient training to officers to ensure their appropriate use. Police officers must be cautioned that the use of warning shots, if later deemed inappropriate, may make the officer subject to disciplinary action and/or civil litigation.

These cautions are even more important in urban and suburban environments where there is added danger of errant shots striking innocent bystanders. In addition, warning shots can and have been mistaken for a shooting exchange that precipitates the use of gunfire by other officers or the suspect(s). Once the first shot is fired in a hostile confrontation, it is often difficult to control other shooting reactions.

On the basis of these and related considerations, the model policy takes the position that "warning shots may be fired if an officer is authorized to use deadly force and only if the officer reasonably believes a warning shot can be fired safely in light of all circumstances of the encounter."

## E. Shots at or from Moving Vehicles

Another modification addressed in revisions of the *Model Policy on Use of Force* involves shots fired at or from moving vehicles. The model policy takes the position that this issue, like that of warning shots, must be governed by the overall use-of-force policy. However, it must be made clear that there are substantial additional risks in the discharge of firearms under these conditions. The likelihood of misses and subsequent risks of errant shots harming innocent parties is increased under these conditions. It is also improbable that an officer could stop a vehicle or its operator in this manner without causing death or serious injury. Therefore, these are among the factors that counsel against such actions other than in the most extreme circumstances.

The model policy takes the position that "decisions to discharge a firearm at or from a moving vehicle shall be governed by this use-of-force policy and are prohibited if they present an unreasonable risk to the officer or others."

Again, training is essential in implementing this policy. Officers must recognize that such actions are only permitted under extreme circumstances and, because they generally involve a higher potential risk, they carry a higher burden of justification for use. It must be understood that the use of firearms under such conditions often presents an unacceptable risk to innocent bystanders. Handguns are generally ineffective in attempts to disable a motor vehicle, if in fact this is the intent of their use. And even if successfully disabled, the vehicle will most likely continue under its own power or momentum for some distance thus creating another hazard. Moreover, should the driver be wounded or killed by shots fired, the vehicle will almost certainly proceed out of control and could become a serious threat to officers and others in the area.

Most conventional police firearms, in fact, will normally fail to penetrate automobile bodies, or steel-belted automobile tires that are in motion, and frequently do not penetrate auto safety glass. Again, as in the case of the use of warning shots, firing at a motor vehicle is an extreme measure that may only be taken under highly unusual circumstances and generally when all other rea-

sonable alternatives have been exhausted or would be perceived as unacceptable

There are circumstances in which trained tactical officers with appropriate weaponry may take such actions if deemed appropriate by command personnel. Even under these circumstances, such actions should be taken only if the action does not permit an unreasonable risk to officers or others, when reasonable alternatives have been exhausted, when failure take such action would probably result in death or serious bodily harm, and then only when due consideration has been given to the safety of innocent bystanders. In many cases involving the discharge of firearms at a moving vehicle, it is based on the contention that the driver was intentionally attempting to run the officer down. One of the simplest alternatives to the use of a firearm in this instance is to move out of the vehicle's path and/or seek cover.

## F. Non-deadly Force

Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring a subject under control. This is the same objective standard used in determining whether deadly force is warranted.

As noted in the prior discussion of the "force continuum," use of force can range widely from verbal coercion to the use of deadly weapons. Therefore, police officers must have at their disposal a variety of equipment and techniques that will allow them to respond appropriately to resistant or dangerous individuals. These include, but are not limited to, skills in verbal persuasion, unarmed self-defense tactics, use of come-along holds, use of restraint and physical compliance measures, and use of departmentally approved non-deadly weapons such as pepper spray, the stun gun, PR-24, baton and related devices. Without these and other alternatives at their disposal, there is a greater likelihood that officers may employ tactics that are inappropriate or excessive or that serve to aggravate or escalate a confrontation.

Police agencies must provide specialized training with equipment and force techniques authorized by their agency if they are to minimize the risk of complaints of excessive force. In this context, departmental training in this area should include a segment on handgun retention tactics and techniques. Statistics on police officers killed feloniously over more than a decade reveal that about 15 percent of police homicides were perpetrated by assailants using the officer's own handgun. This fact underscores the importance of developing skills necessary to thwart such attacks.[5] It also suggests that departments should be cognizant of holster selection and allow use only of those that balance ready access to the handgun with security of the firearm. Trick holsters and loose-fitting holsters should not be authorized. A proper holster should hold the firearm snug to the hip and have a reasonably tight safety strap. Design of the holster should allow the officer to grip the handgun so that it will be ready to be fired when removed.

The National Law Enforcement Policy Center does not advocate the use of any specific non-deadly force weapons. The appropriateness of any such weapon depends largely on the needs and desires of each police department in the context of the community in which it operates and in accordance with the service demands and typical force scenarios faced by its police personnel. In addition, non-deadly weapons and techniques are being continuously introduced, refined, and updated. As such, police administrators must routinely assess current equipment and make judgments on selection and use that are appropriate to their department. A critical element of that decision-making process is an assessment of the limitations of each device or technique, and the potential for its abuse or failure. A synopsis of these factors was developed in regard to several of the more popular non-deadly force weapons by Americans for Effective Law Enforcement, Inc.[6]

The National Law Enforcement Policy Center recommends however, that police departments ban the use of several types of weapons. These include slapjacks, blackjacks, brass knuckles, nunchucks, fighting stars, and other martial arts weapons. In addition, police agencies should consider serious limitations on the use of the police flashlight as an impact weapon.

## G. Reporting Use of Force

Accurate and timely reporting of use-of-force incidents is an essential part of the process of monitoring and controlling such responses. The immediacy and mechanism for such reporting should depend on the nature of force used and the degree of injury involved. The National Law Enforcement Policy Center has developed a model policy on use of force reporting which is available upon request. The IACP is also engaged in a nationwide project designed specifically to develop information and statistics on the use of force. Report forms suitable for agency use are available upon request through the IACP Use of Force Reporting Project, to include computer software for those agencies that wish to incorporate data collection and incident monitoring through this automated approach.

## H. Departmental Response to Uses of Force

Use of deadly force has serious departmental and community implications. The integrity of a police department and its relationship to the community are often measured by the professionalism and impartiality that it brings to investigations of police uses of force in general and deadly force in particular.

Involvement of law enforcement officers in deadly force encounters can also have debilitating emotional effects upon not only the officers directly involved but those who may have indirect contact with the incident, such as emergency communications personnel. In this regard, law enforcement agencies must be prepared not only to conduct a professional investigation of the force incident but also be prepared to deal effectively with any emotional trauma affecting involved officers and other agency personnel.

The above two concerns are addressed in the *IACP Model Policies on Officer-Involved Shooting Investigations* and *Post-Shooting Incident Procedures*. It is recommended that agencies involved in the development or refinement of use-of-force policies obtain a copy of these two policies for reference and guidance.

## I. Training

The issue of firearms training has been purposely excluded from the *Model Policy on Use of Force* as it is addressed in depth in the *Model Policy on Firearms* published by the policy center. However, the importance of training in the appropriate use of both deadly and non-deadly force necessitates that several key points be made in this regard.

First, civil rights litigation has made it abundantly clear that law enforcement agencies have a responsibility to ensure that police officers are adequately trained in the use of all weapons that they are permitted to carry on and off duty. This includes not only firearms but all non-deadly force equipment such as pepper spray. Police administrators, departments, and parent jurisdic-

tions may be held liable for the actions of their officers should they be unable to verify that appropriate and adequate training has been received and that officers have successfully passed any testing or certification requirements. Police departments must provide responsive training, and all records of training received by officers must be maintained accurately for possible verification later.

Backup handguns and other firearms should be subject to the same procedures for departmental registration, routine inspection, training and qualification as the on-duty handgun.

Finally, firearms training with respect to the use of deadly force cannot be limited to routine firearm qualifications and proficiency testing. It is recommended that all officers authorized to carry firearms be required to qualify with each authorized firearm on at least a semiannual basis and preferably three times per 12 month period. But, in addition to proficiency testing, it is strongly recommended that police agencies provide (1) routine instruction and periodic testing on the agency use-of-force policy and (2) instruction and practical exercises in making decisions regarding the use of deadly force.

In the latter instance, it is important that an element of firearms training include realistic use-of-force simulation exercises. This includes night and/or reduced light shooting, shooting at moving targets, strong-hand/weak-hand firing, and combat simulation shooting. Firearms training should attempt to simulate the actual environment and circumstances of foreseeable encounters in the community setting, whether urban, suburban, or rural. A variety of computer-simulation training is available together with established and recognized tactical, exertion, and stress courses. In essence, acceptable firearms training and evaluation are no longer limited to target practice. Scrutiny of firearms training will normally include an evaluation of the relevance and utility of such instruction.

Endnotes

[1] Copies of these documents may be obtained by contacting the National Law Enforcement Policy Center, International Association of Chiefs of Police, Alexandria, Virginia.
[2] *Graham v. Connor*, 490 U.S. 386 (1989).
[3] *Tennessee v. Garner*, 471 U.S. 1 (1985).
[4] *Graham v. Connor*, 490 U.S. 386 (1989).
[5] "Handgun Retention," *Training Key #373*, International Association of Chiefs of Police, Alexandria, Virginia (1988).
[6] "Use of Force Tactics and Non-Lethal Weaponry," *Alert, No. 3*, Americans for Effective Law Enforcement, Inc., Chicago (1988).

This project was supported by Grant No. 2000-DD-VX-0020 awarded by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice. The Assistant Attorney General, Office of Justice Programs, coordinates the activities of the following program offices and bureaus: the Bureau of Justice Assistance, the Bureau of Justice Statistics, National Institute of Justice, Office of Juvenile Justice and Delinquency Prevention, and the Office of Victims of Crime. Points of view or opinions in this document are those of the author and do not represent the official position or policies of the United States Department of Justice or the IACP.

Every effort has been made by the IACP National Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.

# EXHIBIT E

**EXHIBIT "E"**



EXHIBIT F

**EXHIBIT "F"**

**VEHICLE SEARCH**

Case # KENT 03-07659
AUBURN 03-6543

Date: 6-27-03

Time: 0910 - 1130

Vehicle Description: WA 168LNB
GRN 2001 KIA RIO

LEGEND

1 = Front driver's seat (seat portion)
1a= Front Driver's side floorboard
1b= Front Driver's seat (upright portion)
2= Front Passenger's Seat (seat portion)
2a=Front Passenger's floorboard
2b= Front Passenger's seat (upright portion)
3= Rear Driver's side seat (seat portion)
3a=Rear Driver's side floorboard
3b=Rear Driver's side seat (upright portion)
4= Rear Passenger's side seat (seat portion)
4a=Rear Passenger's side floorboard
4b=Rear Passenger's side seat (upright portion)
5=Front Dashboard Area
6=Rear deck area (behind seats)
7= Trunk (inside)
8=
9=
10=

## NOTES



RC1- rear floorboard Bag & papers
RC-2 - Army shirt
RC-3 - Backpack CD's
RC-4 Gloebox contents
RC-5 Blk velvet box
RC-6 photos taken of search on CD discs
RC-7- misc clothing
RC-8 CD's
RC-9 - CD's, shoes
RC-10 Tan Purse
RC-11 Hatchet
RC-12 Blue dress/Box
RC-13 3 pr pants
RC-14 Blk bag/Purse
RC-15 Notebook
RC-16 Day Planner
RC-17 License Plate (front)
RC-18 - various make-up
RC-19 - glovebox - glass mari) pipe
RC-20 glass pipe
RC-21 WA reg of oth.
RC-22 - bullet
RC-23 Tan Leather case

} trunk full of clothes -
many with price tags on them.
not taken.

PDR - 291

# EXHIBIT G

# EXHIBIT "G"





# EXHIBIT H

EXHIBIT "H"

## IACP National Law Enforcement Policy Center

# Investigation of Officer-Involved Shootings

**Concepts and Issues Paper**

**August, 1999**

## I. INTRODUCTION

### A. Purpose of Document

This paper was designed to accompany the *Model Policy on Investigation of Officer-Involved Shootings* established by the IACP National Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their community and their law enforcement agency.

### B. Background

Statistically, few officers become involved in hostile shooting situations. But all officers should have an understanding of steps that must be taken in such an event. The initial response of involved officers and the steps taken thereafter by first responders, supervisory and investigative personnel often determine whether an accurate and complete investigation can be conducted. The accuracy and professionalism of such investigations can have significant impact on involved officers.

Other than in training exercises or similar agency-authorized actions, discharges of firearms by police officers, whether on or off duty, should be the subject of departmental investigation. The extent of the investigation should depend largely upon the real or potential impact of the shooting. Shootings that take place under hostile circumstances and, in particular, those in which injuries or fatalities have occurred, are situations that require more intensive investigation and involve a broader range of potential information requirements. The present discussion is focused primarily on this latter type of hostile-shooting investigation. However, the discussion is also suitable as guidance for other shooting investigations.

The seriousness of officer-involved shootings cannot be overstated. The reputation and often the career of involved officers often depends upon whether a full and accurate determination can be made of the circumstances that precipitated the event and the manner in which it unfolded. The critical nature of these investigations is also underscored by the frequency with which these incidents result in civil litigation.

From a broader perspective, a law enforcement agency's reputation within the community and the credibility of its personnel are also largely dependent upon the degree of professionalism and impartiality that the agency can bring to such investigations. Superficial or cursory investigations of officer-involved shootings in general and particularly in instances where citizens are wounded or killed can have a devastating impact on the professional integrity and credibility of an entire law enforcement agency. An accurate and complete investigation of these deadly force incidents requires agency planning and the establishment of protocols that must be followed in such instances. It also depends largely upon the prudence of decisions made and steps taken immediately following shootings by the officers involved, supervisory personnel and criminal investigators. Failure to take appropriate measures can lead to the loss of indispensable evidence, inaccurate investigative findings, inappropriate assignment of responsibility or culpability for wrongdoing, and even the filing of criminal charges against involved officers.

Many agencies, because of their limited resources and expertise in these matters, may rely in all or in part on the investigative resources and expertise of a state police agency, sheriff's department or other law enforcement authority with appropriate jurisdiction. But these investigations cannot be turned over completely to others. For example, most of the burden for evidence preservation and protection of the crime and/or incident scene is the responsibility of involved officers and first responders. Therefore, it is essential that all officers have an understanding of the significance and importance of the proper initial officer responses and appropriate investigative measures required to conduct a professional officer-involved shooting investigation.

## II. PROCEDURES

### A. Involved Officer Responsibilities

As indicated in the model policy, for officers involved in a hostile-shooting situation there are four general areas of concern that should be addressed after the initial confrontation has been quelled: (1) the welfare of officers and others at the scene (2) apprehension of suspects (3) preservation of evidence and (4) the identification of witnesses.

The safety and well-being of the officer(s) and any innocent

A publication of the IACP National Law Enforcement Policy Center
515 N. Washington St., Alexandria, VA 22314-2357

This document is the result of work performed by the IACP National Law Enforcement Policy Center. The views and opinions expressed in this document are sanctioned by the center's advisory board and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

bystanders is the first priority. Initially, the officer should ensure that the threat from the suspect has been terminated. This includes but is not limited to handcuffing or otherwise securing the suspect. Should firearms or other weapons be available to or in the vicinity of the suspect, they should be confiscated and secured. All suspects should be handcuffed unless emergency life saving activities being employed at the time would be hindered by these actions. If not handcuffed or otherwise secured during the application of emergency first aid, an unencumbered armed officer must be present at all times to oversee security of the suspect and safety of emergency service providers. One should never assume that because a suspect has been shot or otherwise incapacitated that he is unable to take aggressive action.

The agency's communication center should also be provided with information on any suspects or suspicious persons who may have left the area, to include their physical description, mode and direction of travel and whether the suspects are armed. A decision to pursue suspects will generally be based on a wide array of factors. However, the most important of these generally involves the ability of officer(s) at the scene to conduct a pursuit, the potential for apprehension of suspects and the need to provide assistance to injured parties at the scene.

Given the diminished physical and mental condition of many officers following a shooting incident, it is better for these officers to stay at the scene. In so doing, they may be able to assist the injured, protect evidence, identify witnesses, provide dispatch with suspect information and assist in establishing a containment area to aid in the apprehension of escaping suspects. Obviously, if the officer is injured, he/she should request emergency medical assistance as soon as possible. But, in the interim, the officer should administer emergency first aid to himself/herself to the degree possible.[1] Where reasonably possible, officers should then administer first aid to other injured parties pending the arrival of emergency medical service providers.

Assuming that one or more of the involved officers is physically capable of taking action following the incident, there are several other concerns that should be addressed immediately. For example, officers should request the presence of a supervisory officer as well as required back-up. Depending upon the circumstances, back-up assistance may involve a number of the agency's specialized units in addition to patrol units for traffic control, protection of evidence and related matters. These may include command-level officers, a hostage negotiator, SWAT, K-9, crime scene technicians and a public information officer among other possibilities.

Immediately following hostile-shooting incidents, many officers are emotionally and physically disoriented. The ability of an officer to recognize and understand these problems is important in the officer's efforts to regain a degree of control over the situation and take appropriate measures. But this is often a difficult undertaking. Officers who have been involved in shootings often experience a number of immediate and involuntary physical and emotional reactions that may interfere with their ability to react effectively.

Emotional and physical reactions vary according to many factors involved in the shooting incident. These include the officer's perceived vulnerability during the incident, the amount of control he/she had over the situation and his/her ability to react effectively. It also includes such factors as how close the officer was to the victim, how bloody the incident may have been and the nature or character of the suspect. In this latter issue for example, an incident involving a hardened and notorious killer

can have different effect on an officer than one which involved a scared teenager. Similarly, shooting a person who used the officer to commit suicide may evoke an angry response while other situations may produce far different feelings.

A variety of traumatic reactions caused by a shooting incident may interfere with an officer's ability to cope and react effectively and appropriately. For example, it is quite common for an officer involved in a hostile-shooting incident to experience perceptual distortions of various types. Some may experience time distortion in which events appear to occur in slow motion. For others, time may seem to accelerate. Auditory distortions are also common among officers involved in shootings. For most, sound diminishes and gunshots, shouts, or other sounds may be muffled or unheard. An officer may not hear all the shots being fired and may not be able to relate this type of information accurately if questioned at a later date. Involved officers should be aware of the possibility that their recall is impaired in one or more of these ways and investigative officers should keep these and related factors in mind when conducting shooting investigations.

For example, it is not advisable to conduct in-depth investigative interviews with officers immediately following their involvement in a shooting if they are experiencing such reactions. By the same token, in many situations, officers cannot provide basic or detailed information concerning the shooting. Officers should not be self critical because of this nor should investigators assume that this is necessarily an indication that the officers are purposefully withholding information. It is reasonable to entertain the possibility that these lapses are the result of trauma associated with the incident. Interviews conducted at a later time after the officer has had the opportunity to regain his/her composure may be more productive.

A complete discussion of the symptoms and effects of post-traumatic stress is beyond the scope and purpose of this paper. However, for purpose of the present discussion, it may be sufficient to recognize that such emotional and psychological phenomena are relatively common. As such, officers should be aware of these possibilities and recognize first, that they are natural responses to traumatic and unusual events and second, that the officers are not "going crazy" or responding in bizarre and irrational ways. In fact, they are exhibiting natural adaptive reactions to highly unusual life threatening situations.

Given the above context, it is often unrealistic for involved officers to perform many of the first aid and post-shooting actions that have been identified thus far and many of those that will be discussed. But officers must attempt to muster as much self-composure as possible in order to protect themselves and be cognizant of events around them. Understanding that they are experiencing one or more of these emotional or psychological reactions may assist officers in their attempts to regain their composure immediately following a shooting incident.

For example, officers need to be aware of their surroundings following a shooting and take note of important facts such as the time of day, lighting conditions, persons present, those who may have departed the scene, witnesses or potential witnesses, possible suspects or accomplices, and suspect vehicles, to name only a few. In some cases, emergency medical personnel and/or fire fighters may be on hand prior to the arrival of back-up police personnel. Officers at the scene should make note of this with the understanding that these personnel may unknowingly move, misplace or even inadvertently destroy evidence in the course of performing their duties. For example, it is not uncommon for such persons to remove (even ultimately discard) items of cloth-

ing from the suspect or others who have been wounded. Such items of clothing are often invaluable in attempts to establish the position, location and distance of involved individuals in a shooting exchange.

Other items of potential evidentiary value should be of particular concern. One of the principal evidentiary items among these is firearms. In this regard, officers should ensure that their firearm is secured safely and that it is not handled in any manner until it can be examined by investigators or other designated police personnel. The firearm should not be removed if it is holstered. Nor should it be opened, reloaded, or tampered with in any other manner. In some instances the officer's or suspect's firearm may have been dropped at the scene. In such cases it should be left in place if this can be done safely. If safety precludes this, officers may mark the location and position of the firearm and secure it in their holster or in another acceptable manner. However, the preferred procedure is that weapons, expended cartridge casings, brass, speed loaders, magazines and related items be left in place undisturbed.

Before back-up officers and supervisory personnel arrive, involved officers should begin to secure the area to the degree that time, resources, and individual capabilities permit. Often this is no more than securing parts of the scene that may be destroyed or damaged during the first few moments of the incident, such as evidence blowing away or being washed away by rain. If possible, the perimeter should be secured with crime scene tape or by other appropriate means, and all non-essential personnel should be precluded from entering the area. Any items of potential evidentiary value therein should be protected and back-up officers should be used wherever possible in this capacity. In some cases, emergency fire or medical personnel will need to move persons or items in order to provide medical assistance. Where this is the case, officers should note their original position and condition and provide this information to investigative officers.

Where possible, officers should also identify potential witnesses to the shooting. These individuals should be separated so that their personal perceptions can be obtained without the potential influence of opinions and observations gleaned from others. The name, address and phone number of witnesses and other persons in the general vicinity of the shooting should be recorded. In some cases these persons will claim that they did not see anything in order not to become involved. Nevertheless, officers should attempt to collect identifying information from them so that it will be possible to contact them at a later date. Any witnesses or potential witnesses who have been identified should be asked to remain on hand until a statement has been taken from them.

Beyond performing these basic responses where possible, officers involved in a hostile-shooting incident where injury or death has occurred should prepare themselves for an extended period of sitting, waiting and interviewing with agency investigators. Officers should not be insulted by tough questions asked by investigators following such incidents. Only by asking the tough questions can all of the facts and circumstances surrounding the shooting event be compiled.

## B. Supervisory Responsibilities at the Scene

The first supervisor to arrive at the scene of an officer-involved shooting should be designated as the officer-in-charge (OIC) until such time as he/she is relieved from this responsibility by an investigator or other appropriate senior officer. The

supervisor's first responsibility is to ensure that the safety and security of officers has been adequately addressed. The potential threat from assailants should be eliminated first and any suspects at the scene should be detained or arrested. Following this, emergency medical providers should be summoned if necessary and emergency first aid provided if needed in the interim.

The supervisor should ensure that the crime scene has been protected and, to the degree possible, that it is kept intact and undisturbed until criminal investigators arrive. Supervisory officers should then deal with those issues discussed in the foregoing section of this paper if officers at the scene were not able to do so. That is, supervisors may need to broadcast lookouts for suspects, request backup and related support services, secure the scene and protect any items of evidentiary value, identify persons who may have been at or within close proximity to the scene of the incident, as well as identify witnesses and request their cooperation. It is preferable to transport eyewitnesses to the station where they can be interviewed by investigators. Normally, detailed interviews with witnesses should not be conducted by supervisory personnel at the scene. If witnesses are unwilling or unable to go to the station to make a statement, the general scope of their knowledge of the incident should be established and recorded together with a record of their identification for future contact by investigators.

Supervisory personnel should be aware of the possibility that officers involved in the shooting may be suffering from post-traumatic shock as previously noted. If this is the case, they should be handled in a manner consistent with agency policy and professional practice.[2] For example, the officer(s) should be moved away from the immediate shooting scene and placed in the company of a fellow officer, preferably a peer counselor where these officers are available through the police agency.

If an officer has been shot, the OIC should ensure that another officer accompanies the injured officer to the hospital and remains with the officer until relieved. The accompanying officer should be responsible for ensuring that the clothing and other personal effects of the injured officer are not discarded but are preserved and turned over to the police department as evidence. The supervisor should ensure that the officer's family or next-of-kin is notified on a priority basis and in-person wherever possible. An in-person notification should always be made when a death has occurred. An officer should be assigned to transport immediate family members to the location where they are needed. Particular care should be taken to keep the name of the involved officer(s) from the media or other sources until the immediate family members of the officer have been notified.[3] An officer should be assigned to the family of a wounded officer in order to provide them with security, emotional support, assistance in dealing with the press and related matters.

In addition to the notification of backup and specialized assistance previously mentioned, supervisory personnel should contact other necessary personnel in their agency at this stage depending upon the seriousness of the incident and the requirements of their agency policy. Such notifications may include the agency's internal investigative authority, homicide investigators, chief of police or sheriff, public information officer, patrol commander, legal advisor, coroner or chaplain.

Depending on the seriousness of the incident, it may also be necessary and prudent to establish a command post in order to better coordinate the many persons involved in the investigation. In this regard, it is also a good idea to appoint one officer as a "recorder" for the incident. The duties of a recorder are to docu-

ment the event and establish a chronological record of the activities at the scene. This record should include but need not be limited to: the identities of all persons present and those who entered the incident/crime scene including emergency medical and fire personnel, actions taken by police personnel, evidence processed and any other matters of significance.

It may also be necessary at this point to establish a media staging area. Police officer-involved shooting incidents invariably draw sizeable contingents of media representatives. If the agency has a public information officer (PIO), this individual may be used to control media representatives and provide them with information as available and appropriate. Should a PIO not be employed or readily available, the OIC will need to appoint an officer at the scene to control these individuals and to provide them with the basic details of the incident as they become available and as they are appropriate for release. Caution should be exercised in the release of any information at the scene prior to a full investigation of the incident.[4]

The supervisor should also begin collecting certain types of evidence. In some agencies, this is the responsibility of investigative officers and/or evidence technicians and, in such cases, it may be necessary to defer collection for their arrival. Irrespective of the organizational responsibilities involved, the supervisor should ensure that an appropriate crime scene perimeter has been established in order to protect evidence until collected. The pressures of time and unusual conditions at the scene of the incident may require alternative approaches to evidence collection. Bad weather, a physical location of the incident that threatens destruction or theft of evidence, the ability of officers to secure and contain the incident scene, lack of ready access to specialized personnel and related factors may necessitate immediate action to avoid the loss of evidence. Therefore, supervisory officers should be prepared to identify and gather essential components of evidence if required rather than risk their destruction or loss pending arrival of investigators. The same rationale holds true with the collection of information from bystanders, witnesses and suspects.

Therefore, as time permits, and within the parameters of the police agency's policy and procedures, supervisory personnel should begin to document the scene or ensure that this activity is undertaken by authorized agency personnel. The overall scene should be diagrammed manually, indicating the location and relative distances between key points and items of evidence. Then, photographs and, where possible, a videotape recording should be made of the overall scene and all key pieces of evidence. Videotaping is recommended wherever possible as it provides an added perspective and dimension that still photography can't always provide. The officers' and suspects' firearms and other weapons as well as expended cartridge casings should be located, safeguarded and photographed in place. They should normally be left in place for collection by evidence technicians unless circumstances or conditions at the scene threaten to contaminate or destroy them.

At the same time, it is prudent to inspect the primary and back-up firearms of any ancillary officers who may have been at the scene during the incident to determine if their firearms have been fired recently. In so doing, one may be able to respond more accurately to potential allegations or concerns about additional shots fired by police personnel. One should also establish and mark the original position and any subsequent locations from which the officers and suspects fired.

If possible, it is also a good practice to videotape and/or pho-

tograph, in a general manner, any bystanders or onlookers who may be at the scene. Some of these individuals may be witnesses to the incident but may disperse before their identity can be determined. Some may fail to come forward as witnesses, fail to provide information if questioned or provide false identification. A visual image may assist investigators at a later time in identifying and locating these individuals, if necessary.

If the officer involved in the shooting is still at the scene of the incident and it is reasonably possible to do so, it is highly advisable to take color photographs of the officer's condition and any wounds or injuries that he/she has sustained. These photographs can provide graphic documentation regarding the extent of injuries and the actual physical condition of the officer at the scene and can provide compelling testimony to the nature and impact of the incident. Should this not be possible at the scene, such photographs should be taken with the permission of hospital emergency service providers.

## C. Investigator's Responsibilities

Law enforcement agencies vary with regard to the unit assigned responsibility for the investigation of an officer-involved shooting. In some cases, this responsibility is assigned to internal affairs, officers assigned to person-to-person crime investigations in the detective division or homicide investigators. Depending on the seriousness of the shooting, the circumstances involved and the protocols of the specific agency, it may be appropriate to conduct parallel investigations of such shootings by both homicide investigators or criminal investigators and internal affairs officers. Frequently, agencies conduct concurrent criminal and administrative investigations of tactical shootings (e.g., where an officer and/or suspect is wounded or killed), the former to establish conformity with departmental policies and training and the latter to establish whether criminal conduct was involved.

Larger agencies utilize specially trained "shooting teams" to respond to such events. And, as previously mentioned, many agencies turn these investigations over to larger state or county police or sheriff's departments. The prudence of these arrangements is largely based on the experience and capabilities of the officers who staff these positions. However, as a general rule, trained and experienced homicide investigators are the best persons to conduct investigations of officer-involved shootings. Their experience generally allows them to more readily identify, organize and evaluate relevant details of a shooting situation and to establish the facts of the event such as is the case in homicide investigations.

Investigative officers assigned the lead role in an officer-involved shooting should assume control of the shooting scene and the investigation upon their arrival. Supervisory officers and other police personnel at the scene should, from that point on, answer to the investigative OIC. The investigator should determine the degree to which the foregoing tasks discussed in this document have been completed and, where deficiencies exist, ensure that these tasks are fully completed. In particular, the lead investigator should ensure that the overall scene has been properly secured, that all evidentiary items are diagramed, photographed, videotaped, properly recorded, collected and stored, and that all persons present at the scene are also videotaped and/or photographed.

The next order of business is to receive a general briefing and walk-through of the scene by the initial supervisory officer or the most knowledgeable officer at the scene. A decision to include

officers involved in the shooting will depend upon the knowledge of the supervisor of all details of the shooting, and the physical and emotional state of the officer(s). Investigators should ensure that all essential details of the shooting have been or are being recorded. These include the nature of the call to which the officer was responding; the time it was received and dispatched; circumstances in which suspects were encountered; the time of day of the incident, weather and lighting conditions; the names and ranks of all officers involved together with their serial numbers and assignments; the identities of all persons who have had access to the shooting scene including emergency medical service personnel and firefighters; the time of dispatch and arrival of any back-up officers; whether the officers were in uniform or, if in plainclothes, whether they were identifiable as police officers at the time of the shooting; the types of vehicles involved by officers and suspects, if appropriate; and the identities and background of all suspects and others involved in the shooting.

Throughout the investigation, the OIC should play "devil's advocate" in weighing the value of the variety of information gathered in the investigation. This includes, in particular, the statements of suspects. For example, typical suspect claims include the following:

- "I shot the officer to defend myself."
- "I grabbed the officer's gun because he beat me."
- "It was an accident."
- "I didn't know he was a cop."
- "I don't remember anything."

These common claims and excuses are starting points for critical assessment of physical evidence and the statements of others.

The same holds true with witnesses and alleged witnesses to officer-involved shooting incidents. The problems associated with the reliability of eyewitnesses and the accuracy and validity of their accounts are legendary. Steps taken to separate such individuals at the scene of shootings in order to prevent the sharing of their accounts and feelings is one step among others that can and should be taken to help maintain the integrity of these accounts. But there are no guarantees that their accounts will be trustworthy. How, for example, do you explain a deadly force incident where one or more seemingly disinterested and independent witnesses describe the shooting of a suspect who was purportedly handcuffed on the ground, only to find that physical evidence precludes this from happening? Lying is one explanation but it is not the only explanation. It is possible and has been proven that individuals perception can be colored and influenced by their background, experiences and predispositions. While law enforcement officers are trained to be exacting in both observation and descriptions, they are also not immune to these same problems of perception. In addition, officer judgments and perceptions can be influenced by heightened levels of fear or anxiety when operating in dangerous environments not to mention the psychological trauma of the actual shooting as heretofore described. The vast majority of officer-involved shooting investigations reveal that actions taken by officers were warranted under the circumstances. But, for example, claims by an officer that he/she believed the suspect was armed, was in the process of drawing a firearm, was holding a firearm or was otherwise posing a threat of death or serious bodily harm cannot always be taken at face value.

Careful collection and examination of physical evidence in conjunction with witness statements will generally prove sufficient to support or refute these claims and thereby focus the investigation. Some agencies conduct a criminal investigation of

all tactical officer-involved shootings while others may conduct internal administrative investigations or even parallel administrative and criminal investigations. Whichever the case, the guidelines for *Miranda* warnings exist as in any other situation. Buat, questioning of involved officers should not normally include the issuance of *Miranda* warnings unless officers are criminal suspects. While an officer can be compelled administratively to respond to questioning or face departmental disciplinary action, any compelled testimony will be precluded from subsequent criminal proceedings. The complexity of these matters necessitates that where criminal charges appear forthcoming, the local prosecutor's office and the agency chief executive become involved before in-depth questioning of a criminal focus begins.[5]

With these issues in mind at the scene of an officer-involved shooting, investigative officers should ensure that all pertinent evidence has been or is in the process of being collected, in particular, the officer's firearm(s) and ammunition. The officer's firearm and any other firearm discharged during the incident should be taken into custody and handled as evidence.[6] If the firearm is in the possession of the officer, it should be taken in a discrete manner and arrangements should be made to replace it with another firearm or return it to the officer as soon as possible. At an appropriate juncture, the serial number, make, model, and caliber of all officer and suspect weapons used at the scene should be recorded. Expended bullets and cartridge casings should be marked, photographed in place and eventually collected as evidence for forensic examination.

As previously noted, officer and suspect clothing can provide important (often the most important) information about the shooting and should be preserved. Often the suspect's clothes can prove the proximity of the officer(s) to the suspect; the position of the suspect's arms (either up or down); the distance and trajectory of shots that were fired; or entrance and exit points. Examination of the clothing can help prove or refute charges that the officer fired shots while the suspect was handcuffed, lying on the ground, standing with hands and arms raised, or when the suspect was not a threat to the officer. Therefore, investigators should ensure that arrangements have been made to secure this clothing before it is discarded by emergency service workers, hospital personnel or others.

Voice transmissions are also potentially important pieces of information or evidence. Therefore, arrangements should be made during the course of the investigation to identify and interview the complaint taker and dispatcher who handled the incident and to secure and review all recorded voice and data transmissions surrounding the incident, to include the logs of mobile data terminals (MDTs) where employed.

A complete description and diagram of the shooting scene should identify, to the degree possible, the location and movement of all officers involved as well as those of suspects and witnesses, and the paths of bullets fired.

Investigative officers should also concentrate on identifying possible witnesses and obtaining preliminary statements from those persons. All such statements from these individuals should be tape recorded, as should any statements made by officers and suspects involved in the shooting. The identity of persons within the general area should be obtained as should those of persons who claim not to have seen anything. Often such persons are reluctant to speak directly to police officers at the scene while later contact may prove beneficial.

In obtaining statements, investigators should not overlook

information and observations made by emergency service personnel such as paramedics and firefighters. Often, these are the first responders to the scene and have dealt directly with suspects and officers immediately following the shooting. Their initial impressions concerning the circumstances of the incident upon their arrival, what may have been said by those involved, actions taken at the scene and other matters can be of great value to the investigation.

Tape-recorded interviews should be conducted with each officer irrespective of statements made previously to supervisory personnel or fellow officers. Exceptions to this include situations where the officer has been hospitalized and is unable to respond to immediate questioning or is suffering from the effects of traumatic stress associated with the incident that is sufficient to interfere with accurate recall of events that took place. In the latter regard, investigators should be cognizant of symptoms such as time and space distortion, confusion, hearing and visual distortion and emotional impairment as mentioned previously in this paper. Interviews with involved officers and others at the scene should be conducted as soon as possible following the incident unless such symptoms exist. These interviews should be conducted in a private location away from sight and hearing of other agency members and persons who do not have a need and a right to the information solicited from the officers. It is generally wise to remove the officer from the scene of the incident to a neutral location.[7] The officers should be advised not to discuss the incident with anyone except a personal or agency attorney, union representative or departmental investigator until the conclusion of the preliminary investigation.

Once business at the shooting scene has been concluded, investigators may follow up on leads and additional points of contact. For example, all pertinent suspect information should be obtained, such as a complete description of the suspect, his prior criminal record to include any parole or probation history. Search warrants for suspect residences and any vehicles involved in the incident should be obtained and searches conducted where appropriate in a timely manner.

If officers have died in the shooting, investigators should ensure that appropriate steps have been taken by the agency in conformance with line-of-duty death policies and death notification procedures.[8] In such instances and where suspects have died it is particularly important to work closely with the coroner's office, to include attending the autopsies of officers and suspects. Among issues of importance are those related to the determination of entrance and exit wounds,[9] estimates of shooters' positions, the presence of any controlled substances in the decedents' blood and related matters.

The lead investigator should brief the agency chief executive once preliminary results of the investigation have been established.[10] Normally, this should take place the day following the incident or as soon as possible. Following this, with approval of the agency chief executive or his/her designee, the investigative officer should prepare a staff memorandum that details the facts of the incident. This memorandum should be posted or distributed to all personnel as soon as possible following the shooting, preferably on the day following the incident. By doing this, staff rumors can be kept to a minimum and concerns over unknown circumstances of the event can be resolved before speculation supplants fact.

An additional briefing of the prosecutor's office is also necessary in a timely manner following the shooting incident. In some cases, a member of the prosecutor's office will respond to an offi-

cer-involved shooting as a matter of established protocol. Nonetheless, the police agency should make a preliminary statement of facts as soon as possible to the prosecutor's office and work with them closely throughout the investigation. A preliminary statement of facts may then be developed with the approval of the agency PIO and chief executive or other designated personnel for release to the press.

## D. Force Review Committee

Once an investigation of the shooting incident is completed, some agencies bring these findings to a Force Review Committee, Shooting Review Committee or similar entity within the organization that sits on an ad hoc basis to review these findings. These inquiries should not be punitive in nature as matters of criminal or civil liability or administrative punishment for involved officers should be dealt with through other established agency procedures. Rather, the scope and intent of these forums is to assess such incidents to determine whether they have any implications for the department's training function, policies and procedures. These forums are an effort to bring together all elements of an investigation in a risk management context to improve the agency's response to these critical incidents and to make any corrections in agency practice or procedure that will help avoid identified problems in the future.

These reviews should be conducted by command level officers, personnel at the supervisory level who were involved in the incident and investigation, and any other agency specialists who can provide insight to the incident. The committee should review the reports and interview materials of involved officers, first responders, supervisors and investigators. On initial review of this material, additional clarification may be required by Internal Affairs personnel, tactical or specialist teams or others. Upon completion of this review, findings and recommendations may be made concerning modifications in established agency policy, training, supervision, equipment or related matters.

## Endnotes

[1] Any officer who has been shot is at high risk of going into shock, irrespective of the severity of the wound. Self-administered first aid for persons in shock is limited and sometimes impossible. But, in some cases, there are simple steps that officers can take to minimize their chances of going into shock and maximize their chances of surviving such a critical incident. See, for example, "Emergency Care: Trauma," *Training Key #375*, International Association of Chiefs of Police, Alexandria, VA.

[2] A full discussion of the signs and symptoms of post-traumatic shock is beyond the scope of this paper. For a complete discussion of this topic, see the *Model Policy and Concepts and Issues Paper on Post-Shooting Incident Procedures*, International Association of Chiefs of Police, Alexandria, VA.

[3] If the officer(s) has died, the agency should adhere to policy and procedures established for line-of-duty deaths. Agencies that do not have policies and procedures in effect for these contingencies are urged to establish them as soon as possible. Agencies that wish to develop, review and/or update such polices should contact the IACP National Law Enforcement Policy Center for a copy of the *Model Policy on Line-of-Duty Death* and its accompanying *Concepts and Issues Paper*. In addition, agencies may wish to refer to IACP *Training Key #358*, "Death Notification," for information and guidance on dealing with the task of informing survivors of the death of an officer or other person.

[4] For a detailed discussion of information that may and may not be released at the scene of these and other incidents, see the *Model Policy and Concepts and Issues Paper on Police-Media Relations*, IACP National Law Enforcement Policy Center, Alexandria, VA.

[5] For a detailed discussion of information concerning the rights and obligations of officers and investigators in internal administrative and criminal investigations, see: *Model Policy on Complaint Review*, IACP National Law Enforcement Policy Center, International Association of Chiefs of Police, Alexandria, VA.

[6] The need to conduct forensic comparison of ballistic evidence in officer-involved shootings underscores the importance of obtaining ballistic samples from all officers' primary and back-up firearms as part of the agency's firearms authorization requirements. For example, officers should be authorized to carry only departmentally approved firearms and ammunition with specified loads. Ballistic samples of these firearms should be required as part of the authorization process.

[7] While investigators may wish to request that the officer(s) "walk through" the incident, investigators should be aware of the impact that the shooting may have on clear recall of events by officers immediately following the incident. If a walk-through is deemed necessary,

it should not be videotaped. Should the officer be suffering from faulty recall or other emotional trauma, such recordings may prove unfair and prejudicial should they be subpoenaed and entered into evidence by the plaintiff in a later civil action.

[6] *Op. Cite.,* footnote 3.

[9] The importance of employing experienced officers who are completely familiar with shooting investigations cannot be overemphasized. For example, recent research has demonstrated that normal delays in reaction time of officers in hostile shooting encounters often explain unusual bullet entrance and exit wounds of suspects and others, to include seemingly unexplained and suspicious shots to the suspect/victim's back. The entrance wounds of bullets do not always provide a full explanation of the circumstances surrounding the shooting event. Only highly trained and experienced investigators can decipher the full range of potential evidence involved in a complex shooting investigation.

[10] For a discussion of procedures to be used in the event that criminal or administrative charges are brought against an officer in the course of a shooting or other investigation, see for example, *Model Policy and Concepts and Issues Paper on Complaint Review,* National Law Enforcement Policy Center, International Association of Chiefs of Police, Alexandria, VA.

This project was supported by Grant No. 95-DD-BX-K014 awarded by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice. The Assistant Attorney General, Office of Justice Programs, coordinates the activities of the following program offices and bureaus: the Bureau of Justice Assistance, the Bureau of Justice Statistics, National Institute of Justice, Office of Juvenile Justice and Delinquency Prevention, and the Office of Victims of Crime. Points of view or opinions in this document are those of the author and do not represent the official position or policies of the United States Department of Justice or the IACP.

Every effort has been made by the IACP National Law Enforcement Policy Center staff and advisory board to ensure that this model policy incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no "model" policy can meet all the needs of any given law enforcement agency. Each law enforcement agency operates in a unique environment of federal court rulings, state laws, local ordinances, regulations, judicial and administrative decisions and collective bargaining agreements that must be considered. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities among other factors.