UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| NICOMEDES TUBAR, III, <br><br> Plaintiff, <br><br> v. <br><br> JASON CLIFT; and THE CITY OF KENT, WASHINGTON, a municipal corporation, <br><br> Defendants. | No. C05-1154JCC <br><br> **Second Supplementary Declaration of D.P. Van Blaricom** |

D.P. Van Blaricom declares as follows:

1. I am of legal age, competent to testify, and have personal knowledge of the facts set out herein.

2. My law enforcement career has spanned over forty-nine years of active employment to date:

   a. Twenty-nine years of continuous police service, during which I was Chief of Police in the City of Bellevue, Washington for the last eleven of those years;

   b. Thereafter, I have been engaged as a police practices consultant for an additional twenty years.

3. A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include, but are not limited to: police use of force; less-lethal alternatives to deadly force in both equipment and tactics; police administration,

Declaration of D.P. Van Blaricom - 1

policies, practices, procedures and standards of care; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defense throughout the United States.

4. My specific training, as a police practices expert, to review officer-involved shootings, includes the following:

   a. Small arms repairman in the United States Marine Corps,
   b. Death investigation by the King County, WA Coroner,
   c. Police and medical investigation of death by the Dade County, FL Medical Examiner;
   d. Shooting reconstruction by:
      1) Northwestern University's Center for Public Safety,
      2) American Academy of Forensic Sciences,
   e. Forensics certificate from the University of Washington.

5. Additional experience, as a career police officer, in the prevention and investigation of shootings, included:

   a. Police firearms instructor for over ten years;
   b. Detective commander in shooting investigations, including a freeway sniper who shot two victims in motor vehicles;
   c. Incident commander in the deployment of SWAT units during critical incidents.

6. As a police practices expert retained in over 1,200 matters, for both plaintiff and defense, I have:

   a. Reviewed 260 officer-involved shootings to date;

Declaration of D.P. Van Blaricom - 2

    b. Testified in state and federal courts throughout the United States in officer-involved shootings and my testimony has never been excluded;

    c. Served to reconstruct officer-involved shootings for my recommendation on whether or not the shooting officer should be criminally prosecuted, as requested by:

        1) Rapides Parish, LA District Attorney,

        2) City and County of San Francisco, CA District Attorney.

7. I was retained by Timothy K. Ford to review the facts and circumstances of the officer-involved shooting (OIS) of plaintiff by City of Kent Police Department (KPD) Officer Jason Clift (shooter) on June 26, 2003. At the time of making this declaration I have discussed the matter with plaintiff's counsel and I have reviewed the following documents:

    a. Complaint;

    b. Answer;

    c. Motion to Stay Discovery;

    d. Response;

    e. Defendants' Motion for Partial Summary Judgment:

        1) Declaration of Auburn Police Department (APD) Detective Randy Clark,

        2) Declaration of Sergeant Bob Crouch,

        3) Declaration of Officer Rodd Joseph;

    f. APD report 03-06543;

    g. KPD report 03-7659;

    h. KPD IA report 03-003;

    i. APD Detective Randy Clark in the matter of *State v. Morehouse*;

    j. Transcribed interviews of shooter;

    k. Depositions:

        1) Plaintiff,

        2) Heather Morehouse;

    l. KPD Field Training and Evaluation Manual;

    m. Patrol complaints:

        1) 1998 - #21,

        2) 2002 - #09;

    n. Shooter's personnel file;

    o. Audiotape of radio traffic;

    p. Fitness for duty psychological evaluations:

        1) Pre-shooting June 17, 2003,

        2) Post-shooting July 3, 2003;

    q. National Law Enforcement Policy Center (NLEPC) standards of care:

        1) Use of Force (attached hereto as Exhibit "D"),

        2) Investigation of Officer-Involved Shootings (attached hereto as Exhibit "H").

8. I have reviewed the following additional documents, since preparing my initial declaration of March 29, 2006:

    a. Defendants' Objection to Plaintiff's Evidence:

        1) Supplementary Declaration of APD Detective Clark,

        2) Second Declaration of shooter,

        3) Declaration of Joseph Fountain;

  b. Report of John Hunter;

  c. Report and declaration of Dr. Abdelouahab Abrous;

  d. Further depositions:

        1) APD Detective Clark (2),

        2) KPD Officer Jon Shipman,

        3) Shooter.

9. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a police reviewing authority. In conducting that evaluation I apply:

  a. My training and experience as a career police officer, who was required to use reasonable and necessary force in the performance of my law enforcement duties;

  b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;

  c. My training and experience as a police supervisor and commander, who was assigned to train police officers on patrol procedures, use of force and firearms;

  d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

  e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, terminate police officers;

f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

h. My continuing education and training, as is supplemented by an ongoing review of professional publications that address contemporary developments in my areas of expertise;

i. Additionally, I have served as a police practices expert in 1,000+ matters of police-related litigation (see Exhibit "A"), wherein I have often testified in deposition and/or at trial (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

10. My use of certain terms (i.e. – *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"deliberately indifferent"*, etc.) merely reflects my training, in applying reasonable standards of care to officers' conduct, and does not presume or imply a statement of any legal opinion.

11. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that the shooter did not have probable cause to believe that the vehicle, in which plaintiff was riding, posed a significant threat of death or serious injury at the time the shots were fired. In reaching that conclusion I was specifically mindful of the following information from the record:

a. The investigation of this OIS produced an accurate diagram of the scene and the path of the vehicle is depicted thereupon by the track of a flattened right front tire (attached hereto as Exhibit "E");

b. As would be expected of a front wheel drive vehicle with a flat right front tire, the vehicle was naturally turning in an arc to the right;

c. The investigation further produced:

   1) A diagram of the trajectory of what had to have been the first shot through the interior of the vehicle (attached hereto as Exhibit "F"),

   2) A photograph of a trajectory rod placed into the bullet hole from what had to have been the second shot into the left front of the vehicle (attached hereto as Exhibit "G");

d. The third shot, which struck plaintiff, was fired at or near a right angle to the left side of the vehicle and through the driver's side window;

e. Officer Joseph, who arrived on the scene immediately after the shooting, heard a *"pause"* after the second shot and before the third shot that struck plaintiff;

f. The investigation located the shooter's approximate position on the diagram, and the shooter stated in his second interview that *"the reconstruction is exactly right"* (page 73 line 3);

g. By placing the vehicle's right front wheel along the right turn arc, so as to align the trajectories of shots one and two into the vehicle, the vehicle's

position can be approximately located for when each of those shots was fired and the third shot was fired as the vehicle was passing the shooter;

h. As can be seen from Exhibit "E", the vehicle was always turning away from the shooter, with no sudden steering input, and passed him at a distance he describes in his second interview as being *"probably around ten feet"* (page 26 lines 9-11), after he had moved some *"five feet"* (page 25 lines 6-7) *"to the right --- to get out of the way"* (page 45 lines 6-7);

i. The NLEPC standard of care on Use of Force addresses this very issue, incidentally, (see Exhibit "D"):

   1) *"In many cases involving the discharge of firearms at a moving vehicle, it is based on the contention that the driver was intentionally attempting to run the officer down"*;

   2) *"One of the simplest alternatives to the use of a firearm in this instance is to move out of the vehicle's path and/or seek cover"*:

j. *"To move out of the vehicle's path"* was, of course, just what the shooter did but, thereafter, he unreasonably and unnecessarily shot into the vehicle too.

12. Based upon my training experience and a careful evaluation of the totality of circumstances, it is my considered opinion that the shooting of plaintiff was an objectively unreasonable use of excessive force. In reaching that conclusion I was specifically mindful of the following information from the record:

a. All of the information previously described herein;

b. After the shooter knew that backup assistance was en route and about

Declaration of D.P. Van Blaricom - 8

to arrive, he broadcast, *"Okay, they're starting out **I'M TRYING TO STOP** (emphasis supplied) this car here"* (the prepared transcript has, however, misleadingly substituted the words *"by you"* for *"I'm"*);

c. Inexplicably, the shooter had and took time to key his radio and broadcast, *"They're driving right at me"*;

d. When first interviewed, the shooter explained (page 10):

1) He was specifically asked why he did not *"step to the curb here and just let the vehicle go away, just let it drive off"*, to which he candidly replied that he *"could have"*,

2) But added, however, he was *"doing my job trying to **STOP THEM**"* (emphasis supplied);

e. Accordingly:

1) The shooting could not have been in self-defense, unless the shooter had chosen to remain in the vehicle's path, which, of course, he demonstrably did not,

2) His real purpose in shooting was merely to prevent the escape of two people in a stolen vehicle;

f. Use of fatal force to prevent suspects' escape from a non-violent property crime has long been established to be excessive, by both the relevant legal standard and police practice in conformance therewith;

g. Therefore, no officer could have reasonably believed that the shooting of plaintiff was justified and/or permissible.

13. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that the shooter's description of events is absolutely contradicted by the physical evidence. In reaching that conclusion, I was specifically mindful of the following information from the record:

   a. The shooter testified in his deposition:

      1) *"The vehicle was moving, and it kept getting closer to me and it was straight on to me"* (page 83 lines 6-8) – the shooter reiterates this testimony repeatedly,

      2) *"I think it happened that she turned at me and that's why I said she was driving straight at me and that's when I probably started shooting"* and this was occurring as *"I was either going backwards or to my right"* (page 124 line 25 and page 125 lines 1-2 and 13-18),

      3) *"No, I didn't shoot at her when she was that far back"* and he shot at her *"second veer"*, which was *"right at the very end, I mean the last probably ten feet of when the vehicle stopped, where it turns off"* (page 128 lines 11-14);

   b. To the contrary, however, the physical evidence convincingly demonstrates:

      1) *"The total station data failed to reveal any evidence of a 'swerve' by the Kia towards Officer Clift"*, and how the investigation projected such a *"swerve"* is an unexplained *"artifact"*,

      2) *"The distance traveled by the Kia between the first and third shots is approximately 42 feet"*,

   3) *"Between the 2.15 to 2.94 seconds that elapsed between the first shot and the third shot, the car was turning and not posing and danger to Officer Clift because it was traveling at **LOW SPEED** and **TURNING AWAY** (emphases supplied) from him";*

 c. As a matter of standard practice, in conducting forensic analysis:

   1) Where witness perceptions and physical evidence are contradictory, resolve the contradiction in favor of the physical evidence,

   2) Always adopt the least extraordinary hypothesis.

14. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that this OIS was not investigated to a reasonable standard of care. In reaching that conclusion I was specifically mindful of the following information from the record:

 a. All of the information previously described herein;

 b. The shooter's account of the shooting was unreasonably delayed, until after he had been counseled by both his attorney and psychologist:

   1) An undated written statement was sent by FAX, from his attorney's office, on July 8, 2003 (twelve days after the shooting),

   2) He was not interviewed until July 10, 2003 (fourteen days after the shooting);

 c. Such a delay can only serve to better prepare a shooter to defend against questioning on the facts and is the antithesis of a police shooting investigation, wherein an officer is not involved;

   d. As regards the long delay in the shooter's interview, lead Detective Clark testified in his deposition:

   1) *"I wanted it done sooner versus later"* and *"I just had to wait"* (page 136 lines 1-2),

   2) *"I did not see that any delay was necessary"* and *"his involvement into that part of the investigation was important"* (page 136 lines 6-8),

   3) *"I needed to hear him tell me what he said happened"* because *"that's obviously critical in any officer-involved shooting incident"* (page 136 lines 10-12),

   4) *"It's always better sooner than later"* and *"I would have talked to him as early as I could have, but forces beyond my control made that impossible"* (page 136 12-16);

   e. Although the shooter admitted that he *"could have"* and, in fact, did move out of the vehicle's path, he was not further questioned on that critical issue;

   f. Although the shooter admitted that his purpose was just *"doing my job trying to stop them"*, he was not further questioned on that important issue;

   g. Although admittedly *"not an expert"*, lead Detective Clark wrongly postulated:

   4) The first shot hit the hood and was *"nearly straight on"*, when it had to have been the second shot and was at a significant angle from the left of the vehicle's path,

   5) The second shot hit the windshield, when it had to have been the first shot,

      6) Lead Detective Clark has since testified in his deposition (page 74 lines 9-22 and page 128 lines 4-13) that he misinterpreted the physical evidence of the shot sequence and has adopted my reconstruction thereof;

h. Contrary to the standard of care for investigating an OIS (see Exhibit "H"), this investigation failed to consider:

    1) *"Only by asking the tough questions can all of the facts and circumstances surrounding the shooting event be compiled"*,

    2) *"Claims by an officer that he/she believed the suspect was — posing a threat of death or serious bodily harm cannot always be taken at fact value"*;

i. This OIS investigation, however, neither asked any of the *"tough questions"* nor required explanations of inconsistencies and the shooter's self-serving description of the event, after the fact, was simply *"taken at face value"*, in spite of contradictory physical evidence;

j. Lead Detective Clark testified in his deposition (page 133 lines 15-25) that he did not take the shooter's description of events at *"face value"*, because *"I scrutinize what people say and compare it with physical evidence"*, while being *"extremely critical"*;

k. Nevertheless, lead Detective Clark also testified in his deposition:

    1) The *"second and third rounds"* were fired, when the vehicle was *"obviously turning"* away from the shooter (page 78 lines 3-5),

2) Therefore and *"according to the groove mark, the vehicle was* **CONSTANTLY** *(emphasis supplied) turning toward the right"* in a *"right arc"* (page 137 lines 21-25),

3) In spite of such directly contradictory *"physical evidence"* to the shooter's unsupported and *"face value"* contention that the vehicle *"swerved"* toward him, lead Detective Clark inexplicably concluded *"that the physical evidence indicates that it is possible that she did swerve"* but, even if the *"physical evidence shows what* **ACTUALLY HAPPENED** *(emphasis supplied)"*, it was *"reasonable"* for the shooter to believe otherwise (page 140 line 1-2 and page 141 lines 8-15 and 22-23) -- that is a very subjective analysis;

h. In the final analysis and regardless of the facts, the chief policy maker ratified the shooter's conduct as being with the custom, policy and practice of the KPD.

15. I am prepared to testify to these opinions in deposition or at trial, if called upon to do so.

16. If I am provided with further documentation for my review, I may have additional opinions.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

1
2  Executed this 22nd day of June 2006 at Bellevue, Washington.
3
4
5
6
7                                  _____
8                                           D.P. VAN BLARICOM
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Declaration of D.P. Van Blaricom - 15