UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NICOMEDES TUBAR, III,

    Plaintiff,

v.

JASON CLIFT; and THE CITY OF KENT, WASHINGTON, a municipal corporation,

    Defendants.

CASE NO. C05-1154-JCC

ORDER

This matter comes before the Court on Defendant City of Kent's Motion for Partial Summary Judgment (Dkt. No. 188), Plaintiff's Opposition (Dkt. No. 211), Defendant's Reply (Dkt. No. 215), Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 190), Defendants' Opposition (Dkt. No. 205), and Plaintiff's Reply (Dkt. No. 219). The Court, having carefully considered all of the papers submitted and determined that oral argument is not necessary, hereby DENIES the City of Kent's motion and DENIES Plaintiff's motion, and rules as follows.

## I. BACKGROUND AND FACTS

This is a civil rights lawsuit arising from a shooting incident that occurred on June 26, 2003. Plaintiff Nicomedes Tubar filed this action on June 24, 2005, against Officer Jason Clift in his individual capacity and the City of Kent (the "City") for damages arising from an alleged violation of his civil rights.

ORDER – 1

Officer Clift then sought summary judgment on the basis of qualified immunity (Dkt. No. 30). In denying Clift's motion, the Court recounted the following facts:

> On June 25, 2003, Defendant Jason Clift, a City of Kent Police Officer, discovered a stolen 2001 Kia automobile in the parking lot of Plaintiff's apartment building. Defendant Clift decided to watch the vehicle because he believed that it had been driven recently. He placed a "rat trap"[1] under one of the tires of the stolen vehicle, moved his patrol car out of sight, and hid in the bushes to await the driver's return. Approximately thirty minutes later, just after midnight on June 26, 2003, Defendant Clift observed Plaintiff, along with driver Heather Morehouse, exit the apartment building and enter the stolen vehicle. As Ms. Morehouse began backing the vehicle out of the parking spot, the rat trap punctured the vehicle's tires. At the same time, Defendant Clift emerged from the bushes with his flashlight and gun and announced that he was a police officer. Plaintiff and Ms. Morehouse did not hear this announcement nor realize that Defendant Clift was a police officer, but Defendant Clift thought that the vehicle occupants perceived him.
>
> According to Plaintiff, Ms. Morehouse began driving toward the only exit at a "normal" speed—approximately 15 miles per hour according to both parties as well as supporting testimony that indicates that the vehicle was not going very fast. Ms. Morehouse steered towards the exit of the parking lot, in what Plaintiff characterizes as a "steady right turn." In contrast, Defendant Clift maintains that it was a "sharp U-Turn" to the right. The tire puncture due to the rat trap caused the rim of the front passenger tire to mark the pavement as the vehicle moved, providing evidence of the Kia's path consistent with a steady right turn. Nevertheless, Defendant Clift's version of events is that Ms. Morehouse steered the car toward him, accelerated, and put him in fear for his life. However, Plaintiff claims that the car decelerated as events unfolded and that Ms. Morehouse consistently steered toward the parking lot exit and never accelerated toward Defendant Clift in an attempt to hit him. While Defendant Clift originally claimed that the car "swerved" toward him, none of the evidence indicates a "swerve" and Defendant Clift now seems to have retreated from that theory. Nevertheless, during the vehicle's undisputed curved path, it is clear that at some point the car was headed directly toward where Defendant Clift was standing, though the parties dispute how long this was.
>
> As the car approached the parking lot exit, Defendant Clift fired his weapon at the vehicle three times. The first two bullets entered the hood and front windshield of the vehicle but did not strike either Ms. Morehouse or Plaintiff. Defendant Clift fired his third shot as the vehicle was passing him. This third bullet entered through the driver's side window and struck Plaintiff in the upper left shoulder area. According to Plaintiff's expert, by the time the third shot was fired, the Kia was moving at about 6 miles per hour and visibly decelerating.
>
> It is undisputed that the three shots were fired in a matter of seconds. One witness described the succession of shots as "'bang, bang' (pause) 'bang.'" It is undisputed that the third shot is the one that hit Plaintiff and that it came through the side of the car as it was passing Defendant Clift.

---

[1] A rat trap is a mechanical device used to deflate tires.

ORDER – 2

(Sept. 22 Order 1–3 (Dkt. No. 156) (record citations omitted).)

In ruling on Officer Clift's motion for summary judgment, the Court determined that the evidence, viewed in Plaintiff's favor, sufficiently established that Clift's use of deadly force was objectively unreasonable in violation of the Fourth Amendment. (*Id.* at 8–9.) At minimum, the Court found that Clift's firing of the third shot was objectively unreasonable because any arguable threat to his safety had ceased at the time that shot was fired. (*Id.* at 9.) Because the unconstitutionality of such use of deadly force was clearly established, the Court denied Officer Clift's request for qualified immunity. (*Id.* at 9–10.) On appeal, the Ninth Circuit affirmed the denial of qualified immunity and found that, taking Plaintiff's allegations as true, "no reasonable officer could have thought that the use of deadly force was reasonable under the circumstances." (Mandate 7 (Dkt. No. 179-2).)

Officer Clift was also involved in two other shooting incidents prior to the June 2003 incident. The first incident occurred in November 2000 and involved Guadalupe Martinez, who was stopped in heavy traffic after leading police on a high speed chase. (Weissich Decl. ¶ 4 (Dkt. No. 57 at 1).) Witnesses stated that Martinez emerged from the vehicle with what appeared to be a large-caliber handgun, which she pointed at Officer Clift, who had approached the driver's door (*Id.* at ¶ 5.) Both Clift and another Kent officer fired their weapons, and Martinez was killed. (Mot. 6 (Dkt. No. 188).) Subsequently, it was determined that the gun Martinez displayed was a pellet gun. (*Id.*) The Auburn Police Department investigated the circumstances of the shooting and concluded that Officer Clift shot Martinez in self-defense. (Martinez Investigation 4 (Dkt. No. 57 at 4–7).) Thereafter, Kent Police Chief Ed Crawford found that Clift's use of force was justified and officially "exonerated" him of any wrongdoing. (2001 Exoneration (Dkt. No. 212-2 at 16).)

The second shooting incident occurred in May 2002 following a high speed chase. (Jackson Investigation 1 (Dkt. No. 57 at 8).) Officers had stopped a vehicle because the driver, Eric Jackson, had an outstanding felony warrant. (*Id.*) The vehicle also had a female passenger, Kristina Howe. (*Id.*) Jackson struggled with the officers as they attempted to take him into custody, and he managed to escape

ORDER – 3

back to his vehicle where he sped away. (*Id.* at 2.) During the chase, Officer Clift employed a Pursuit Intervention Tactic, which involved impacting the fleeing vehicle and forcing it to come to a stop. (*See id.* at 3.) As a Federal Way officer approached the stopped vehicle, Jackson apparently revved the engine. (*Id.*) Clift and two other officers claimed that Jackson was attempting to run over the approaching officer. (*Id.* at 3–4.) The three officers then fired their weapons at the vehicle, hitting Jackson and Howe, both of whom suffered non-fatal injuries. (*Id.*; Mot. 7 (Dkt. No. 188).) After an internal review, Chief Crawford again found that Clift's use of force was justified and "exonerated" him. (2002 Exoneration (Dkt. No. 212-2 at 163).)

As in the two previous shootings, Chief Crawford ultimately exonerated Officer Clift from any wrongdoing in the shooting incident at issue in the instant lawsuit. Immediately after the shooting, Clift gave a brief oral report to his sergeant and was then taken to the Kent police station to meet with his union representative and attorney. (Clark Narrative (Dkt. No. 212-6 at 76).) Chief Crawford then placed Clift on administrative leave and referred the incident to the Auburn Police Department for an investigation. (Miller Decl. ¶ 17 (Dkt. No. 135 at 5).) The Chief also sent Clift to a psychologist for an evaluation of his fitness to return to duty. (*Id.*) After being ordered by the Deputy Police Chief to provide a statement, Clift submitted a written statement of the incident on July 8, 2003, nearly two weeks after the incident. (Internal Review 5 (Dkt. No. 212-2 at 122).) On July 10, 2003, Clift gave a recorded interview to Auburn investigators in the presence of his attorney. (*Id.*) Subsequently, the Kent Police Department conducted its own internal review of Officer Clift's use of deadly force. (*See id.*) The internal review noted that Clift had not submitted a Use of Force Report as required, but concluded that he had acted in compliance with Police Department policies in discharging his firearm. (*Id.* at 6–8.) Specifically, the internal review found that Clift properly employed deadly force upon believing that he was in immediate danger of death or serious injury. (*Id.* at 6.) Thereafter, Chief Crawford found that Officer Clift was "justified, acted lawfully, properly, and within grounds of accepted police conduct" in using deadly force, and therefore, Clift was "exonerated." (2004 Exoneration (Dkt .No. 212-2 at 161).)

ORDER – 4

On June 24, 2005, Plaintiff brought this lawsuit against the City of Kent and Officer Clift, alleging violation of his civil rights under 42 U.S.C. section 1983, along with supplemental state law claims for negligent hiring, training, supervision, and retention. (Compl. (Dkt. No. 1).) After the Ninth Circuit affirmed this Court's denial of qualified immunity for Officer Clift, both parties filed cross-motions for partial summary judgment. The City filed a Motion for Partial Summary Judgment on Civil Rights Municipal Liability and Negligence Claims (Dkt. No. 188), and Plaintiff filed a Motion for Partial Summary Judgment that Defendants are Liable for Unreasonable Seizure (Dkt. No. 190).

## II.     ANALYSIS

### A.     Legal Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

ORDER – 5

### B. The City of Kent's Motion for Partial Summary Judgment

Defendant requests summary judgment dismissal of Plaintiff's constitutional claims against the City of Kent, arguing that Plaintiff has failed to establish the necessary elements for municipal liability. (City's Mot. 1 (Dkt. No. 188).) Defendant also argues that Plaintiff's state law claims against the City for negligent hiring, training, supervision, and retention should be dismissed.

#### 1. Constitutional Claims

A municipality may be held liable under 42 U.S.C. section 1983 when a governmental policy or custom inflicts a constitutional injury, but it may not be held liable under a *respondeat superior* theory. *Monel v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). A plaintiff can establish municipal liability under section 1983 in one of three ways. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). "First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Id.* (*citing Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy." *Id.* (*citing Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). "Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1346–47 (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Here, Plaintiff argues that the City is liable because it ratified Officer Clift's unconstitutional use of deadly force. Plaintiff contends that the City is also liable because it had a policy or custom of deliberate indifference in the supervision of its officers' use of force thereby causing the constitutional deprivation. (Resp. 12–18 (Dkt. No. 211).)

Under the ratification doctrine, a single decision by a municipal policymaker that ratifies unconstitutional conduct may be sufficient to trigger municipal liability under section 1983. *Praprotnik*, 485 U.S. at 127; *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) ("A municipality also can be liable

ORDER – 6

for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions."). In *Praprotnik*, a plurality of the Supreme Court stated that "if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision was final." 485 U.S. at 127. To establish ratification, however, the plaintiff must show that "the triggering decision was the product of a conscious, affirmative choice to ratify the conduct in question." *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *rev'd on other grounds*, 543 U.S. 194 (2004). Mere acquiescence in a subordinate's discretionary decision is insufficient to establish municipal liability. *Gillette*, 979 F.2d at 1348. "Ordinarily, ratification is a question for the jury." *Christie*, 176 F.3d at 1238–39.

The City argues at-length that this case poses difficult problems of proof and that Plaintiff must show a "direct causal link" between the municipal action and the constitutional violation. (City's Mot. 17–19 (Dkt. No. 188); Reply 2–3 (Dkt. No. 215).) However, the ratification doctrine is based on a municipal policymaker's decision that occurs after the constitutional deprivation and endorses a subordinate's conduct causing the injury. *See Gillette*, 979 F.2d at 1348. Under this theory, therefore, a plaintiff need only show a causal link between the subordinate's conduct and the constitutional injury. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) (ratification occurs where an official adopts and approves of "the acts of others who *caused* the constitutional violation") (emphasis added).

The Ninth Circuit has found that a policymaker's failure to overrule or discipline the conduct of a subordinate is ordinarily insufficient to establish municipal liability by ratification. *See Gillette*, 979 F.2d at 1348. In *Gillette,* the court found that a city manager's "acquiescence in [the plaintiff's] termination" merely amounted to "inaction" that failed to establish ratification under *Pembaur* and *Praprotnik*. *Id.* The fact that the city manager "did not overrule" a subordinate's decision, was insufficient to establish that the city made "a deliberate decision to endorse" the alleged unconstitutional action. *Id.*

In contrast, the Ninth Circuit has found municipal liability by ratification where "the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation."

ORDER – 7

*Trevino*, 99 F.3d at 920; *see Christie*, 176 F.3d at 1240 (finding municipal liability via ratification where prosecutor "affirmatively approved" of alleged constitutional violations). In *Fuller v. City of Oakland*, 47 F.3d 1522, 1534–35 (9th Cir. 1995), the court found section 1983 municipal liability where a police chief ratified a "grossly inadequate" investigation by expressly "approv[ing] both of the propriety of the investigation and the report's conclusions." The police chief's official approval of the thoroughness and conclusions of the internal affairs investigation was sufficient evidence of ratification to foreclose summary judgment dismissal of municipal liability. *Id.* at 1535; *see Larez v. City of Los Angeles*, 946 F.2d 630, 646–48 (9th Cir. 1991) (finding that police chief ratified an inadequate investigation into allegations of excessive use of force when he signed a letter stating that none of the plaintiff's complaints would be sustained).

Here, Plaintiff has set forth sufficient evidence that the City of Kent, through Police Chief Crawford,[2] affirmatively approved of and endorsed Officer Clift's use of deadly force against Plaintiff. Shortly after the incident, Chief Crawford directed Lieutenant Weissich to conduct an internal investigation of Clift's use of deadly force against Plaintiff.[3] (Internal Review 2 (Dkt. No. 212-2 at 119).) Following the use of force review and investigation, the Chief issued a memorandum specifically finding that Officer Clift was "justified, acted lawfully, properly, and within grounds of accepted police conduct" in using deadly force against Plaintiff. (2004 Exoneration (Dkt .No. 212-2 at 161).) Chief Crawford therefore declared that Clift was "exonerated" from any wrongdoing. (*Id.*) There is little doubt that the

---

[2] There is little doubt that Chief Crawford had final policymaking authority over the propriety of Officer Clift's conduct. *See Larez*, 946 F.2d at 646 (finding that the police chief is an official policy-maker for the city on police matters); *Fuller*, 47 F.3d at 1534–35 (same). Chief Crawford was therefore an authorized policymaker, whose express "approv[al] [of] a subordinate's decision and the basis for it" could expose the City to liability under the ratification doctrine. *See Praprotnik*, 485 U.S. at 127.

[3] Although the Auburn Police Department conducted an outside investigation of the incident, Kent Police Department policy required that internal affairs investigate and review Officer Clift's use of force because it resulted in "serious injury or death." (Internal Review 5 (Dkt. No. 212-2 at 122).) Accordingly, the Kent Police Department conducted an internal investigation and was ultimately responsible for determining the legitimacy of Clift's use of deadly force. (*Id.* at 6–8.)

ORDER – 8

Chief's final decision to exonerate Clift was chosen from among various other alternatives at his disposal.[4] *See Pembaur*, 475 U.S. at 483–84 (municipal liability may attach where "a deliberate choice to follow a course of action is made from various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question").

The City argues that Chief Crawford did not knowingly ratify any unconstitutional conduct because he relied on the internal review and Auburn investigation in exonerating Clift. (Reply 7–8 (Dkt. No. 215).) The Court is not persuaded by this argument. Ratification does not require knowledge that the approved conduct is actually unconstitutional. Rather, the policymaker need only have "knowledge of the *alleged* constitutional violation" and its factual basis prior to ratifying the conduct in question. *See Christie*, 176 F.3d at 1239 (emphasis added). Here, the City was well aware of the factual basis behind a potential civil rights suit prior to Chief Crawford's exoneration of Clift. Shortly after the shooting, the City identified Plaintiff Tubar as a potential "claimant" and its insurance defense lawyers began billing hours in preparation for an anticipated civil action, which it captioned "Kent adv. Morehouse/Tubar." (*See* Ins. Billing (Dkt. No. 212-3 at 35–36).) Thus, at the time Chief Crawford issued the exoneration, he was aware of potential constitutional violations arising from Clift's use of deadly force and was acting as the City official with ultimate responsibility to determine the propriety of such conduct.

Chief Crawford's review of the internal investigation and official exoneration of Officer Clift constituted "affirmative or deliberative conduct" sufficient to create a triable issue as to municipal liability by ratification. *See Christie*, 176 F.3d at 1238–39 (ratification is ordinarily a question of fact for the jury). Unlike in *Gillette*, Chief Crawford did not merely acquiesce or fail to object to unconstitutional conduct. Nor did Chief Crawford merely fail to discipline Officer Clift like the police chief in *Haugen*. Instead, and like the police chief in *Fuller*, Chief Crawford directed an internal affairs investigation and then, at the close of the investigation, explicitly "approved . . . of the propriety" of the alleged unconstitutional

---

[4]Chief Crawford, of course, had the authority to take corrective action against Officer Clift if he determined that the use of deadly force was not justified.

ORDER – 9

conduct. *See Fuller,* 47 F.3d at 1534. Chief Crawford therefore made a "conscious, affirmative choice to ratify the conduct in question" by officially exonerating Clift and finding that the use of deadly force was justified. *See id.* at 1535 (finding municipal liability where police chief ratified an internal affairs decision that approved of the an unconstitutional investigation); *Christie*, 176 F.3d at 1240 (finding municipal liability via ratification where prosecutor "affirmatively approved" of unconstitutional prosecution); *Ashley v. Sutton*, 492 F. Supp. 2d 1230, 1253 (D. Or. 2007) (police chief's declaration that subordinate officer properly followed department policy was sufficient to establish municipal liability if the jury found the officer employed excessive force).

Plaintiff's ratification theory is further buttressed by evidence of multiple instances in which Chief Crawford had "exonerated" Clift of any wrongdoing in employing the use of deadly force. In *Haugen*, the Ninth Circuit explained that "some pronouncements ratifying a subordinate's action could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*." 339 F.3d at 875. On the facts of that case, the court concluded that the police department's "*single* failure to discipline" an officer for a shooting incident, by itself, was insufficient to establish affirmative ratification. *Id.* (emphasis added). Here, in contrast, the evidence demonstrates that Chief Crawford not only failed to discipline Clift for two other incidents where he used deadly force, but the Chief also officially exonerated him from any wrongdoing in those shootings.[5] (*See* 2001 Exoneration (Dkt. No. 212-2 at 16); 2002 Exoneration (Dkt. No. 212-2 at 163).) Plaintiff's experts maintain that the Police Department's exonerations and failure to properly investigate or take corrective action in the previous two shootings is indicative of a general policy of tolerance and ratification for an officer's use of deadly force. (*See* Reiter Decls. (Dkt. Nos. 212-4, 212-5, & 212-6 at 2–13); Van Blaricom Decl. (Dkt. No. 200).) Plaintiff's experts also claim that the investigation of Plaintiff's shooting was similar to previous investigations of Clift's use of deadly force

---

[5]The Court expresses no opinion as to the validity of the exonerations in the previous two shootings, and mentions them merely to illustrate that Plaintiff's ratification theory is based on the Kent Police Department's failure to discipline, and approval of, Officer Clift's use of deadly force in numerous instances.

ORDER – 10

and failed to accurately assess Clift's conduct and correct it. (*See id.*) In short, Plaintiff's claim for municipal liability by ratification based on more than a "single failure to discipline," and involves multiple instances where the City endorsed and approved of similar conduct. *See Larez*, 946 F.2d at 645–48.

Viewed in Plaintiff's favor, the evidence sufficiently establishes that Chief Crawford ratified the alleged unconstitutional conduct when, after reviewing the internal investigation and just like on prior occasions, he expressly approved of and officially endorsed Officer Clift's actions. Because Chief Crawford had final policymaking authority and ratified Officer Clift's use of deadly force, Plaintiff has sufficiently established ratification to avoid summary judgment on municipal liability for his constitutional claims.[6]

### 2. State Law Claims

Plaintiff has also asserted state law claims against the City for negligent hiring, training, supervision, and retention of Officer Clift. The City argues that because it has admitted *respondeat superior*, Plaintiff's state law claims are redundant and precluded under Washington law. (City's Mot. 19–22 (Dkt. No. 188).) The City contends that a negligent supervision claim is an alternative means of establishing employer liability that is not available where, as here, the employer admits that the employee was acting within the scope of employment. (Reply 11 (Dkt. No. 215).) The Court finds that the City's argument is misplaced.

The City relies on *Gilliam v. DSHS*, 950 P.2d 20 (Wash. Ct. App. 1998) for the proposition that a negligent supervision theory is not available here. (Mot. 20 (Dkt. No. 188); Reply 11 (Dkt. No. 215).) In *Gilliam*, the State had acknowledged that its employee was acting within the scope of employment and it "would be vicariously liable for her conduct." 950 P.2d at 28. The court determined that, because the plaintiff had asserted a negligence claim against the employee, for which the State had admitted vicarious

---

[6]Because the record provides sufficient evidence to establish ratification and preclude summary judgment on municipal liability, the Court need not address Plaintiff's alternative argument that the City's deliberate indifference in the supervision of its officers' use of force caused the constitutional deprivation.

ORDER – 11

liability, a claim for negligent supervision would be "redundant." *See id.* If the employee was found liable for negligent investigation, the State would necessarily be vicariously liable under *respondeat superior*. *Id.* In other words, the State's liability was dependant on whether the employee was negligent. Here, there is no such redundancy because Plaintiff has not asserted a negligence claim against Officer Clift for which the City would be vicariously liable by admission. Instead, Plaintiff claims that the City itself is negligent for breaching its own standard of care with respect to the hiring, supervision, and training of Officer Clift.

The City also argues that allowing the state negligence claim to proceed would be unfairly prejudicial, and cites *Logan v. City of Pullman Police*, No. CV-04-214-FVS, 2006 WL 994754 (E.D. Wash. 2006), for support. However, in *Logan*, the court dismissed a negligent supervision claim for the same reasons articulated in *Gilliam*. The court stated: "The reason the *Gilliam* court held that the plaintiff's claim for negligent supervision against the employer was redundant with the plaintiff's claim for vicarious liability is that both causes of action rested upon a determination that the employee was negligent . . . . The same is true here." *Id.* at *2 (citation omitted). The court determined that the negligent supervision claim was "unnecessary, irrelevant and prejudicial," only because the plaintiff had also asserted a negligence claim against the employee officers. *Id.* Again, because Plaintiff has not asserted a negligence claim against Officer Clift, no such risk of redundancy or irrelevance exists here.

There mere fact that the City admitted that Clift was acting within the scope of his employment does not prevent Plaintiff from asserting state law negligence claims against the City. The scope of employment test operates to limit an employer's *vicarious liability* for torts committed by its employees, but the test does not dictate whether the employer can be held *directly liable* for breaching its own duty of care through negligent hiring, supervision, or training. *See Smith v. Sacred Heart Med. Ctr.*, 184 P.3d 646, 650 (Wash. Ct. App. 2008) ("The scope of employment limits an employer's vicarious liability for an employee's torts. It does not, however, limit an employer's liability for a breach of its own duty of care."). The Washington Supreme Court has described this distinction:

ORDER – 12

> Even where an employee is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others. This duty gives rise to causes of action for negligent hiring, retention and supervision. Liability under these theories is *analytically distinct and separate from vicarious liability*. These causes of action are based on the theory that "such negligence on the part of the employer is a wrong to [the injured party], entirely independent of the liability of the employer under the doctrine of respondeat superior."

*Niece v. Elmview Group Home*, 929 P.2d 420, 426 (Wash. 1997) (emphasis added) (alteration in original) (citation omitted). Thus, regardless of whether an employee was acting within the scope of employment, employers have an independent duty to prevent their employees from harming foreseeable victims. *See id.* The City cannot preclude a claim for a breach of its duty of care merely by admitting that Officer Clift was acting within the scope of employment at the time of the Plaintiff's injury. Accordingly, the City's request to dismiss Plaintiff's state law negligence claims is hereby DENIED.

### C. Plaintiff's Motion for Partial Summary Judgment

Plaintiff argues that Defendants are liable, as a matter of law, for violating his Fourth Amendment rights because Officer Clift unreasonably seized him by walking into the path of the vehicle, in which he was a passenger, and then pointing a gun at the car in an effort to stop it before firing three times. (Pl.'s Mot. 1 (Dkt. No. 190).) The Court has already determined that by shooting Plaintiff, Clift "seized" Plaintiff for purposes of the Fourth Amendment. (Sept. 22 Order 7–8 (Dkt. No. 156).) Viewed in *Plaintiff's favor*, the Court also found that the evidence sufficiently showed that Clift's use of deadly force was unreasonable in violation of the Fourth Amendment.[7] (*Id.* at 8.) The Court noted, however, that material facts remained in dispute as to whether Clift was in danger at the time he fired his gun. (*Id.*) Plaintiff's motion recognizes this dispute, and therefore does not seek a determination that Clift's use of deadly force was objectively unreasonable as a matter of law (*See* Pl.'s Mot. 8 (Dkt. No. 190).) Instead,

---

[7] These determinations were affirmed by the Ninth Circuit on appeal. (Mandate 6–7 (Dkt. No. 179-2) (finding that "by shooting Tubar, Clift seized Tubar for purposes of the Fourth Amendment") ("Tubar produced enough evidence to show that Clift's use of deadly force amounted to a violation of his Fourth Amendment Rights".).)

ORDER – 13

Plaintiff argues that Clift's use of deadly force "was the proximate and foreseeable result of the unreasonable seizure attempt that *preceded* it." (*Id.* (emphasis added).) On that basis, Plaintiff contends summary judgment is warranted because Clift acted unreasonably in creating the situation that might otherwise have justified the use of deadly force. (*Id.* at 9–11.)

A seizure is "the intentional acquisition of physical control" by a government actor, and it occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989). Thus, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirements of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment test examines whether the force used in a seizure was "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 388 (1989). This calculus "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The reasonableness inquiry is objective and does not take into account the officer's "underlying intent or motivation." *Id.* at 397.

Plaintiff's motion asks the Court to find that Officer Clift's conduct prior to the shooting was unreasonable as a matter of law, and thereby constituted an independent Fourth Amendment violation. Plaintiff relies, almost exclusively, on *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 2004). Since *Alexander*, however, the Ninth Circuit has carefully explained and limited its reach. *See Billington v. Smith*, 292 F.3d 1177, 1188–91 (9th. Cir. 2002). *Alexander* holds that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington,* 292 F.3d at 1189. The determination of whether an officer's provocation is intentional or reckless "must be kept within the Fourth Amendment's objective reasonableness standard." *Id.* at 1190. Thus, a plaintiff

ORDER – 14

may establish liability by demonstrating that an officer's provocative actions are objectively unreasonable under the Fourth Amendment. *Id.*

To prevail on his theory for summary judgment, Plaintiff must establish that Clift intentionally or recklessly provoked a violent response, *and* such provocation was an independent constitutional violation, i.e., it was objectively unreasonable. *See id.* Viewing the evidence in the light most favorable to Defendants and drawing reasonable inferences in their favor, *Anderson*, 477 U.S. at 248–50, the Court finds that Plaintiff has failed to meet his burden on either element. As the parties' pleadings readily demonstrate, significant factual disputes remain as to (1) whether Clift placed himself in front of the car or tried to block its path with his body, (2) whether the car turned toward Clift, and (3) whether Clift's positioning created the danger, or perceived danger, that precipitated the shooting.[8] The determination of whether Clift "intentionally or recklessly provok[ed] a violent confrontation" necessarily requires a resolution of the factual disputes regarding Clift's exact positioning relative to the car's travel prior to his use of deadly force. On the one hand, if the factfinder determines that Clift intentionally attempted to block or stop the car by positioning his body in its direct path of travel, then he may have recklessly provoked the subsequent dangerous situation.[9] On the other hand, if Clift was positioned beyond the car's path of travel and the car then turned toward Clift, then he likely did not recklessly create the need to use defensive deadly force. *See Billington,* 292 F.3d at 1189–90. Moreover, these factual disputes preclude a finding that Clift's conduct prior to the shooting was objectively unreasonable as a matter of law. *See id.* at 1190 ("[I]f a police officer's conduct provokes a violent response . . . but is objectively reasonable under the Fourth Amendment, the officer cannot be held liable for the consequences of that provocation

---

[8]The bulk of each brief on this motion is dedicated to discussing, dissecting, and arguing over the factual circumstances surrounding the shooting. (*See* Pl.'s Mot. 1–8 (Dkt. No. 190); Resp. 1–12 (Dkt. No. 205); Reply 1–4 (Dkt. No. 219).) Each party points to some evidence that supports their version of how the events unfolded.

[9]Of course, if the factfinder determines that Clift's use of deadly force itself was unreasonable because he was not in imminent danger, then it will be unnecessary to examine his prior conduct.

ORDER – 15

regardless of the officer's subjective intent or motive."). The Court cannot resolve these factual disputes at the summary judgment stage.

Plaintiff argues that Clift's initial decision to move from a position of safety into the parking lot and the eventual path of the vehicle was *ipso facto* an intentional, unconstitutional provocation. (Pl.'s Mot. 11 (Dkt. No. 190).) Regardless of Clift's exact position, Plaintiff asserts it is undisputed that Clift deliberately positioned himself somewhere in between the vehicle and the exit before he started shooting. (*Id.* at 4.) A Fourth Amendment violation, however, is not established based merely on "bad tactics that result in a deadly confrontation that could have been avoided." *Billington,* 292 F.3d at 1190. *Id.* And, "the fact that an officer negligently got himself into a dangerous situation will not make it unreasonable for him to use force to defend himself." *Id.* Clift's decision to approach the stolen vehicle in an attempt to arrest its occupants and then backpedal through the parking lot once the vehicle began moving, may have been a bad tactical decision or even negligent. But the Court cannot employ 20/20 hindsight to find that these decisions effected an unconstitutional provocation as a matter of law. *See id.* at 1191 (finding that the list of tactical errors supplied by plaintiff's expert was nothing more than "20/20 hindsight"). In sum, Plaintiff has not met his burden of demonstrating that Clift intentionally or recklessly provoked a violent response, and such provocation was an independent constitutional violation. Accordingly, partial summary judgment that Defendants are liable for unreasonable seizure is not appropriate.

### III. CONCLUSION

For the foregoing reasons, Defendant City of Kent's Motion for Partial Summary Judgment (Dkt. No. 188) is hereby DENIED, and Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 190) is hereby DENIED.

SO ORDERED this 4th day of December, 2008.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 16