THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

NICOMEDES TUBAR, III,

                  Plaintiff,

   v.

JASON CLIFT, et al

                Defendants.

No.  C05-1154JCC

**DEFENDANTS' TRIAL BRIEF**

**TRIAL DATE:  MAY 14, 2009**

## I.    INTRODUCTION

This is Defendants' Officer Jason Clift and the City of Kent's trial brief in this §1983 civil rights case arising from an incident that occurred on June 25-26, 2003, when Officer Clift fired shots at a stolen vehicle driven directly at him by Heather Morehouse. The passenger, plaintiff Nicomedes Tubar, was injured when one of the bullets struck him in the shoulder.

The Court has ruled that it will submit this case to the jury on (1) a civil rights Fourth Amendment claim against Officer Clift, (2) a ratification theory of municipal civil rights violation against the City, and finally (3) on a negligent supervision state claim against the City for its dealings with Officer Clift.

## II.    STATEMENT OF FACTS

The facts of this case have been briefed extensively.  For purposes of this trial brief defendants offer this shortened version.

Shortly before midnight on June 25, 2003, Officer Clift checked a business parking lot at 10618 Kent-Kangley Road.  Some months before, the business owner had reported a vehicle stolen from the parking lot.

Officer Clift found a Kia automobile in the lot, and confirmed it had been recently stolen. Investigating the car, he noted a glass narcotics pipe on the front seat and observed that the front license plate had been removed. Officer Clift knew from his experience with stolen vehicles that it was common for car thieves to remove front license plates. The hood was still warm, and Officer Clift decided to wait to see if the thief would return. He notified dispatch of his plan. He also put a small mechanical device known as a "rat trap" under the passenger side tire. This device is used to flatten a vehicle tire when it is driven over. He moved his patrol car out of sight and waited in a corner of the lot where he could observe the car without being seen.

Somewhat later, Officer Clift saw a male and female approach the car and get into it. Clift advised dispatch of these events, and was aware that back up officers were in route. He approached the vehicle from the rear shining a flashlight into the rear of the car and holding his service weapon in his other hand.

As he approached the vehicle, he yelled "Police. Stop." He saw both occupants of the car turn their heads backward toward him. The vehicle began to back up and again he yelled "Police. Stop." He then heard a loud noise and rapidly escaping air as the front tire was punctured by the "rat trap". He yelled again "Police. Stop." but the vehicle continued to back toward him. The vehicle backed slowly in his direction. As it did, he moved backward away from the vehicle.

Heather Morehouse, the driver, then pulled forward making a U-turn to her right as Officer Clift continued backing through the parking lot. He continued to yell at the vehicle to stop and kept his flashlight trained on it. Morehouse initially drove around the officer to his right and toward the exit of the lot, but then suddenly Morehouse turned the vehicle directly toward the officer and accelerated. He could hear the vehicle motor revving as it continued to get closer to his location. Officer Clift could see Morehouse was looking directly at him. It was very apparent to him that she was now trying to hit him with the vehicle. At that point the car was quickly closing in on the officer's location. He began

DEFENDANTS' TRIAL BRIEF - 2
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

firing his weapon.  The car then swerved to the right and came to a stop.  Clift had fired three bullets, one of which struck plaintiff Nicomedes Tubar.

Plaintiff Nicomedes Tubar lived in an apartment near the parking lot where the shooting occurred.  Heather Morehouse, who had stolen the car the day before, also lived at the complex.  The two met approximately a year earlier, and occasionally "hung out" together.  On the day of the shooting, Morehouse told Tubar she had a "new car".  Later that night, he returned around 11:30 p.m. and found Morehouse outside smoking.  He accepted her invitation to come to her apartment for a drink.  Shortly, the conversation turned to cigarettes, and Morehouse asked whether Tubar would go with her to a nearby store, commenting, "We'll take my car, it's fast."

Both Tubar and Morehouse were aware of the officer's presence before the car moved.  Tubar remembers turning to look out the rear window at the light shining into the car.  Morehouse was aware a flashlight was shining at the car.  Nevertheless, Morehouse drove away without stopping.  Tubar claims he believed Officer Clift was a "security guard," but has no memory of seeing the security guard after the car began to move forward.

Tubar reports hearing "noises" (the gunshots) after which Morehouse slammed on the brakes. It took a few moments for Tubar to realize he had been shot.  At the hospital, Tubar told a police officer that Morehouse accelerated toward the uniformed person and that it seemed Morehouse was trying to hit him.  Tubar later denied making this statement.

As the vehicle was backing, it was not a threat to Officer Clift.  And, as it began moving forward and turning to its right (in the process of making a u-turn), it was not initially a threat.  Indeed, Officer Clift thought the vehicle would exit the parking lot by going around him to his right.  Suddenly, everything changed.  The vehicle turned and began traveling directly at him.  At that point, even assuming normal acceleration, Officer Clift had less than two seconds until the car would hit him.  He had no way of predicting the driver's behavior, and no means of protecting himself—except firing in an attempt to

1 stop the driver.

2 ### III.   STATEMENT OF LAW

3 **A.   <u>Individual Liability Claim Against Clift.</u>**

4   Plaintiff claims that Officer Clift violated his Fourth Amendment right to be free

5 from excessive force. The Supreme Court held in *Graham v. Connor*, 490 U.S. 386, 104

6 L.Ed.2d 443, 109 S.Ct. 1865 (1989) that, generally, claims of excessive force against

7 officers engaged in apprehending law violators are properly analyzed under the Fourth

8 Amendment, not the more subjective standard of Fourteenth Amendment substantive due

9 process. The Fourth Amendment provides that the "right of the people to be secure in their

10 persons . . . against unreasonable . . . seizures, shall not be violated . . ."

11   The Court previously rejected defense claims that Tubar was not "seized" for Fourth

12 Amendment purposes because he was not the intended object of the officer's use of force—

13 thus leaving it to the jury to decide whether Officer Clift's use of force in these

14 circumstances was reasonable. The defense understands the Court's decision, but does not

15 want to be deemed to have waived the issue should this matter be appealed further.

16 Therefore, defendants are proposing an instruction to the effect that intentional shooting by

17 the officer that strikes an unintended target, is not a seizure.[1]

18   The Fourth Amendment does not prohibit *any* use of force, but only the use of

19 "unreasonable" force under the circumstances. Where an "officer has probable cause to

20 believe that the suspect poses a threat of serious physical harm, either to the officer or to

21 others, it is not constitutionally unreasonable to prevent escape by using deadly force."

22 *Brosseau v. Haugen*, 543 U.S. 194, 197-198 (2004).

23   The standard applied to the officer's conduct is the "objective reasonableness"

24 standard set forth in *Graham v. Connor*, 490 U.S. 386, 104 L.Ed.2d 443, 109 S. Ct. 1865

25 (1989). Determining whether the officer's conduct was reasonable "is not capable of

---

26 [1] In order to preserve this issue for potential further review, Defendants are proposing Instruction No. 34:

27   If you find that the officer intentionally fired his weapon in an effort to hit the driver, but mistakenly hit the passenger instead, no Fourth Amendment civil rights violation occurred, and your verdict should be for the officer.

precise definition or mechanical application."   And, because "police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" the reasonableness of the officer's belief as to the appropriate level of force should be judged from the on-scene perspective.   *Graham v. Connor*, at 396-397; *see also, Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001).   The Supreme Court "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."   *Saucier v. Katz, supra*, 533 U.S. at 205.

Ninth Circuit Model Civil Jury Instruction 9.22 addresses the elements of an excessive force claim.   But, Model Instruction 9.22 contemplates a situation not present here, that is that the *plaintiff* posed an immediate threat to the officer's safety.   Here, of course, the driver Morehouse provided the threat.   Cf. *Seattle v. Clay County*, 205 f.3D 867, 878 (6TH Cir. 2000).   The model instruction should be modified as suggested by defendants, below.   Otherwise the liability standard could be construed to be strict liability.

Defendants propose (No. 23) the following modified version of Model Instruction 9.22:

> In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest and in defending himself. Thus, in order to prove an unreasonable seizure in this case, the plaintiff must prove by a preponderance of the evidence that the officer used excessive force when he fired shots at the stolen vehicle.
>
> Under the Fourth Amendment, a police officer may only use such force as is "objectively reasonable" under all of the circumstances. In other words, you must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.
>
> In determining whether the officer used excessive force in this case, consider all of the circumstances known to the officer on the scene, including:
>
> 1.  The severity of the crime or other circumstances to which the officer was responding;
>
> 2.  Whether the vehicle posed an immediate threat to the safety of the officer;

3. Whether the driver was actively resisting arrest or attempting to evade arrest by flight;

4. The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary;

5. The type and amount of force used.

Plaintiff's arguments in earlier briefing have relied heavily on claims about Officer Clift's *subjective* mindset—instead of the objective reasonableness of his acts which is the proper standard. Tubar has repeatedly argued Clift's subjective intent, *e.g.*, he fired shots "not because he was in danger" but merely "to stop" Morehouse and Tubar. Plaintiff's briefing claimed that Officer Clift deliberately and intentionally fired through the driver's side window even though the threat had passed. "[H]e paused before firing that shot, and demonstrated his control and intention by shooting directly at the two occupants." Tubar's expert, D.P. Van Blaricom, claimed that Clift's "real purpose in shooting was merely to prevent the escape of two people in a stolen car."

These arguments are invalid because the "subjective motivations of the individual officers. . .[have] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Graham v. Connor,* 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Similarly, Tubar also relies heavily on hindsight. Due to the appearance of the gouge mark, Tubar claims Ms. Morehouse drove in a "predictable" path, made a "steady right turn," and "was driving toward the only exit" (ignoring the fact that the so-called "steady" turn would have resulted in a collision with a sidewalk). According to Tubar, Clift should have anticipated the route the car would follow, and thereby rest assured of the driver's benign intent. Tubar reasons that since Clift was not run over, he was never in any danger. This hindsight reasoning ignores two facts. First, the car was being driven directly

at Clift and was only a short distance away.  Second, once it turned to its right it could easily have turned back toward him—all Morehouse had to do was steer it.

The proper focus is whether *any reasonable officer* would be objectively reasonable, *even if mistaken*, in employing deadly force under the circumstances confronted by Clift.  If the officer reasonably, *but mistakenly,* believed he was in mortal danger due to Morehouse's driving, there is no liability. *Anderson v. Creighton,* 483 U.S. 635, 641 (officers who "reasonably *but mistakenly* conclude that probable cause is present" are entitled to immunity (emphasis supplied)).  "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 U.S. 194, 205 (2001).

No officer is expected to act based upon after-the-fact information.  The officer's conduct is legally judged on whether a reasonable officer "could have" believed he was at risk (and could have been capable of physically performing) when he acted.  *Hunter v. Bryant*, 504 U.S. 224, 228 (1991)("[I]f a reasonable officer *could have believed* that probable cause [to arrest] existed" he was entitled to immunity.) Clift had no way of knowing whether Morehouse would stop, slow, rapidly accelerate, continue steering toward, or turn away from him.

Plaintiff's arguments invited scrutiny of subjective considerations, not the objective reasonableness the law requires.  The Court should define "objective reasonableness" clearly, both because the Model Instructions fail to do so and because plaintiff's proof relies heavily on claims about subjective considerations:

> "Objectively reasonable" means you should consider the officer's actions without regard to his subjective motivation.  You must consider whether an another officer in the same situation Officer Clift confronted when shots were fired, and possessing the information known to Officer Clift, would have been reasonable to respond as the defendant officer did.  The subjective motivation of the officer has no bearing on whether a particular seizure is reasonable or not under the Fourth Amendment.

> If you find that the defendant officer made a mistake about some factual matter or in some action he took in the situation, this does not necessarily mean he acted unreasonably as long as under all the surrounding circumstances he acted reasonably.

Defendants' Proposed Instruction No. 35.

The jury should be *specifically* instructed that Officer Clift did not need particular information that *Tubar* posed an immediate threat to his safety—as opposed to Ms. Morehouse who was driving the vehicle.

The Comment to Model Instruction 9.22 directs that it should be used with Model Instructions 9.2-9.7—in this case 9.2 relating to the individual claim against Officer Clift. The Comment also references Model Instruction 9.18, which should be modified as follows:

> As previously explained, the plaintiff has the burden to prove that the acts of defendant Officer Jason Clift deprived the plaintiff of particular rights under the United States Constitution. In this case, the plaintiff alleges the defendant deprived him of his rights under the Fourth Amendment to the Constitution when Clift fired at the stolen vehicle striking plaintiff.

> Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of his person. In order to prove the defendant deprived the plaintiff of this Fourth Amendment right, the plaintiff must prove, by a preponderance of the evidence, that when Officer Clift fired at the stolen vehicle, striking plaintiff, this seizure of plaintiff was not objectively reasonable.

Defendants' Proposed Instruction No. 21. The Court has already ruled that a seizure occurred in this case, and the ruling was affirmed by the Ninth Circuit. The language in Model Instruction 9.18 for determining whether a "seizure" has occurred is unnecessary because it has been decided by the Court. Providing direction to the jury about finding a "seizure" suggests that is a determination they must make. Moreover, instructing the jury with the remaining language in Model Instruction 9.18 would be tantamount to instructing that if plaintiff proves he did not understand he was being seized, Tubar would automatically be entitled to a plaintiff's verdict. As previously stated, the defense is, nevertheless, proposing an instruction contrary to the Court's ruling on the "seizure" issue merely to avoid any question of waiver should the case be appealed in the future.

Since Officer Clift had a right to protect his life regardless of the status of persons in the vehicle, and without attention to whether he had particularized information identifying

DEFENDANTS' TRIAL BRIEF - 8
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

Tubar as a suspect, the jury should be given clear direction on handling the issue. Model Instruction No. 9.22 refers to an officer "defending himself," but nowhere defines self-defense for the §1983 context. Defendants are claiming Officer Clift shot to defend his life from imminent risk. Self defense is available as a complete defense in a §1983 case if an officer reasonably defends himself against an assailant. The officer "bears no liability for accidental injury to a third party." *Grisom v. Logan,* 334 F.Supp. 273, 279-280 (C.D. Calif. 1971); Prosser, *Law of Torts* 113 (1964).

The Model Instruction is modified to specifically indicate "Officer Clift." The final sentence is deleted because this is not a criminal case. The word "substantial" is exchanged for "great" to conform with the use of the term "substantial bodily harm" consistently throughout.

Model Instruction 9.22, quoted above, with modifications, at 5-6, mentions a "police officer's" use of force "in making a <u>lawful arrest or in *defending himself*</u>" (emphasis supplied). But the model instructions do not define "defending himself." Defendants are claiming Officer Clift shot to defend his life from imminent risk. Self defense is available as a complete defense in a §1983 case if an officer reasonably defends himself against an assailant. The officer "bears no liability for accidental injury to a third party." *Grisom v. Logan,* 334 F.Supp. 273, 279-280 (C.D. Calif. 1971); Prosser, *Law of Torts* 113 (1964); *Cf. Scott v. Clay County*, 205 F.3d 867, 878 (6th Cir. 2000).

Accordingly, defendants propose that Ninth Circuit Model Criminal Jury Instruction No. 6.7 (modified) be given to adequately instruct the jury on this issue:

> Officer Clift has offered evidence of having acted in self-defense. Use of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force. However, a person must use no more force than appears reasonably necessary under the circumstances.

> Force likely to cause death or substantial bodily harm is justified in self-defense only if a person reasonably believes that such force is necessary to prevent death or substantial bodily harm.

**KEATING, BUCKLIN & McCORMACK, INC., P.S.**
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

Defendants propose the following limiting instruction to be given as a separate instruction:

> If you find under all the circumstances, it was reasonable for Officer Clift to shoot at the vehicle to protect himself from substantial bodily harm or death, your verdict should be for Officer Clift even though a bullet struck the plaintiff passenger.

Defendants' Proposed Instruction No. 19.

Under Washington law, vehicles are included in the definition of "deadly weapon" if under the circumstances in which they are "used, attempted to be used, or threatened to be used," they are "readily capable of causing death or substantial bodily harm."   RCW 9A.04.110(6).  "It is undisputed that an automobile can inflict deadly force on a person, etc. *See United States v. Aceves-Rosales,* 832 F.2d 1155, 1157 (9th Cir. 1987) (*per curiam*).

Accordingly, Defendants' Proposed Instruction No. 32 provides:

A state statute provides:

> "Deadly weapon" shall include any vehicle which, under the circumstances in which it is used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

In addition, given the many criticisms of various tactical decisions made by Officer Clift, the Court should be recognize that jurors may conclude that faulty, "negligent," or unwise decision making by the Officer before shooting events set the stage that lead to the shooting.  Arguments that Officer Clift "got himself into" a situation where he had to shoot do not suffice to violate constitutional rights when the act in question is not itself a constitutional violation.  *Billington v. Smith*, 292 F.3d 1177 (2001).

For example, Plaintiff will argue that Officer Clift should not have even approached the suspect vehicle in the parking lot.   Yet, obviously, approaching a vehicle is not a constitutional violation.  Even if some expert or juror may disagree with the wisdom of the approach, the officer has not acted "objectively unreasonably" for Fourth Amendment purposes as long as his later use of force was reasonable to stop an imminent threat. Accordingly, the Court should give a limiting instruction that so called "bad tactics" are not

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

in themselves sufficient to establish liability.   Accordingly, Defendants' Proposed Instruction No. 37 states as follows:

> You may have heard evidence or argument that Officer Clift acted improperly because he approached the stolen vehicle before it started to move or later in positioning himself in the parking lot as the car was moving. In addition, you may have heard claims that Officer Clift's driving or use of vehicle impact maneuvers in other instances were improper.

> In considering the Fourth Amendment Claim against Officer Clift, you should consider if it was objectively reasonable for him to shoot under the circumstances.  You may consider his actions leading up to his decision to shoot.  But even if you believe his actions were unwise, he may still defend himself if an objectively reasonable officer in the same situation could conclude he was facing an imminent threat of death or substantial bodily harm at the time he decided to shoot.

> You may not consider this evidence in determining Fourth Amendment liability of Officer Clift or the City—whether or not you believe Officer Clift should not have approached the car or positioned himself as he did, or whether he should have been retrained.  You may not consider alleged, improper or unwise decisions and actions of the officer in determining the City's civil rights liability, but you may consider them on the state law negligence claim.

**B.    Civil Rights Municipal Liability Claim Against the City.**

**1.    The Jury Should *Not* be Instructed on the "Custom" and/or "Policy" Theory of Municipal Liability.**

The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*" for unconstitutional acts of an employee. *Board of County Comm'rs v. Brown,* 520 U.S. 397, 403 (1997).  Typically, plaintiffs attempting to prove a civil right municipal liability theory must show their civil rights were violated by a city actor and that the city had custom or policy manifesting "deliberate indifference" that was the moving force behind the violation.  *Gibson v. Washoe Cty.*, 290 F.3d 1175, 1185 (9th Cir. 2000).  Plaintiff must show that the City "*itself* caused the constitutional violations at issue." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)(emphasis supplied).  A requisite for city liability is proof that some *deliberate choice* by a policymaking official caused plaintiff's injury:

**KEATING, BUCKLIN & McCORMACK, INC., P.S.**
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

1
2

> Municipal liability under §1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternative by city policymakers.

3  *Canton v. Harris, supra.*

4
5
6

> Locating a 'policy' insures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality.

7  *Bd. Commr's of Bryan County v. Brown*, 520 U.S. 397, 403-404 (1997).

8
9
10
11
12

Here, no City official "policy" or custom allows the unlawful use of deadly force. In fact, the applicable police department policy is consistent with prevailing law on the use of force, and plaintiff does not claim otherwise.   Kent has no practice or custom—much less a "permanent" or "widespread" practice or custom—that allows officers to use deadly force absent an imminent risk to officers or others.

13
14
15
16
17
18

This Court appears to recognize that such a theory requires strict compliance with both causation and culpability requirements—which cannot be proven in this case. Dkt. 286 at 7.   Before a municipal corporation can be held liable under §1983, a plaintiff must not only show the requisite degree of culpability ("deliberate indifference"), but also demonstrate a "direct causal link" between the municipal action and the violation of rights. *Bryan County, supra* at 1388.

19
20
21
22
23

The Supreme Court has held that there are only "limited circumstances" in which there can be custom and policy liability under §1983.  *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  It is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality.  Instead, plaintiff must go one step further and demonstrate causation:

24
25
26
27

> The plaintiff must also demonstrate that, through its *deliberate conduct*, a municipality was the 'moving force' behind the injury alleged.

*Bryan County, supra* at 1388 (emphasis in original).

1   In the police context, plaintiff must show a *causal link* between the "policy" and the

2   injury:

3   > The fact that a municipal 'policy' might lead to 'police misconduct' is hardly
   > sufficient to satisfy *Monell's* requirement that the particular policy be the
4   > 'moving force' behind a *constitutional* violation. There must be at least an
   > affirmative link between training inadequacies alleged, and a particular
5   > constitutional violation at issue.

6   *Tuttle*, 471 U.S. at 823, n. 8 (emphasis in original).

7   A "custom" is something that has "not been formally approved by an appropriate

8   decision maker." *Bryan County, supra.* Rather, plaintiff must show that "the relevant

9   practices *were so widespread as to have the force of law.*" *Id.* (emphasis supplied). As the

10  Ninth Circuit has explained, the practice or custom must be widespread, permanent, and

11  well settled:

12  > Absent a formal governmental policy, [a plaintiff] must show a longstanding
   > practice or custom which constitutes the standard operating procedure of the
13  > local government entity. *The custom must be so persistent and widespread
   > that it constitutes a permanent and well settled city policy.* Liability for
14  > improper custom may not be predicated on isolated or sporadic incidents; it
   > must be founded upon practices of sufficient duration, frequency and
15  > consistency that the conduct has become a traditional method of carrying out
   > that policy. [Emphasis supplied.]

16

17  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quotations and citations omitted).

18  Kent has no practice or custom—much less a "permanent" or "widespread" practice

19  or custom—that allows officers to use deadly force *absent* an imminent risk to officers or

20  others.

21  As stated, plaintiff's expert do not claim the City had a policy allowing officers to

22  improperly use deadly force. Instead, they focus on criticisms of Officer Clift's tactics in

23  other shooting incident, including approaching suspect vehicles. Plaintiff's experts may

24  argue that Kent has a custom or policy of having officers approach high-risk vehicles

25  improperly. Unlike plaintiff's expert's who appear to claim that officers should never

26  approach a suspect vehicle, Kent trains officers to apply varying techniques and tactics in a

27  flexible manner—approaching the vehicle if objectives would be served by doing so. This

DEFENDANTS' TRIAL BRIEF - 13
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

does not reflect "custom" or "practice" as those terms are applied in municipal liability cases. Holding otherwise would mean that one expert's preference for a tactical approach would assume a constitutional dimension, despite the fact that other qualified professionals disagree with the approach. In this case, plaintiff's expert ignores the fact that other risks flow from a decision never to confront noncompliant suspects in a vehicle.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Here, Tubar utterly failed to produce any evidence of a "conscious disregard of an obvious risk" that a constitutional violation would occur. *Bryan County*, 117 S. Ct. at 1393.

The alleged deliberate indifference must have "actually caused" the injury. *City of Canton*, 409 U.S. at 391 (requiring a "close causal connection"). It is not enough that the violation be "likely to happen in the long run," rather the violation must "**almost be bound to happen sooner or later**." *Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997) (emphasis supplied).

The above cases demonstrate that the threshold is quite high for finding "deliberate indifference" by failing to address a pattern of police misconduct. The past misconduct must be "persistent and widespread," and must involve constitutional violations—not just torts or policy breaches. In this case, there was no "pattern" of misconduct by Officer Clift. Officer Clift had no history of using unlawful force. The City was not deliberately indifferent to Tubar's rights. Tubar has not and cannot meet his burden of proof for a custom and policy theory to be submitted to the jury.

Also, as defendants previously pointed out there is no municipal liability as a matter of law for a police department to seek and follow the advice of a psychologist on the question of an officer's psychological fitness to perform his usual functions. In *Davis v. City of Ellensburg*, 86 F.2d 1230 (9th Cir. 1989), plaintiff alleged several Ellensburg police officers used excessive force in arresting him. Prior to the encounter with Davis, the Police Chief sent two of the officers to a police psychologist for concerns about the officers'

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

1   ability to function as officers.   In affirming summary judgment for the city, the Ninth

2   Circuit said:

3       [T]he <u>Chief allowed both to remain on active duty only after receiving

4       written reports from Dr. Shaw that both were competent to perform their duties.</u> … Viewing the evidence in the light most favorable to Davis, we

5       agree with the district court's conclusion that the evidence fails to establish that the Chief acted with deliberate indifference in failing to remove the two

6       officers from active duty.  Consequently, the City of Ellensburg is no liable under *section 1983* for inadequate supervision.  Accordingly, we need not

7       decide whether there is a genuine issue regarding causation.

8   *Davis*, 869 F.2d at 1235 (emphasis supplied).

9         It is undisputed that in the approximate month before the shooting, Kent sent Clift to

10  police psychologist Norman Mar.  After testing, fact gathering and an interview, Dr. Mar

11  wrote to Kent that *Clift was fit to return to his normal duties.*  Like the Chief in *Davis*,

12  *supra*, Chief Crawford put Clift back on active duty.  This is direct proof of the *absence* of

13  deliberate indifference *as a matter of law*.

14       **2.**    **<u>Arguments that Officer Clift Should Have Been Retrained Do Not Meet the Stringent Proof Standards Set Forth Above; and For That Reason May Not Serve as a Basis for Municipal Liability.</u>**

15

16        Since municipal liability cannot be based upon *respondeat superior* liability,

17  plaintiff cannot solely rely on proof of the employee officer's conduct in the subject

18  incident.  Here, plaintiff plans to rely upon police expert Lou Reiter's opinions that the *City*

19  improperly trained officers' in approaching high-risk vehicles.   Arguments based on

20  improper training do not stem from the "ratification" theory of municipal liability, but

21  rather claims of the City's unconstitutional, deliberately indifferent hiring, training,

22  supervision. These claims are not viable because Tubar cannot identify a custom or policy

23  reflecting deliberate indifference that was a "moving force" causing his injuries.

24        Plaintiff's police expert Reiter criticizes Officer Clift tactics immediately before the

25  shooting.  Reiter claims Clift and other officer should not have approached suspect vehicles

26  in two prior shootings.  Instead, he insists the officer should have taken cover and ordered

27  the occupants out of the vehicles.  But in both instances, the officers repeatedly ordered

DEFENDANTS' TRIAL BRIEF - 15
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

**KEATING, BUCKLIN & MCCORMACK, INC., P.S.**
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

suspects out of their vehicles at gunpoint, to no avail.  Also, in each case drivers were aggressively driving to maneuver their vehicles out of the confines of surrounding police cars.

Reiter also criticized the City because Clift employed a driving maneuver called a "PIT" which Reiter claims should have been restricted to lower speeds.  Reiter also argues that Clift should have been retrained on the maneuver and approaching "high risk" vehicles.  He then concludes due to lack of retraining "Officer Clift's conduct with respect to the Morehouse/Tubar vehicle" was a "predictable result."  Officer Clift's encounter with Tubar did not involve the *officer's* driving, and thus these arguments cannot conceivably be a moving force behind any unconstitutional act.

Similarly, expert's arguments about faulty tactics will not result in municipal liability.  In previous briefing, the defense pointed out significant Ninth Circuit criticism of Van Blaricom, another of Plaintiff's police experts.  In *Billington v. Smith,* 292 F.3d 1177, 1185-1186 (9th Cir. 2002), the Court summarized Van Blaricom's opinions, criticizing the defendant police officer (referring to them as a "litany of tactical errs") as follows:  "the theory is basically that Detective Smith shouldn't have gotten himself into the situation, so he couldn't constitutionally shoot his way out of it."

> [Claims that] Detective Smith should have sat in his car until backup arrived, or donned all of his equipment before approaching [the suspect], or have taken precautions against [the suspect's] grabbing him by his throat and pulling himself out of the car window to attack the detective, or that Detective Smith should have dropped off his wife and daughter somewhere before dealing with [the suspect], *none of Detective Smith's supposed errors could be deemed intentional or reckless, much less unconstitutional, provocations that caused [the suspect] to attack him.*  (emphasis supplied.)

*Billington v. Smith, supra* at 1191.  That is precisely the argument raised by both plaintiffs' experts in the claims described in this section.

Similarly, the so-called unconstitutional conduct of the City in training officers to approach high-risk vehicles did not subsequently *cause* Ms. Morehouse to drive in the manner that resulted in the shooting.

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

Plaintiff and defense experts do not agree about appropriate tactical training of officers.  Plaintiff's expert will testify that officers should never approach a high-risk vehicle under any circumstances.  Defendants' expert asserts that plaintiff's "no approach" theory is absolutely inconsistent with police training anywhere in Washington State, or elsewhere, to his knowledge, and his approach would not eliminate threats to officers and public safety.  Moreover, Kent does not ascribe to a uniform method of handling high-risk vehicles—as Reiter appears to suggest.

The City's approach to training is not a "custom" or "policy" (as the terms are used in the municipal liability) because the City trains officers to use a *variety* of approaches aimed at achieving appropriate law enforcement objectives.  This can hardly amount to unconstitutional custom or policy.  The City's training approach was not "deliberately indifferent", nor was it the "moving force" in causing plaintiff's injuries—much less, the violation of his rights.

Furthermore, the circumstances of Morehouse/Tubar incident are markedly different than the two earlier incidents, and there is no coherent argument that any particular training error had general application to the three incidents.  Officer Clift was not trying to extract Morehouse from the vehicle when he first approached it from the rear.  In *neither* prior shooting was Officer Clift in a position of danger because of putting himself in front of the suspect vehicle.

**3.     City Liability Under a Ratification Theory Should Not Result *De Facto Respondeat Superior* Liability.**

The Court's ruling on municipal liability appears to squarely focus on a "ratification" theory of municipal liability—as opposed to the more traditional theory requiring proof of a custom and policy.  Dkt. 286 at 6-11.  ("[T]he plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.")  Dkt. 286 at 6.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

The Court states the ratification theory applies when an "authorized" policymaker makes a "conscious, affirmative choice" ratifying the conduct in question, and thus it makes no difference that the ratifying decision occurs after the fact, and thus cannot have been a "moving force" behind the violation itself. *Id.* at 7.  The Court then discussed the policy-making conduct that could result in liability to include approving a grossly inadequate investigation that approves the propriety of the conduct.  The Court also held the conduct must involve a final decision that chooses among various "alternatives."

The Court comments that "[r]atification does not require knowledge that the approved conduct is actually unconstitutional.  Rather, the policymaker need only have 'knowledge of the *alleged* constitutional violation' and its factual basis prior to ratifying the conduct in question."  Id. at 9.  Yet, reasonable conclusions reached after a fair reading of an investigation should not result in unconstitutional conduct by the City—just because parties with a vested interest can put forth arguments to the contrary.  In this case, the validity of the shooting is strongly supported by Ms. Morehouse's guilty plea, as well as her continuing failure to seek to withdraw her guilty plea despite the claims Tubar is making in this case.  The involved prosecutor will testify there was ample evidence to convict Morehouse, and her able criminal defense attorney agreed when he attended the plea hearing and advised her to plea.

Under these undisputed circumstances, the police chief cannot reasonably be expected to reject the investigation that underpinned the Morehouse prosecution and provided ample reason for exonerating the officer.  Plaintiff will argue that the "flawed investigation" justifies a conclusion the policy maker knew he should not have approved the conduct.  But the "flaws" identified do nothing to prove improper or unconstitutional conduct.  Plaintiff claims too much time elapsed between the shooting and Clift's making a statement.   But there is no evidence any delay impaired the investigation, resulted in lost evidence, or otherwise affected the outcome of the investigation.   Plaintiff claims investigator Det. Clark did not ask Officer Clift the "tough questions."  Yet, Ms. Morehouse

DEFENDANTS' TRIAL BRIEF - 18
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

promptly retained a competent defense attorney who was free to ask the "tough questions."

The investigation alleged "flaws" do not prove the full truth did not come out in the investigation, or that the Police Chief knowingly exonerated Clift based on compromised information. Any jury reaching such a conclusion would necessarily be relying on speculation.

The Court commented that because the City had civil liability defense counsel available in the early stages "he was aware of potential constitutional violations arising from Clift's use of deadly force." *Id*. at 9. Cities, indeed governments in general, are routinely sued when injuries arise from their activities whether they are at fault or not. Police activity, more than most government activity, comes with considerable risk— whether police to confront and apprehend criminals, or choose not to. Officers are sued by suspects for using force against them; they are also sued when they refrain from using force and suspects harm others.

Kent, for example, has already shown that police expert Van Blaricom criticized the City in another case when officers pulled over another young female car thief who had recently exited a parking lot. Van Blaricom criticized officers that she was allowed to "go mobile" arguing she should have been stopped before leaving parking lot! She ran from police and killed two persons when she ran a red light. Yet in this case, the same "expert" argues Clift should *not* have tried to stop Morehouse before she left the lot. Chief Crawford did not have Tubar's experts' opinions when he exonerated Clift. The fact that Van Blaricom and others could be depended upon to find something wrong with Clift's conduct (and stood to gain financially for making sure they did) does not mean those opinions are valid.

Plaintiff claims that because the City consulted civil attorneys, this is proof of a "guilty conscience." This is wrong for many reasons. It should be no surprise that police frequently find themselves subject to suit—regardless of the reasonableness of their actions— and that they would want to protect their interests and the public resources

DEFENDANTS' TRIAL BRIEF - 19
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

1  burdened with covering the significant costs of defending lawsuits.

2       Defendants are unaware of any other context where a jury is invited to consider

3  whether a party has a "guilty conscience" based upon nothing more than consulting an

4  attorney.   In the criminal context, such an argument would be prosecutorial misconduct

5  potentially resulting in a mistrial.

6       Permitting the inference has obvious consequences for civil litigants as well.

7  Parties have a legitimate interest in consulting counsel without having to calculate that, by

8  merely doing so, a jury may infer that are "guilty." In *Knorr-Bremse v. Dana Corp.,* 383

9  F.3d 1337 (D.C. Cir. 2004) a patent infringement defendant consulted attorneys concerning

10  a competitor's patent and refused to divulge advice received claiming attorney-client

11  privilege.  The trial court inferred from the litigant's refusal to divulge counsels' advice that

12  advice received was unfavorable.  Proof of the willfulness of the litigant's conduct was a

13  necessary element for recovery, and of course the litigant's opponent wanted to use the

14  refusal to disclose attorney advice to support the inference reached by the trial court.

15       The appellate court ruled the *inference was improper.*  Relying upon the strong

16  interest in protecting the attorney-client relationship, the appeals court rejected the notion

17  that the inference should be permitted because it would "distort the attorney-client

18  relationship in derogation of the foundations of that relationship." *Id.* at 1344.  The Court

19  reached this result even though plaintiff's case was more difficult to prove as a result.

20       In *Hunter v. State*, 82 Md. App. 679, 691, 573 A.2d 85 (1990), the court directly

21  addressed this exact issue:

22       The exercise of [the right to an attorney] does not imply a consciousness of
         guilt. In seeking legal advice or representation, the person may well believe
23       himself culpable of some tortious or criminal conduct. But he may just as
         well believe himself entirely innocent or only partly culpable, or he simply
24       may not know whether his acts or omissions are in violation of law. And if
         he has some pre-formed belief as to his culpability or innocence, that belief
25       may turn out to be unfounded. Indeed, common human experience would
         suggest that, absent some special circumstance not evident here, the most
26       likely purpose for seeking legal advice or representation is to find out what
         one's status and exposure may be. If there is a rational inference to be drawn
27       from the seeking of such advice or representation therefore, it cannot be
         more than that—an uncertainty. *To draw an inference of consciousness of*

DEFENDANTS' TRIAL BRIEF - 20
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

*guilt from the seeking of such advice, then, is both illogical and unwarranted; the fact to be inferred-the consciousness of guilt-is not made more probable (or less probable) from the mere seeking of legal advice or representation, and so evidence of the predicate fact is simply irrelevant. On pure evidentiary grounds, it is inadmissible.* (emphasis supplied)

One would be hard-pressed to find a case that more directly addressed the issues in this case than the language quoted above.

If the Court decides that the inference is fair game against defendants, the plaintiff is similarly subject to negative inferences for obtaining counsel, defendants will of course be required to explain to the jury the large volume of meritless claims police officers and departments continually face which "goes with the territory" of police work.  Defendants would point out that Tubar *also* promptly obtained counsel.

These issues arise from the Court's ruling denying the City's municipal liability summary judgment motion. Plaintiff's ratification theory arguments are exceedingly weak, and necessarily based on speculative leaps not supported by evidence.  Tubar cannot point to anything specific in the investigation, or in facts known to Chief Crawford, that should have alerted the Chief that Officer Clift allegedly violated Tubar's rights.  If the investigation were so obviously flawed, it could not have passed muster as a basis for Morehouse's guilty plea. The mere fact that the Chief expected (correctly) that the City might be sued, is not sufficient evidence he knew the shooting was unjustified.  Allowing this vacuum of evidence to be filled by negative inferences because the City exercised its right to consult counsel compounds the problem.

In the absence of proof that the policy maker either (1) knew the shooting was unjustified or (2) that the investigation was so critically flawed that the legality of the shooting either could not be determined or was misrepresented, the Chief's "ratification" does not arise to unconstitutional conduct by the City.  Allowing the jury in this case to decide in such an after-the-fact matter that the Chief should have viewed the investigation and the facts as plaintiff's biased experts claim they should be viewed negates long-standing principles which limit imposition of municipal civil rights liability.  To impose liability, facts must be sufficient so that the City can fairly be said to have *itself* caused a

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

violation of civil rights.

Defendants will except to the jury be instructed on municipal liability for the reasons stated.  However, if the Court decides to instruct the jury on a municipal liability ratification theory, Model Instruction 9.6, should be modified as proposed in Defendants' Instruction No. 24:

> In order to prevail on his §1983 claim against defendant City of Kent alleging liability based on ratification by a final policymaker, the plaintiff must prove each of the following elements by a preponderance of the evidence:
>
> 1.  Officer Clift acted under color of law;
>
> 2.  The acts of Officer Clift deprived the plaintiff of his particular rights under the United States Constitution as explained in other instructions;
>
> 3.  Chief Ed Crawford acted under color of law;
>
> 4.  Chief Ed Crawford had final policymaking authority for defendant City of Kent when he reviewed the circumstances of this shooting and Officer Clift's prior shootings following internal investigations to determine adherence to city policy; and
>
> 5.  Chief Ed Crawford ratified Officer Clift's acts and the basis for them, that is, Ed Crawford knew that Officer Clift's shootings under the circumstance of this case and other cases was unjustified and the Chief nevertheless specifically approved of the Officer Clift's acts.  In the alternative, Chief Crawford ratified Officer Clift's acts knowing that he (Chief Crawford) was relying upon a grossly flawed investigation which in some material manner misrepresented or obscured the unjustified nature of Officer's Clift's conduct.
>
> A person acts "under color of law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation. I instruct you that Officer Clift acted under color of law.
>
> I instruct you that Chief Ed Crawford had final policymaking authority from defendant City of Kent concerning the act at issue and, therefore, the fourth element requires no proof.
>
> If you find the plaintiff has proved each of these elements, and if you find that the plaintiff has proved all the elements he is required to prove under Instructions [Model Instructions 9.18 and 9.22 (as modified)], your verdict should be for the plaintiff. If, on the other hand, the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant.

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

1   If the jury is instructed on this theory and the Court admits evidence that the City consulted

2   an attorney, the Court should give a limiting instruction, Defendants' Proposed Instruction

3   No. 36 as follows:

> 4   Parties have a right to seek the advice of attorneys, and you may not infer that by doing so, Chief Crawford, or any other city official or employee receiving legal advice, were subjectively aware of wrongdoing and are, for that reason, liable for violation of plaintiff's civil rights.

**C.     Plaintiff's Provocation Theory.**

8        It would be error for the Court to instruct on plaintiff's "provocation" theory.

9   Officer Clift's alleged constitutionally defective approach to the Morehouse vehicle *was not*

10  *the impetus for assaultive conduct by Morehouse*.   Clift was not approaching the vehicle,

11  but was trying to stay out of its way when Morehouse drove in his direction.   The defense is

12  of course aware of Tubar's claim that Clift stepped in front of the moving unconcerned

13  about the obvious risk to his life just to give himself an excuse to shoot the occupants.   That

14  novel theory is not supported by any of the three eyewitnesses to events—inconvenient

15  though it is for plaintiff's experts.

16       Even if Officer Clift negligently or even recklessly placed himself in a dangerous

17  position in front of the moving car, that is not a Fourth Amendment violation in and of

18  itself—which *Billington*, *supra* at 1191, requires.   As the Court's stated in its order (Dkt.

19  286 at 15) for plaintiff to prevail on a Fourth Amendment claim based upon provocation,

20  "Plaintiff must establish that Clift intentionally or recklessly provoked a violent response,

21  and such provocation was an *independent* constitutional violation, i.e., it was objectively

22  unreasonable." (emphasis supplied) This statement clearly anticipates that a jury will

23  consider the officer's subjective state, i.e., whether he intend to provoke an assault or to

24  give himself an excuse to shoot.   But the Supreme Court has repeatedly rejected the notion

25  that an officer's subjective motivations are even relevant.    It is also contradictory to

26  suppose a jury *could* determine whether an officer's subjective motive is "objectively

27  reasonable."

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

Finally, it also ignores that the Fourth Amendment requires a "seizure," evidently relying upon the idea that the *later* shooting establishes that element of the violation, but this would negate the *Billington* requirement of a *separate* unconstitutional act.

Unless the Court rules that plaintiff's experts opinions on the subject of alleged improper tactics and improper training are barred from evidence, a cautionary instruction should be given to the jury to eliminate the possibility that plaintiff's claims on these subjects could be a proper basis for liability.  As the Supreme Court has stated:

> Some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the tests set out in *Monell* will become a dead letter.

*Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

For this reason the defense proposes Instruction No. 37, quoted above at p. 11.

**D.      Plaintiff's State Law Negligent Hiring, Supervision Theory.**

   **1.   If the Court Instructs the Jury on a State Theory of Recovery Ignoring the Absence of a *Respondeat Superior* State Claim Against Officer Clift, the City Could be Held Liable Even if Officer Clift is Deemed not Liable by the Jury.**

Tubar's Complaint alleges that the City "had a duty to use reasonable care in hiring, training, supervision, and retention of defendant Clift."  Plaintiff claims the City "breached this duty and proximately caused damages" to him.  Yet, plaintiff did not bring a state law claim for assault against Officer Clift.  He could have done so because Washington law has long recognized a state common law tort for excessive force by a police officer carrying out his duties.  *See, e.g., Thomas v. Seattle,* 395 F.Supp.2d 992, 1000 W.D.Wash. 2005); *Boyles v. Kennewick,* 62 Wn.App. 174, 813 P.2d 178 (1991).  Plaintiffs suing on state law theories routinely rely upon *respondeat superior* to hold the employing entity responsible for officers' acts.

The City has admitted Clift was acting within the course and scope of his duties at the time.  Thus, if Plaintiff had made a state law claim against Clift, and if Clift was found liable on a state law claim, the City would be automatically liable to plaintiff—making it entirely unnecessary for the plaintiff to prove "negligent hiring, retention," etc.  Tubar

presumably knows this, but decided *not* to bring a state law claim against Clift for tactical reasons.

The Court denied the City's summary judgment motion on this issue concluding that the rule stated in *Gilliam vs. Dept. of Soc. & Health Servs.,* 89 Wn.App. 569, 950 P.2d 20 (1998) only applied when the theory of liability applicable to the employee is "negligence," commenting:

> The [Gilliam] court determined that, because the plaintiff had asserted a negligence claim against the employee, for which the State had admitted vicarious liability, a claim for negligent supervision would be "redundant." *See id.* If the employee was found liable for negligent investigation, the State would necessarily be vicariously liable under *respondeat superior. Id.* In other words, the State's liability was dependant on whether the employee was negligent.

Dkt. 286 at 11-12. But the "redundancy" the State court is referring to is fact that *respondeat superior* liability for the City is automatic—making it unnecessary to find an alternative means of proving employer liability. The redundancy is present in both situations: when the liability theory is negligence of the employee and when a police employee is found liable for assault under a state law theory of assault.

The availability of a "negligent supervision and retention" theory is only necessary—and thus not redundant—if the employee's acts are outside the scope of his duties. Usually, the employee has engaged in a criminal act which cannot be said to have furthered his employer's interests, but nevertheless the continuing employment of an obviously unsuitable employee has provided an opportunity to harm plaintiff that would not have been available otherwise.

This Court concludes that the City's admission of scope has no consequence for whether the negligent hiring and retention theory should also be available: the scope of liability "test does not dictate whether the employer can be held *directly liable* for breaching its own duty of care through negligent hiring, supervision, or training." Dkt. 286 at 12. The Court cites *Smith v. Sacred Heart Med. Ctr.,* 144 Wn.App 537, 543, 184 P.3d 646 (2008), but that case is a typical example of employee acts (sexual conduct with

plaintiff) outside the scope of his employment, precisely the circumstance under which the alternative negligent hiring, supervision theory is applied.  That is not the situation is this case.

The difficulty with the Court's conclusion on summary judgment in this case is that it *uncouples* Officer Clift's liability for wrongdoing in the shooting and makes possible City liability even if Officer Clift did nothing wrong.  A jury could find Officer Clift was *acting lawfully* within the scope of his employment, but the City still could be held "negligent" under the state theory (on some training or supervision issue) *despite* the fact that Officer Clift was not tortiously liable. But, this is inconsistent with Washington law.   *If the underlying conduct was not tortious, whether the City negligently supervised or trained Officer Clift is irrelevant*.  As stated in *Shielee v. Hill*, 47 Wn.2d 362, 366, 287 P.2d 479 (1955), "[I]t seems clear that so far as the liability of the employer to a third person is concerned, his failure to hire only competent and experienced employees does not *of itself* constitute an independent ground of actionable negligence." (emphasis supplied; quoting 35 *Am.Jur* 978, §548).

The Court's ruling thus far is contrary to the state law authorities previously cited by defendants and the *Smith* case relied upon by the Court.  Defendants respectfully request that the Court decline to instruct the jury on plaintiff's state law negligent hiring, supervision and retention claim.

## 2.   If the Court Instructs on the State Law Negligence Theory, it Should Also Instruct on Plaintiff's Contributory Negligence.

If the Court instructs the jury on the negligent hiring and supervision issue, it should then also instruct on the issue of plaintiff's contributory negligence.  Mr. Tubar's testimony will establish that shortly before the shooting, Ms. Morehouse was quizzing him, over drinks, on whether he took "speed," and offered him some of her prescription medication. Yet, he accepted her invitation to drive to a nearby store stating they should take her new "fast" car.  He watched as she cleared the front seat leaving behind a crack pipe which he sat on as they began there trip.  She ignored the presence of a "security guard" shining a

DEFENDANTS' TRIAL BRIEF - 26
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & MCCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

flashlight into the back of the stolen car, even though neither of them had ever seen security guards in the area before—and Mr. Tubar did not protest.  He ignored noises of the front tire being rapidly deflated, and the continued presence of the officer shining his flashlight into the vehicle.  The jury should consider whether Mr. Tubar's own conduct contributed to his injury.

### 3.   If the Court Instructs on the State "Negligent Hiring, Retention" Theory, It Should Instruct Consistent with *Tegman*.

Washington's comprehensive scheme of apportioning liability distinguishes between negligent tort-feasors and intentional tort-feasors.  *Price v. Kitsap Transit*, 125 Wn.2d 456 (1994).  The liability of negligent tort-feasors is *not apportioned* to intentional tort-feasors.  *Welch v. Southland*, 134 Wn.2d 629, 636-37 (1998).  In this case, plaintiff strategically decided not to sue Ms. Morehouse for her intentional criminal conduct.  Furthermore, he chose not to bring state law claims against Officer Clift, but he did include a negligence state law claim against the City.

Under RCW 4.22.070, the trier of fact must determine the total fault for any injury.  RCW 4.22.070(1); *Price*, *supra*.  Fault under RCW 4.22 includes negligent acts and omissions.  RCW 4.22 .015.  But the definition of fault does not include intentional acts or omissions.  *Tegman v. American Medical Investigations*, 150 Wn.2d 102, 109 (2003).  "Intentional torts are part of a wholly different legal realm, and inapposite to the determination of fault pursuant to RCW 4.22.070(1)."  *Price v. Kitsap Transit*, 125 Wn.2d at 464.

Judge Martinez concluded the Court was compelled to instruct the jury to segregate damages from intentional conduct from negligence-based conduct.  *See R.K. v. Corp. of President of the Church of Jesus Christ of Latter Day Saints*, U.S.D.C. No. C04-2338RSM, *Order Granting Defendant's Motion to Segregate Damages Resulting from Intentional Tortfeasor*, dated August 28, 2006 (order attached).  Where both negligent and intentional acts combine to cause plaintiff's damage, the negligent actors are jointly and severally liable for "that part of the total damage that they negligently cause." *Tegman*, 150 Wn.2d at

DEFENDANTS' TRIAL BRIEF - 27
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861   FAX: (206) 223-9423

114.   Defendants who act negligently "are not jointly and severally liable under RCW 4.22.070(1)(b) for any damages resulting from intentional acts or omissions." *Id*. at 114. These rules require a jury to assess the damages and segregate them. "The damages due to intentional acts must be segregated" from negligent acts. *Tegman*, 150 Wn.2d at 115. And the negligent defendants are never jointly and severally liable for the intentional damages. *Id*.

Intent for purposes of tort law does not require proof that the actor intended harm or injury. "The intent with which tort liability is concerned is not necessarily a hostile intent, nor a desire to do any harm . . .  Intent, however, is broader than a desire to bring about physical results.  It must extend not only to those consequences which are desired, but also those which the actor believes are substantially certain to follow what he does . . ." *Bradley v. American Smelting*, 104 Wn.2d 677, 683 (1985) (citing RESTATEMENT (SECOND) OF TORTS § 8).

When a child pulls a chair out from under a houseguest, intent is present even where the child did not intend to hurt the guest. *Garratt v. Dailey*, 46 Wn.2d 197, 201 (1955). Intent is present if the child intends to move the chair, and knew that a fall was the likely result. *Id*.  Thus, when a Tacoma smelter intentionally discharges soot, knowing the wind will carry it to Vashon Island, it has committed the intentional tort of trespass. *Bradley*, *supra*.  It is intentional because "there is a high probability of injury to others. . . ." *Id*.

Here, Heather Morehouse intentionally drove the stolen car in a manner which was life-threatening to Officer Clift, probably under the influence of illegal drugs, likely fully aware the police were looking for the stolen vehicle she deliberately hid in the back lot of a business adjacent to her apartment.  While her judgment may have been affected, she was obviously coherent enough to drive, to refuse to give a statement to police after-the-fact, *and to deliberately aim her vehicle at the officer while accelerating.*   She will admit that the officer's flashlight was clearly visible to her, and yet she turned her vehicle directly toward it.  Under these circumstances, "there is a high probability of injury to others."

DEFENDANTS' TRIAL BRIEF - 28
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861  FAX: (206) 223-9423

*Bradley*, *supra*.  Her acts were intentional, and if the jury is instructed on the state law claim, damages calculations should take into account the damages apportionment rule set forth in *Tegman*.  The jury should be permitted to assess whether these acts were intentional and apportion fault to them.  The following instruction (Defendants' 31) should be given:

Tegman Instruction

> If you find in favor of plaintiff on the state law negligence claim, you must also consider whether Ms. Morehouse's intentional conduct was a proximate cause of plaintiff's injuries and damages.

> A person acts with intent to achieve a particular result if the evidence demonstrates either (1) that the person wants to achieve the particular result or (2) that the person knows the particular result is substantially certain to follow from his or her conduct.  This instruction relating to whether the driver acted intentionally should guide your deliberations only as to Ms. Morehouse's state of mind at the time, and not the conduct of other individuals or parties.

*Hanson PLC v. National Union*, 58 Wn. App. 561, 571 (1990); *Bradley v. American Smelting*, 104 Wn.2d 677, 682 (1985).

**E.   The Court Should Not Permit Unfounded Comment or Arguments by Plaintiff's Counsel Alleging Wrongdoing by Defense Counsel in the Prosecution of Ms. Morehouse.**

The defense has moved to exclude plaintiff's arguments that defense counsel influenced the prosecution of Ms. Morehouse.  *See* defense motions in limine, Dkt.  240, P. 19.  Defense concerns were heightened during discovery by repeated comments and claims by plaintiff's counsel that alleged improper conduct.  For example, back in 2006 plaintiff's briefing argued that after the Morehouse prosecutor "consulted" with the Officer Clift's defense counsel (Steve Thorsrud) in this case, Ms. Morehouse pleaded to the "doubtful charge" of assault on Officer Clift.  Subsequently, in a letter dated two years later in 2008, plaintiff's counsel, Mr. Ford, wrote in a letter:

> "As you know, our position is that the City, through your law firm intervened in the Morehouse prosecution to obtain a conviction that was false, in order to help conceal Officer Clift's wrongdoing.  We will argue at trial that such conduct is evidence of the City's policy of toleration of unnecessary force, and the defendants' consciousness of guilt."

Mr. Ford made these statements knowing that the prosecutors involved denied they

had been pressured by the City's attorney, and prosecutors had testified that contacts they did have with the attorney were routine communications with a representative of a crime victim. Prosecutors testified in depositions that it was they who were "firm" that *they* would not agree to a plea from Morehouse that *did not* include a plea to assault on the officer. The prosecutor testified that Morehouse assault case was a "good case" based on "solid" evidence. Despite this information, plaintiff's counsel continued to argue that Clift's attorney was responsible for the Morehouse guilty plea.

Plaintiff's counsel obviously intends to rely upon arguments of impropriety when he knows very well they are untrue. As stated in briefing to this Court.

It is emblematic of a City policy of focus on liability avoidance that led to this shooting; and it is indicative of the fact that the City's officials know that this shooting was unjustified and *sought to manufacture evidence to support it.* Dkt. 250 at 4.

There is, of course, not a whit of evidence that the City, or its attorneys did any such thing. In lengthy correspondence, defense counsel has objected to this remark explaining that it is wholly devoid of evidentiary support, and it therefore sanctionable under Rule 11 should plaintiff's counsel continue to advocate this position at trial.

Defendants are bringing this to the Court's attention, because they are concerned that similar, unfounded claims will be repeated during trial. There is no evidence whatever that the City, or its attorneys, did anything improper relating to the Morehouse prosecution, and the prosecutors will so testify. The defense urges the Court to grant its motion in limine on this topic to avoid the potential for prejudicial, unfounded (and irrelevant) claims or innuendo of misconduct by the City or its counsel.

## G.   Officer Clift Will Invoke the Marital Privilege if His Ex-Wife Tracie Jarratt or His Current Wife Are Called to Testify.

Because plaintiff has indicated his intent to call Officer Clift's ex-wife, Tracie Jarratt, and his current wife, Brandy Clift, the officer is notifying the Court he will invoke the "marital communications" privilege. Under the privilege, private communications between spouses are generally assumed to have been intended to be confidential, and are

DEFENDANTS' TRIAL BRIEF - 30
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

thus privileged. The privilege: (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications, that is, those not made in the presence of, or likely to be overheard by, third parties. *See United State v. Montgomery*, 384 F.3d 1050 (9th Cir. 2004).

## IV.    CONCLUSION

Defendants request that the jury be instructed as set forth above and as set forth in the proposed jury instructions submitted by these defendants.

RESPECTFULLY submitted this 9th day of May 2009.

KEATING, BUCKLIN & McCORMACK, INC., P.S.

/s/ Mary Ann McConaughy
Mary Ann McConaughy, WSBA #8406
Steven L. Thorsrud WSBA #12861
Attorneys for Defendants
mmcconaughy@kbmlawyers.com

DEFENDANTS' TRIAL BRIEF - 31
Cause No. C05-1154
K:\MAM\WCIA 03107\p-050609-trial brief MAM.doc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

R.K.,

             Plaintiff,

    v.

THE CORPORATION OF THE
PRESIDENT OF THE CHURCH OF JESUS
CHRIST OF LATTER DAY SAINTS, *et al.*,

         Defendants.

CASE NO.  C04-2338RSM

ORDER GRANTING
DEFENDANT'S MOTION TO
SEGREGATE DAMAGES
RESULTING FROM
INTENTIONAL TORTFEASOR

16

17

18

19

20

21

22

23

24

25

26

    This matter comes before the Court on defendant, the Corporation of the President of The Church of Jesus Christ of Latter-Day Saints' ("COP"), Motion to Segregate Damages resulting from the intentional tortfeasor, who is not a named party to this action.  (Dkt. #123).  Defendant argues that the Washington State Supreme Court's decision in *Tegman v. Accident and Medical Investigations Inc.*, 150 Wn.2d 102 (2003) compels an Order by this Court stating that it will instruct the jury to segregate damages resulting from Jack LaHolt's intentional conduct from damages attributable to defendant's negligence, if any.  Plaintiff argues that *Tegman* does not apply to the instant case, and that *Welch v. Southland*, 134 Wn.2d 629 (1998), actually compels a determination that damages may not be segregated.  (Dkt. #136).  Having reviewed defendant's motion to segregate, plaintiff's opposition, defendant's reply, the declarations in support of those briefs, and the remainder of the record, the Court hereby finds and ORDERS:

ORDER
PAGE - 1

1   (1) Defendant's Motion to Segregate Damages (Dkt. #123) is GRANTED. The Court finds

2   plaintiff's reliance on *Welch*, *supra*, misplaced. As defendant notes, *Welch* governs the

3   apportionment of fault, whereas *Tegman* governs the apportionment of damages. This is evidenced

4   by the *Tegman* majority's rejection of certain premises set forth in the dissenting opinion. In his

5   dissent, Justice Chambers characterized *Welch* as applying to the apportionment of damages under

6   RCW 4.22.070. *Tegman*, 150 Wn.2d at 127 (Chambers, J., dissenting). However, the majority

7   opinion made clear that Justice Chambers had misapplied *Welch*, and that *Welch* only applied to the

8   apportionment of fault. The court explained:

> All of the defendants in this case are jointly and severally liable, but not for the
> same damages. The damages due to intentional acts must be segregated from
> damages caused by fault-based acts or omissions because RCW 4.22.070(1)(b)
> only [sic] liability for at-fault entities. *The liability* of intentional tortfeasors for
> damages caused by their intentional acts or omissions is not determined under
> RCW 4.22.070(1). Once the damages due to intentional acts or omissions are
> segregated, then, as to all remaining damages, *i.e.*, those damages resulting from
> fault-based acts or omissions, all the negligent defendants causing those damages
> are jointly and severally liable.
>
> The dissent believes, however, that under our decision negligent defendants are
> improperly allowed to apportion liability to the intentional tortfeasor, contrary to
> this court's decision in *Welch*. Under RCW 4.22.070, and our decision here,
> intentional tortfeasors are not entitled to the benefit of proportionate liability; the
> negligent defendant is not permitted to apportion fault to an intentional tortfeasor.
> This is in accord with *Welch*. There, the trial court had reasoned that "'where the
> plaintiff, a negligent tortfeasor defendant, and an intentional tortfeasor are all
> liable, the negligent defendant is entitled to the benefit of the comparative fault
> statute,'" and that "'unidentified tortfeasors are entities that a jury may attribute
> fault to under RCW 4.22.070.'" This court determined that under RCW
> 4.22.070(1) fault cannot be apportioned to intentional tortfeasors, stating that if
> "fault is to be apportioned to intentional tortfeasors, it is for the Legislature to
> make such a determination." Here, it is clear that no fault is apportioned to the
> intentional tortfeasor, exactly as RCW 4.22.070 requires and *Welch* holds.

*Tegman*, 150 Wn.2d at 115-16 (citations omitted) (emphasis added).

Similarly, plaintiff's reliance on an unpublished Order issued by the Honorable Fred Van

Sickle, United States District Judge in the Eastern District of Washington, is also misplaced. (*See*

Dkt. #137, Ex. A). It is clear from the language of the Order that Judge Van Sickle was not

addressing a motion for the apportionment of damages. Rather, the plaintiffs had asked the court for

ORDER
PAGE - 2

1  an Order prohibiting the defendants from apportioning liability to the intentional tortfeasor or to the

2  minor plaintiff. The court used the words "fault" and "liability" interchangeably, noting that *Welch*

3  stood for the proposition that "'a defendant is not entitled to apportion liability to an intentional

4  tortfeasor.'" (Dkt. #137, Ex. A at 4-5) (citation omitted). Thus, it is clear that, unlike the instant

5  motion, the district court was not determining whether damages could be apportioned to the

6  intentional tortfeasor, and therefore, that Order is inapplicable to this Court's analysis.

7      In addition, the Court finds that it is of no significance that Jack LaHolt has not been named

8  as a party to this lawsuit. In *Tegman*, the court explained that at-fault defendants are not jointly and

9  severally liable for damages resulting from intentional acts or omissions. *Tegman*, 150 Wn.2d at

10  114. Nothing in the court's language suggests that at-fault defendants are not liable for such

11  damages of only named intentional tortfeasors in an action.

12      Finally, plaintiff argues that *Tegman* does not apply where the negligent actor had an

13  independent duty to protect the plaintiff from the intentional actor's conduct. (Dkt. #136 at 5-8).

14  Again, the Court finds that argument misguided. Although plaintiff relies *on Tegman's* dissenting

15  opinion in support of his assertion that *Tegman* does not apply to questions of negligent supervision,

16  *see Tegman*, 150 Wn.2d at 128 n. 14 (Chambers, J., dissenting), plaintiff fails to acknowledge that

17  Justice Chambers also specifically acknowledged that *Tegman* involved the duty to prevent another's

18  tortious conduct. *See Tegman*, 128-29 (Chambers, J., dissenting). Thus, the Court is not persuaded

19  that *Tegman* does not apply to the instant action.

20      Nor is this Court persuaded by plaintiff's out-of-state authority that *Tegman* should not

21  apply. (*See* Dkt. #136 at 7). Indeed, the *Tegman* court itself rejected the very argument plaintiff

22  presents to this Court, stating:

23      [w]hether segregation is required in other states is irrelevant unless they have
       statutes like ours. Neither the parties nor the dissent has identified any such
24      statutes (state statutes vary considerably in this area), and research has failed to
       disclose any. Lack of precedent is hardly a bar to carrying out the legislature's
25      statutory directives.

26

ORDER
PAGE - 3

1    *Tegman*, 150 Wn.2d at 117-18.  Accordingly, and for all of the reasons discussed above, this Court

2    finds that *Tegman* is applicable to the instant case.

3          Plaintiff next argues that even if *Tegman* does apply, segregation may only occur if defendant

4    meets its burden of segregating damages.  Relying on *Phennah v. Whalen*, 28 Wn. App. 19 (1980)

5    and *Cox v. Spangler*, 141 Wn.2d 431 (2000), plaintiff asserts that defendant must show that its harm

6    is actually divisible from that of the intentional tortfeasor before segregation can occur.  However,

7    *Tegman* clearly involved indivisible damages, and the court ordered segregation in spite of that fact.

8    The court, rejecting the dissenting opinion's contention that segregating indivisible damages would

9    be "baffling" to a jury, explained:

10         Segregating damages in cases of 'indivisible' harm has been a part of this State's
           law since adoption of comparative negligence.  The dissent also complains that it
11         is unprecedented for a trier of fact to both segregate intentionally caused damages
           and apportion fault among negligent defendants for the remaining damages.  Both
12         of these actions are appropriate in a case like this one where there are multiple
           defendants and both intentional and negligent acts have caused harm.  There is no
13         particular mystery involved, nor any duplicative calculations.

14   Tegman, 150 Wn.2d at 117.  Therefore, the Court is not persuaded that defendant bears the burden

15   of demonstrating divisible damages before segregation may occur.

16         (2)  Based on the reasons set forth above, the Court will instruct the jury to segregate

17   damages caused by the intentional conduct of non-party Jack LaHolt from those damages

18   attributable to defendant's alleged negligence, if any.

19         (3)  The Clerk shall forward a copy of this Order to all counsel of record.

20         DATED this _28_ day of August, 2006.

21

22                                              RICARDO S. MARTINEZ
                                                UNITED STATES DISTRICT JUDGE
23

24

25

26

ORDER
PAGE - 4