HON. JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NICOMEDES TUBAR, III,

                                Plaintiff,

   v.

JASON CLIFT; and THE CITY OF
KENT, WASHINGTON, a municipal
corporation,

                                Defendants.

No. C05-1154 JCC

PLAINTIFF'S TRIAL BRIEF

        Plaintiff hereby submits the following Trial Brief, for the jury trial set to be held in this case from May 14 to June 4, 2009.

**NATURE OF THE CASE**

        This is a civil rights case against the City of Kent and a Kent police officer, Jason Clift. The lawsuit involves the shooting of plaintiff Nicomedes Tubar by defendant Officer Clift just after midnight on the night of June 25-26, 2003.  The claims against Officer Clift are brought under brought under 28 U.S.C. § 1983; the claims against the City of Kent are brought under §1983 and Washington common law.  See Complaint (Dkt. 1)  ¶5; Order, (Dkt. 286) at 3-13.

PL'S TRIAL BRIEF- 1
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

1

## STATEMENT OF FACTS

2      In its Order Denying Defendant Jason Clift's Motion for Summary Judgment (Dkt. 156),

3   the Court described the facts regarding the shooting of Nico Tubar and Heather Morehouse by

4   Jason Clift as follows:

5          On June 25, 2003, Defendant Jason Clift, a City of Kent Police Officer,
       discovered a stolen 2001 Kia automobile in the parking lot of Plaintiff's apartment
6      building. Defendant Clift decided to watch the vehicle because he believed that it had
       been driven recently. He placed a "rat trap" under one of the tires of the stolen vehicle,
7      moved his patrol car out of sight, and hid in the bushes to await the driver's return.
       Approximately thirty minutes later, just after midnight on June 26, 2003, Defendant Clift
8      observed Plaintiff, along with driver Heather Morehouse, exit the apartment building and
       enter the stolen vehicle. As Ms. Morehouse began backing the vehicle out of the parking
9      spot, the rat trap punctured the vehicle's tires. At the same time, Defendant Clift emerged
       from the bushes with his flashlight and gun and announced that he was a police officer.
10     Plaintiff and Ms. Morehouse did not hear this announcement nor realize that Defendant
       Clift was a police officer, but Defendant Clift thought that the vehicle occupants
11     perceived him.

12         According to Plaintiff, Ms. Morehouse began driving toward the only exit at a
       "normal" speed--approximately 15 miles per hour[1] according to both parties as well as
13     supporting testimony that indicates that the vehicle was not going very fast. Ms.
       Morehouse steered towards the exit of the parking lot, in what Plaintiff characterizes as a
14     "steady right turn." In contrast, Defendant Clift maintains that it was a "sharp U-Turn" to
       the right. The tire puncture due to the rat trap caused the rim of the front passenger tire to
15     mark the pavement as the vehicle moved, providing evidence of the Kia's path consistent
       with a steady right turn. Nevertheless, Defendant Clift's version of events is that Ms.
16     Morehouse steered the car toward him, accelerated, and put him in fear for his life.
       However, Plaintiff claims that the car decelerated as events unfolded and that Ms.
17     Morehouse consistently steered toward the parking lot exit and never accelerated toward
       Defendant Clift in an attempt to hit him. While Defendant Clift originally claimed that
18     the car "swerved" toward him, none of the evidence indicates a "swerve" and Defendant
       Clift now seems to have retreated from that theory. Nevertheless, during the vehicle's
19     undisputed curved path, it is clear that at some point the car was headed directly toward
       where Defendant Clift was standing, though the parties dispute how long this was.

20         As the car approached the parking lot exit, Defendant Clift fired his weapon at the
21     vehicle three times. The first two bullets entered the hood and front windshield of the

22     _____

23        [1] Although plaintiff accepted *arguendo* the defendants' lowest estimate of 15 m.p.h.,
       plaintiff's evidence will indicate that the speed could have been as low as 10 m.p.h. or less. See
       Dkt. 272-2 at 2.

24

PL'S TRIAL BRIEF- 2
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

vehicle but did not strike either Ms. Morehouse or Plaintiff. Defendant Clift fired his third shot as the vehicle was passing him. This third bullet entered through the driver's side window and struck Plaintiff in the upper left shoulder area. According to Plaintiff's expert, by the time the third shot was fired, the Kia was moving at about 6 miles per hour and visibly decelerating.…

It is undisputed that the three shots were fired in a matter of seconds. One witness described the succession of shots as "'bang, bang' (pause) 'bang.'" … It is undisputed that the third shot is the one that hit Plaintiff and that it came through the side of the car as it was passing Defendant Clift. According to Defendant Clift, he stopped firing when he perceived that the car was no longer a threat to him. Defendant Clift argues that all three shots were reasonable under the circumstances. According to Plaintiff, the car could not have been a threat when the third shot was fired, yet Defendant Clift kept firing his weapon at a car that was passing him. Plaintiff argues that Defendant Clift was never in danger and that none of the three shots was reasonable. Plaintiff further argues that, regardless of the reasonableness of the first two shots, the third shot was unreasonable under the circumstances because of the gap between shots two and three and because of the clearly nonthreatening position of the car at the time the third shot was fired.

In its Order Denying Kent's Motion for Summary Judgment the Court gave the following summary of the evidence regarding Kent's liability on a *Monell* theory of ratification:

Officer Clift was also involved in two other shooting incidents prior to the June 2003 incident.  The first incident occurred in November 2000 and involved Guadalupe Martinez, who was stopped in heavy traffic after leading police on a high speed chase.…Witnesses stated that Martinez emerged from the vehicle with what appeared to be a large-caliber handgun, which she pointed at Officer Clift, who had approached the driver's door.… Both Clift and another Kent officer fired their weapons, and Martinez was killed.… Subsequently, it was determined that the gun Martinez displayed was a pellet gun..… The Auburn Police Department investigated the circumstances of the shooting and concluded that Officer Clift shot Martinez in self-defense…. Thereafter, Kent Police Chief Ed Crawford found that Clift's use of force was justified and officially "exonerated" him of any wrongdoing.…

The second shooting incident occurred in May 2002 following a high speed chase…. Officers had stopped a vehicle because the driver, Eric Jackson, had an outstanding felony warrant…. The vehicle also had a female passenger, Kristina Howe…. Jackson struggled with the officers as they attempted to take him into custody, and he managed to escape back to his vehicle where he sped away…. During the chase, Officer Clift employed a Pursuit Intervention Tactic, which involved impacting the fleeing vehicle and forcing it to come to a stop…. As a Federal Way officer approached the stopped vehicle, Jackson apparently revved the engine…. Clift and two other officers claimed that Jackson was attempting to run over the approaching officer…. The three officers then fired their weapons at the vehicle, hitting Jackson and Howe, both of whom

PL'S TRIAL BRIEF- 3
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

suffered non-fatal injuries…. After an internal review, Chief Crawford again found that Clift's use of force was justified and "exonerated" him….

As in the two previous shootings, Chief Crawford ultimately exonerated Officer Clift from any wrongdoing in the shooting incident at issue in the instant lawsuit. Immediately after the shooting, Clift gave a brief oral report to his sergeant and was then taken to the Kent police station to meet with his union representative and attorney…. Chief Crawford then placed Clift on administrative leave and referred the incident to the Auburn Police Department for an investigation…. The Chief also sent Clift to a psychologist for an evaluation of his fitness to return to duty….  After being ordered by the Deputy Police Chief to provide a statement, Clift submitted a written statement of the incident on July 8, 2003, nearly two weeks after the incident…. On July 10, 2003, Clift gave a recorded interview to Auburn investigators in the presence of his attorney…. Subsequently, the Kent Police Department conducted its own internal review of Officer Clift's use of deadly force…. The internal review noted that Clift had not submitted a Use of Force Report as required, but concluded that he had acted in compliance with Police Department policies in discharging his firearm…. Specifically, the internal review found that Clift properly employed deadly force upon believing that he was in immediate danger of death or serious injury…. Thereafter, Chief Crawford found that Officer Clift was "justified, acted lawfully, properly, and within grounds of accepted police conduct" in using deadly force, and therefore, Clift was "exonerated." …

Dkt. 286 at 3-4 (record citations omitted).

In addition to the evidence of these prior shootings and Kent's ratification of them, plaintiff's *Monell* and negligence claims against the City of Kent are based in part on evidence of inadequacies in Kent's supervision of Officer Clift and other officers regarding their use of force.[2]  This evidence includes evidence that Kent and its former Police Chief, Ed Crawford, Kent's policymaker in such matters, failed generally to supervise and discipline officers to prevent improper uses of force. *See* Plaintiff's Opp. to Kent's Renewed MPSJ (Dkt. 211) at 15-18.  Instead, when faced with incidents of the improper or unnecessary use of force or deadly force by his officers and related discipline problems, Kent and Chief Crawford's goal appears to

---

[2] As noted below, because the negligence and *Monell*/supervision claims are based on the same evidence and largely overlapping, and because of the complexity of both sets of law (state and federal) controlling these claims, plaintiff may at trial elect to dismiss his negligence claim if the Court finds the evidence sufficient to submit the *Monell*/supervision claim to the jury.

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

have been avoiding civil liability and police union problems, rather than protecting the public and preventing violations of constitutional rights.

The evidence plaintiff will present of this policy of disregard will include testimony from several of Chief Crawford's top staff, including his immediate (interim) successor, about his informal policies and management practices, as well as documentary and other evidence about Chief Crawford's actions and decisions surrounding and following each of Jason Clift's three shootings.  Ibid.; see also Plaintiff's Opp. Motion in Limine (Dkt. 269) at 3-7.  This evidence will establish an unusually direct causal link between these policies and practices and the shooting of Nico Tubar.  Because, as the Court has noted, Chief Crawford not only failed to take corrective disciplinary action after Officer Clift's prior shootings, he commended them.  He ignored an explicit warning from a psychologist that Officer Clift needed counseling after the first shooting and—according to Officer Clift—he responded to the concerns of officers and supervisors about Officer Clift's emotional condition by swearing at Clift and threatening to fire him, at the same time conveying to Clift the (we believe accurate) impression that his suspension and psychological examinations were for political cover.  Consistent with that impression, Kent sent Officer Clift to a psychologist who had never seen him before, who was not informed of crucial facts—like the fact that Officer Clift had broken a previous commitment to get counseling, that he had been taken off duty and placed on administrative leave, that he had left his home, and that his police officer wife was seeking a civil protection order against him—and requested only a limited evaluation.   As a consequence of this limited information and assignment, Kent's chosen psychologist (who is now also its expert witness, Dr. Norman J. Mar), apparently did not report to Kent the fact that testing of Officer Clift showed him to be at "high risk" of problems, including anger and integrity problems.  Officer Clift was put back to work, and less than a week later he shot Nico Tubar and Heather Morehouse—in what plaintiffs experts will say was yet another display of arrest and firearm use tactics that was recklessly

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

improper at best, and in what the defendants' experts contend was a state of panic in which Officer Clift was unable to stop shooting when he clearly was out of danger.

After the shooting, Chief Crawford and Kent ignored obvious signs that Clift was at fault and his story made no sense, never conducted a real investigation of his actions, but instead began building a defense against civil liability, for him and for the City—keeping outside investigators from questioning Officer Clift, getting another psychological clearance for him (again from Dr. Mar), ignoring obvious inconsistencies in Officer Clift's version of the events and unequivocally endorsing that version and Clift's conduct (even conduct in direct violation of Kent written policies) although it was the subject of a pending criminal court case (a case Kent sought to influence to produce a guilty plea it is still trying to use in its civil defense).

Plaintiff will call two expert witnesses who will testify to the inadequacy of this supervision and its relation to this incident.  *See* Dkt. 40; Dkt. 200.

## PROCEDURAL BACKGROUND AND PRIOR RULINGS

The Court has issued numerous rulings in this case, and one of them—a motion for partial summary judgment on the basis of qualified immunity brought by defendant Clift—has been upheld on appeal.

The Orders previously entered by the Court that plaintiff believes may impact issues and procedures at trial include the following:

- Order Denying Summary Judgment on Qualified Immunity (Dkt. 156)

- Order Disclosing Telephone Records (Dkt. 172)

- Order Regarding Trial Setting and Pretrial Procedure (Dkt. 183)

- Order Modifying Protection Order (Dkt. 222)

- Order Granting Motion to Compel City of Kent to Produce its Evaluations of Use of Force by Jason Clift (Dkt. 235)

- Order Denying Kent's and Plaintiff's Motions for Summary Judgment (Dkt. 286)

- Order Regarding Trial and Related Dates (Dkt. 299)

PL'S TRIAL BRIEF- 6
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

- Order Denying Bifurcation (Dkt. 300)

- Minute Order Regarding Motions in Limine (Dkt. 301)

- Minute Order Regarding Trial Length (Dkt. 302)

- Minute Order Resetting Trial (Dkt. 304)

- Minute Order (Dkt. 305)

The Court has still pending, to be ruled on, the following additional motions:

- Plaintiff's Motion in Limine Regarding Indemnification and Collateral Source, and Other Issues (Dkt. 249)

- Plaintiff's Motion in Limine to Exclude Evidence of Non-Party Heather Morehouse's *Alford* Plea (Dkt. 250)

- Plaintiff's Motion in Limine to Limit the Testimony of Dr. William Lewinsky (Dkt. 253)

- Defendants' Motions in Limine on various subjects(Dkt. 239)

- Defendants' Motion to Exclude Testimony of D.P. Van Blaricom (Dkt. 244)

- Defendants' Motion to Exclude Certain Testimony of A. Abrous, Ph.D. (Dkt. 246)

- Defendants' Motion to Quash Subpoena Duces Tecum Directed to City Attorney Arthur "Pat" Fitzpatrick (Dkt. 307) (filed May 5, 2009).

### TRIAL PROCEDURE

**1.    Jury Selection**

Plaintiff believes that this case may need some extra time and care in jury selection, because of the sensitive issues it raises.  Plaintiff has separately submitted a list of proposed voir dire questions.  The subjects of those questions all relate directly to the incidents in this case and involve issues that are likely to be significant and on which jurors' personal opinions and experiences may need to be screened.  Some of these deal with core facts of the case, such as questions about police officers and police work, car theft and stolen cars, and firearms and gunshots.  Other questions have to do with less central issues that nonetheless are likely to come up in trial and may be sensitive or touch on particular jurors' individual experiences.  These

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

include the issue of manic depression, and the use of the medication Lithium, which the evidence will indicate may have influenced Heather Morehouse's behavior in the incident in question. [Others?]

### 2.      Allotment and Division of Available Trial Time

The Court has instructed the parties that Thursday, May 14, 2009, will be devoted to announcement of the Court's rulings on pending motions, voir dire and jury selection, and opening statements. Testimony will begin on May 15, 2009, and the case will go to the jury on or before June 4, 2009. Court will not be held on May 26, 2009.

The Court's schedule provides for thirteen (13) trial days, on each of which court will be in session for five hour (two hours and fifteen minutes in the mornings and two hours and forty-five minutes in the afternoons). That is a total of sixty-five (65) hours of court time. The Court has indicated that it will allot the time equally between the two parties.

Plaintiff therefore suggests that each party be allotted thirty (30) hours of total time for testimony, cross-examination, and closing argument. That would leave five hours total unallotted time, to address other court business as necessary. Plaintiff asks that a timekeeper be assigned, and that the parties compare calculations with the timekeeper each day to make sure all parties and the Court are apprised and aware of the allotted time remaining to each.

If it elects to use some other method of time allocation, plaintiff asks that the Court *not* simply allot a certain number of days or hours to the plaintiff's case and a certain number of days or hours to the defendants' case. The parties have agreed that to the extent it is possible without disrupting the flow of the case, defendants will conduct a direct examination of witnesses called by the plaintiff, when plaintiff calls them, so witnesses will not have to return to testify twice. Because of that, and because of the possibility that cross-examination of some witnesses could be more extensive than direct, each party will likely be using a substantial portion of the other

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

party's case, for its own questioning.  Because of that, it would be unfair to hold parties responsible for all time used on particular days or with particular witnesses.

3.     **Exhibits**.

The admissibility of a large number of identified exhibits has been agreed to.  Plaintiff will ask the Court to admit those exhibits at the outset of the case, to avoid delay or waste of time in identifying them prior to admission.  Plaintiff anticipates using a small number of agreed-to exhibits—primarily, drawings and photographs of the incident scene—in opening statement.  If the Court permits that, plaintiff will identify those exhibits he will be using in opening, in advance of trial, to permit defendants to make any objection to that use.  Plaintiff asks that defendants be required to do the same.

A number of the exhibits are documents that have been disclosed in discovery, but are arguably subject to a protective order.  Plaintiff assumes that the protective order will be, expressly or effectively, modified by the Court's rulings on motions *in limine,* so that any exhibit or evidence the Court finds admissible will be exempt from that Order, so it can be offered into evidence and submitted to the jury.

3.     **Opening Statement.**

Plaintiff understands that opening statements will be completed on May 14, 2009, and that testimony will not begin until May 15, 2009.

In addition to this traditional opening statement, plaintiff suggests that because of the length and relative complexity of this trial, it might be helpful to the jury to allot a short amount of time—perhaps twenty minutes—to each side for extended opening statement, to be delivered as each party chooses, during its case at trial.  Such extended opening statements were suggested and allowed by Judge Robert Bryan of this Court in a complex and lengthy civil rights trial plaintiff's counsel was involved in some years ago (*see Davis v. Mason County*, 927 F.2d 1473 (9th Cir. 1991)), and the device appeared to be quite helpful to the jury.

PL'S TRIAL BRIEF- 9
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

1    **4.      Notice of Anticipated Witnesses.**

2           The parties have discussed, but have not yet reached, an agreement regarding notification

3    of the opposing counsel of the witnesses each side intends to call, before the day on which they

4    are called.  Unless the parties reach some different agreement in advance of trial, plaintiff would

5    ask that the Court require each side to identify the witnesses it intends to call on each trial day,

6    two days in advance.   Plaintiff believes that such a notification schedule allows adequate notice

7    and at the same time reasonable certainty and flexibility in witness scheduling.

8                                **ANTICIPATED EVIDENTIARY ISSUES**

9           The key evidentiary issues plaintiff anticipates will arise at trial are addressed the

10   Motions in Limine and Responses thereto that have been filed by both sides.  Plaintiffs'

11   submissions on these issues include Plaintiff's Motion Regarding Indemnification and Collateral

12   Source, and Other Issues (Dkt. 249, and Reply Dkt. 283), Plaintiff's Motion to Exclude Evidence

13   of Morehouse's Alford Plea (Dkt. 250, and Reply Dkt. 282), Plaintiff's Motion to Limit the

14   Testimony of Dr. William Lewinsky (Dkt. 253, and Reply Dkt. 285),  Plaintiff's Response to

15   Defendants' Omnibus Motions in Limine (Dkt. 269, and Supp. 306), Plaintiff's Response to

16   Defendants' Motion to Exclude Testimony of D.P. Van Blaricom (Dkt. 256), and Plaintiff's

     Defendants' Motion to Exclude Certain Testimony of A. Abrous, Ph.D. (Dkt. 246).

17          Plaintiff will provide authorities on those or other evidentiary issues that become evident

18   during trial, in pocket briefing during trial, as the issues arise or as the Court instructs.

19                                  **ANTICIPATED LEGAL ISSUES**

20          Pursuant to local rule, the parties are submitting herewith a Joint Statement of Disputed

21   Jury Instructions (Dkt. 319), which contain authority on most of the legal issues that should

22   affect jury instructions and trial issues.

23          In addition, relevant authority is contained in the parties' various summary judgment

24   memoranda and the Court's rulings on those motions.

PL'S TRIAL BRIEF- 10
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

1    The first of those Motions was Defendant Clift's Motion for Summary Judgment on

2    Qualified Immunity, which the Court of course denied.  Dkt.156.  The affirmance of that ruling

3    by the Ninth Circuit resolves the issue of qualified immunity, which of course is a legal issue for

4    the Court and not a trial defense.

5         The second of those Motions was plaintiff's Motion for Partial Summary Judgment on

6    Unreasonable Seizure, which the Court denied because of evidentiary disputes.  See Dkt. 286 at

7    13-16.  That Motion argued that Officer Clift's conduct in running in front of the Morehouse car

8    with gun drawn and pointed, and then firing rather than stepping out of the way, constituted an

9    unreasonable seizure as a matter of law.  See Motion, Dkt. 190.  Although the Court found the

10   pretrial evidence insufficiently conclusive to warrant such a ruling, plaintiff anticipates that the

11   issue will come up again in a motion for partial judgment as a matter of law or for a directed

12   verdict on the issue, because he believes that the trial evidence will show that Officer Clift's

13   behavior, objectively viewed, clearly was a seizure and clearly was unreasonable, and that the

14   defense protestations to the contrary are both incredible and irrelevant.  See id.; Dkt. 219.  They

15   are irrelevant because "inquiry that under the Fourth Amendment always depends upon objective

16   factors and not upon sincerity of belief."  *Price v. Sery,* 513 F.3d 962, 967 (9th Cir. 2008).

17   Moreover, the determinative factor regarding whether there has been a seizure is the view of the

18   person seized, not the officer. "[W]hether an arrest has occurred depends upon an objective, not

19   subjective, evaluation of what a person innocent of a crime would have thought of the situation,

20   given all of the factors involved."  *United States v. Al-Azzawy,* 784 F.2d 890, 892-93 (9th

21   Cir.1985) (*citing United States v. Johnson*, 626 F.2d 753, 755-56 (9th Cir.1980), *aff'd on other

22   grounds*, 457 U.S. 537 (1982).  And reasonableness is measured objectively, not according to

23   subjective report or belief.  *See, e.g., Acosta v. City and County of San Francisco*,  83 F.3d 1143,

24   1145 (9th Cir. 1996)

PL'S TRIAL BRIEF- 11
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX:  (206) 343-3961

1    The third motions the Court has ruled on were Kent's Motions for Partial Summary

2 Judgment, which the Court also denied with respect to both plaintiff's *Monell* and state law

3 negligence claims.  Dkt. 286.  Because the Court found ratification, it did not find it necessary in

4 that order to determine whether plaintiff had also presented sufficient evidence of supervisory

5 indifference to submit to a jury.  Id. at 11n.6.

6    Plaintiff believes there is overwhelming evidence of supervisory indifference in this case,

7 more than enough to support a separate *Monell* liability theory based on supervision.  See pages

8 4-5 above, and memoranda there cited.  If the Court finds that evidence sufficient to go to the

9 jury, plaintiff will likely move to dismiss his state law negligence claim, as the two liability

10 theories are largely redundant and—as the ar both are sufficiently complex that submitting both

of them to the jury may prove overly confusing.

11    DATED this 7 day of May, 2009.

12                                    Respectfully submitted,

13                              MacDONALD HOAGUE & BAYLESS

14

15                              By   */s/Timothy K. Ford*
                                    Timothy K. Ford, WSBA #5986
16                                   Joseph R. Shaeffer, WSBA #33273
                                 Attorneys for Plaintiff

17

18

19

20

21

22

23

24

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961

1

2

CERTIFICATE OF SERVICE

3
      I hereby certify that on the 8th day of May, 2009, at approximately 12:03 a.m., I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to:

4

5
Steven L. Thorsrud       sthorsrud@kbmlawyers.com
Mary Ann McConaughy    mmcconaughy@kbmlawyers.com

6

7
*/s/Timothy K. Ford*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PL'S TRIAL BRIEF- 13
USDC WDW No.C05-1154 JCC

MacDONALD HOAGUE & BAYLESS
1500 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1745
(206) 622-1604
FAX: (206) 343-3961