UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NICOMEDES TUBAR, III,<br><br>        Plaintiff,<br><br>  v.<br><br>JASON CLIFT; and THE CITY OF KENT, WASHINGTON, a municipal corporation,<br><br>        Defendants. | CASE NO. C05-1154-JCC<br><br>ORDER |

This matter comes before the Court on Defendants' Motion to Exclude Testimony of D.P. Van Blaricom (Dkt. No. 244), Plaintiff's Response (Dkt. No. 256), and Defendants' Reply (Dkt. No. 279); Defendants' Motion to Exclude Certain Testimony of Abdelouahab Abrous, Ph.D. (Dkt. No. 246), Plaintiff's Response (Dkt. No. 271), and Defendants' Reply (Dkt. No. 278); and Plaintiff's Motion in Limine to Limit the Testimony of Defense Witness Dr. Lewinski (Dkt. No. 253), Defendants' Response (Dkt. No. 264), and Plaintiff's Reply (Dkt. No. 285). The Court, having carefully considered all of the papers submitted and determined that oral argument is not necessary, hereby finds and rules as follows.

ORDER – 1

## I. BACKGROUND

This is a civil rights lawsuit arising from a police shooting incident that occurred on June 26, 2003. Plaintiff brings this action against Defendants Officer Jason Clift and the City of Kent (the "City"), alleging that his civil rights were violated when he was shot while riding as a passenger in a stolen vehicle. The case is set for jury trial on May 14, 2009.

The main legal issues for trial are whether Officer Clift's use of deadly force was objectively unreasonable in violation of the Fourth Amendment and, if so, whether the City is liable for such a violation under the principles set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (*See* Revised Pretrial Order 6 (Dkt. No. 298).) In addition, Plaintiff is pursuing a negligence claim against the City for allegedly failing to exercise due care in hiring, training, and supervising Officer Clift. (*Id.* at 2, 6.) Now before the Court are the parties' motions to exclude certain expert testimony.

## II. LEGAL STANDARD

An expert witness may testify at trial if such expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Such a witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id*. Expert testimony is liberally admitted under the Federal Rules. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993) (noting that Rule 702 is part of the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted). The trial court must be careful to avoid supplanting the adversary system or the role of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also* FED. R. EVID. 702 advisory committee notes to 2000 amendments ("[R]ejection of expert testimony is the exception rather than the rule.").

ORDER – 2

## III. ANALYSIS

### A. Defendants' Motion to Exclude Testimony of D.P. Van Blaricom

Defendants move to exclude the testimony of Plaintiff's police practices expert, former Bellevue Police Chief Donald Van Blaricom, on the grounds that his testimony: (1) does not meet *Daubert* standards; (2) is not helpful to the jury; (3) contains legal conclusions; and (4) is more prejudicial than probative. (Mot. 1 (Dkt. No. 244).) Defendants do not dispute that Van Blaricom is qualified to assess police practices. (*Id.* at 5 (agreeing that Van Blaricom "has a good deal of police experience").) As Van Blaricom's curriculum vitae indicates, his law enforcement experience spans fifty-one years, including twenty-nine years as a police officer (eleven years of which he served as the Bellevue Police Chief) and twenty-two years as a police practices consultant during which he has been retained as an expert in over 1,400 lawsuits regarding police liability. (*See* Dkt. No. 200.) Instead, Defendants primarily argue that Van Blaricom's testimony is unreliable, irrelevant, and contains impermissible legal conclusions.

Expert testimony on police practices and the use of force has generally been found to be admissible in cases involving allegations of police misconduct. *See, e.g., Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc); *Davis v. Mason County*, 927 F.2d 1473, 1484–85 (9th Cir. 1991); *Larez v. City of Los Angeles*, 946 F.2d 630, 635, 647 (9th Cir. 1991). However, the "trial judge must ensure that any and all scientific testimony [or any other expert testimony] or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert*'s requirements of relevance and reliability to non-scientific testimony). That said, "a trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal citations omitted). "Concerning the reliability of non-scientific testimony . . . , the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it."

ORDER – 3

*Id.* (internal citation omitted). The trial court's gatekeeping role under *Daubert* is satisfied, even without a formal hearing, by the court's probing of the expert's knowledge and experience. *Id.* at 1018.

### 1. Reliability

Defendants first contend that Van Blaricom's testimony is nothing more than "*ipse dixit*"[1] and should be excluded under *Daubert*. (Mot. 2–7 (Dkt. No. 244).) Defendants assert that the testimony is unreliable because Van Blaricom fails to explain how he arrives at his various opinions. (*Id.* at 2, 5.) However, in reaching his opinions regarding the legitimacy of Officer Clift's use of deadly force, Van Blaricom: (1) describes at length the investigative facts that form the basis for his opinion; (2) delineates what he does and does not credit about Officer Clift's report, and why; (3) and explains where and why he disagrees with aspects of Detective Clark's conclusions. (*See* Van Blaricom Decl. ¶¶ 11–14 (Dkt. No. 200 at 8–17); *see also* (Van Blaricom Dep. pp. 37–44 (Dkt. Nos. 257-2 at 11–12, 257-3 at 1).) Van Blaricom also explains how he interprets the facts and data, based on his training and experience, to reach his specific opinions. The Court therefore finds that a fair reading of Van Blaricom's testimony shows that his opinions are adequately explained and sufficiently reliable to meet the liberal standard set forth in *Daubert*. *See* FED. R. EVID. 702 advisory committee notes to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

### 2. Relevance

Second, Defendants argue that Van Blaricom's testimony is irrelevant because it addresses an issue within the common knowledge of the average layman and "does little more than tell the jury which result to reach." (Mot. 7–8 (Dkt. No. 244).) But Van Blaricom's opinions regarding Officer Clift's use of force and the City's subsequent investigation are based on his interpretation of the investigative facts in light of his extensive experience as a police officer, supervisor, and police chief—experiences that few jurors are likely to share. (*See* Van Blaricom Decl. ¶ 9 (Dkt. No. 200 at 6–7).) Because Van Blaricom has

---

[1] The phrase "*ipse dixit*" is Latin for "he himself said it" and refers to "[s]omething asserted but not proved." BLACK'S LAW DICTIONARY 847 (8th ed.)

ORDER – 4

specialized experience with police practices, his testimony may help the jury interpret and understand the evidence. *See Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.7 (9th Cir. 2002) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."); *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986) ("The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony."). The appropriate response by a police officer attempting to apprehend a stolen vehicle is not necessarily common knowledge. Similarly, the proper response and investigation by a police department to a police shooting is also likely beyond the knowledge of the average juror. Thus, Van Blaricom's specialized knowledge and experience with such police practices may assist the jury in understanding the evidence and making an informed decision.

### 3. Ultimate Issue Testimony

Third, Defendants contend that Van Blaricom's testimony impermissibly provides legal conclusions and opinions on an ultimate issue of law. (Mot. 8–11 (Dkt. No. 244).) As a general rule, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a). "It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter*, 373 F.3d at 1016 (*quoting Mukhtar*, 299 F.3d at 1066 n.10). Accordingly, the Ninth Circuit has generally allowed expert testimony regarding the appropriateness of police conduct. *See, e.g., City of Hemet*, 394 F.3d at 703 (holding that a rational jury could rely upon expert testimony regarding the training of police dogs and their handlers to determine whether the officers' use of force was unreasonable). Nevertheless, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter*, 373 F.3d at 1016 (internal citations and quotation marks omitted).

Here, because Van Blaricom is qualified and his testimony is both reliable and relevant, he may provide an expert opinion regarding Defendants' conduct. Van Blaricom may not, however, express his

ORDER – 5

opinion in terms of: (1) whether Officer Clift had "probable cause" to believe he was in imminent danger; (2) whether Officer Clift acted "unconstitutionally"; and (3) whether Officer Clift's use of deadly force was "objectively unreasonable." Such testimony provides his own legal conclusions as to whether Officer Clift violated the Fourth Amendment and would improperly invade the province of the jury. *See* WEINSTEIN'S FEDERAL EVIDENCE § 704.04[2][a] (2d ed. 2008) (explaining that opinion testimony should be excluded for lack of helpfulness where it "supplies the jury with no information other than the witness's view of how the verdict should read"). These terms encompass ultimate issues of law on Officer Clift's liability that the jury must decide. Similarly, Van Blaricom is prohibited from using the term "ratification" in reference to the City's actions following the shooting because this term is likely to be a central and dispositive issue at trial as to municipal liability. (*See* Resp. 9 (Dkt. No. 256).)

Although Van Blaricom may not use the above terms, this Order does not bar him from expressing an opinion as to whether Officer Clift's use of force was appropriate under the circumstances or whether the City of Kent's conduct was appropriate. *Cf. Davis*, 927 F.2d at 1484–85 (holding that Van Blaricom's expert testimony on the propriety of police conduct was admissible and noting that Rule 702 permits expert testimony comparing an officer's or municipality's conduct to "the industry standard"). This type of testimony involves issues that are ancillary to the ultimate legal issue, and may be helpful to the jury in deciding whether Officer Clift's conduct was objectively unreasonable in violation of the Fourth Amendment, whether the City may be held liable under *Monell*, or whether the City was negligent. *See Hangarter*, 373 F.3d at 1017 (finding that expert testimony on issues "ancillary to the ultimate issue" was properly admitted even though it included legal terms). The Court reserves, until trial, ruling on Defendants' remaining objections as to other aspects of Van Blaricom's testimony. At trial, Van Blaricom should generally avoid offering any conclusions in terms that track the instructions that will be given to the jury.

ORDER – 6

### 4. Unfair Prejudice

Lastly, Defendants object that Van Blaricom's testimony should be excluded under Rule 403 because it is more prejudicial than probative. (Mot. 11 (Dkt. No. 245).) Defendants offer little support for their contention that the testimony is unfairly prejudicial, let alone establish that the testimony's "probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. Defendants have not shown that Van Blaricom's testimony should be excluded under Rule 403.

### B. Defendants' Motion to Exclude Certain Testimony of Abdelouahab Abrous, Ph.D.

Defendants move to exclude certain testimony of Abdelouahab Abrous, Ph.D. on the grounds that it does not meet *Daubert* standards and is more prejudicial than probative. (Mot. 1 (Dkt. No. 246).) Specifically, "Defendants seek to exclude the following testimony from Dr. Abrous: (1) that the Morehouse vehicle was driving at a 'constant' 10 mph at [sic] it approached Officer Clift, (2) that Officer Clift moved from his right to his left as the car drove at him and to its resting spot, and (3) that between the first and third shots between 2.15 and 2.93 seconds elapsed." (*Id.*) Defendants' motion to exclude focuses on three tests performed by Dr. Abrous, termed the "drive test," the "glass debris analysis," and the "pebble test," all of which Defendants contend are "junk science." (*See id.* at 2–5.)

Expert scientific opinion testimony is admissible if the testimony is properly considered "scientific knowledge." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998). Under *Daubert*, expert scientific opinion qualifies as scientific knowledge where it has a "grounding in the methods and procedures of science" and is "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The focus is on the principles and methodology employed. *See id.* Although the Supreme Court has identified four factors for determining reliability (whether the method has been tested, has been subjected to peer review, has a known rate of error, and is generally accepted), "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141. Accordingly, the Court has "broad latitude" in how to determine the reliability of expert testimony. *See id.* at 142.

ORDER – 7

**1.  Estimated Speed of the Vehicle**

Defendants' motion seeks to preclude Dr. Abrous from testifying that the car was traveling at a "constant" 10 mph as it approached Officer Clift. (Mot. 1 (Dkt. No. 246).) This request lacks a factual basis because Dr. Abrous has simply not testified that the car was traveling at a constant 10 mph. Rather, Dr. Abrous's declaration, report, and deposition all state that in his opinion, "the *maximum* speed reached by the car was *between 10 and 15 miles per hour*." (Abrous Decl. ¶ 3(a) (Dkt. No. 272-2 at 3) (emphasis added); Abrous Report 4 (Dkt. No. 272-2 at 9) ("The maximum possible speed of the car through the parking lot ranges from 10 mph to 15 mph in the vicinity of the first shot."); *see* (Abrous Dep. 32:25–33:1 (Dkt. No. 272-3 at 7) ("I got a [speed estimate] range between . . . 10 to 15 miles an hour").)[2]

Dr. Abrous's opinion that the car's maximum speed was between 10 and 15 mph as it drove through the parking lot was based on three different things. First, Dr. Abrous "looked at the nature of the turn and then associated a reasonable lateral acceleration associated with turns of that kind and then determined that the speed ranged between . . . 10, 15 miles an hour." (Abrous Dep. 30:25–31:4 (Dkt. No. 272-3 at 7).) This speed estimate was calculated based on the radius of curvature of the tire mark in the parking lot, the absence of "yaw marks"[3] on the pavement, and reasonable rate of lateral acceleration. When asked about his methodology for this calculation, Dr. Abrous explained:

> Let me put it this way . . . if you are making a turn and the lateral acceleration is 0.3 . . . .
> Then what I will do is go measure the radius of curvature of the arc that the center of

---

[2] Defendants' motion appears to confuse two different measurements, speed (velocity) and acceleration (change in velocity over time). (*Compare* Reply 2 n.2 (Dkt. No. 278) (conflating "constant speed" and "constant acceleration"), *with* Abrous Dep. 32:2–9, 36:1–23 (Dkt. No. 7–8) (explaining that "acceleration just means change of speed").) Dr. Abrous testified that he assumed the vehicle was "*accelerating* at a constant rate" when he analyzed the police dispatch cue markers as part of his "cross-check" for his calculated speed estimate. (*See id.* at 32–36 (emphasis added).) He did not, however, testify that the vehicle traveled at a constant speed.

[3] "Yaw marks" are marks that tires make on pavement due to lateral acceleration, such as when the tires slide across the pavement. (*See* Abrous Dep. 23:1–4, 39:13–15 (Dkt. No. 272-3 at 5, 9).)

ORDER – 8

> mass of the vehicle has done and then determine what is the maximum speed of the vehicle through that mark, because if I exceed that speed, that means I would exceed the 0.3 lateral acceleration, because the lateral acceleration is nothing more than—it's related to the speed. . . . It's the velocity squared, divided by the radius of curvature, divided by the acceleration of the gravity also. So that's related. That's why, if you put a limit on the lateral acceleration for a given radius, it's going to give you a reasonable speed.

(*Id.* at 43:10–25.) Second, Dr. Abrous performed a "cross check" of this speed estimate by comparing the timing of police dispatch cue markers as radioed by Officer Clift against the distance traveled by the car during the incident. (*Id.* at 33:8–34:22.) Third, Dr. Abrous conducted a drive test at the scene to estimate what would be a reasonable speed at which a vehicle could negotiate the path driven on the night of the incident. (*Id.* at 31:5–15, 33:3–7.) Defendants criticize the reliability of this drive test. But Dr. Abrous expressly states that this drive test was merely another "cross check" to see if a vehicle could execute a "normal turning maneuver' at his estimated speed 10 to 15 mph. (*See id.*)

Dr. Abrous has a doctorate and masters degree in engineering and a bachelor's degree in physics, and he has taught both subjects at the college level. (Abrous CV (Dkt. No. 272-2 at 19–20).) He also has considerable experience in accident reconstruction and computer-animated graphics. (*See id.*; Abrous Dep. 8:2–9:24 (Dkt. No. 272-3 at 4).) He is currently working as a full-time structural engineer, teaching for the Oregon Institute of Technology at Boeing, and consulting on accident reconstruction and computer animation. (2008 Abrous Dep. 4:14–18 (Dkt. No. 272-3 at 21).) Dr. Abrous's testimony demonstrates that his speed estimate was based on the laws of physics, measurements made by the police, and mathematical calculations. He then confirmed his speed estimate by analyzing the timing of police dispatch cues against the distance that the car traveled. Finally, he conducted a drive test to cross-check the practical application of his speed estimate at the scene. In light of the above, the Court finds that Dr. Abrous is qualified and that his methodology for arriving at his speed estimate has sufficient "grounding in the methods and procedures of science" to be admissible. *See Daubert*, 509 U.S. at 590.

### 2. Officer Clift's Movement

Defendants also move to exclude Dr. Abrous's testimony that Officer Clift moved from his right

ORDER – 9

to his left as the car advanced. (Mot. 1 (Dkt. No. 246).) Defendants argue at length that because the glass debris analysis and pebble test are not "science," Dr. Abrous's testimony regarding Officer Clift's positioning should be excluded. (*See id.* at 2–5, 7–8.) However, Dr. Abrous's deposition testimony makes clear that the glass debris and pebble tests did not form the primary basis for the testimony that Defendants seek to exclude; and instead, these two tests were employed to "double check . . . whether the third shot occurred while the car was decelerating or not." (Abrous Dep. 69:2–9 (Dkt. No. 272-3 at 12).) When questioned, Dr. Abrous explicitly clarified the limited use and application of the glass debris test, "The *only thing that the glass pattern* was used for —and that's why we didn't care really about the actual deceleration associated with the glass—is to just see if—or to test [Officer Clift's] testimony that the third shot occurred while the car was decelerating." (*Id.* at 135:24–136:3 (emphasis added); *id.* at 76:3–4 (explaining that the glass test is "really an approximate analysis that was validated by what Officer Clift has testified to").) Indeed, Defendants do not contest that, as Officer Clift testified, the car was decelerating when the third shot was fired. (*See* Clift Dep. 154:3–12 (Dkt. No. 78-10 at 11).) Defendants' objection to the glass debris analysis and the pebble test, which were primarily used to verify the car's deceleration, is therefore misplaced.

Dr. Abrous's determination that Clift moved to his left as he shot was based on a number of physical facts derived from the investigation of the scene, such as: the gouge marks indicating the car's path of travel and point of rest; the angle at which each successive shot struck the vehicle, including the fact that the third shot went through the driver's window at about a 90 degree angle; the location of the shattered glass on the pavement; and the location of the spent cartridges, including the police department's test indicating the cartridge ejection pattern. (*See* Abrous Report 4–7 (Dkt. No. 272-2 at 9–11); Abrous Dep. 79:21–80:16, 99:15–22, 101:1–5 (Dkt. No. 272-3 at 15, 18).) Thus, Dr. Abrous's methodology is sufficiently grounded in the objective physical evidence and the application of scientific principles to be admissible under *Daubert*.

ORDER – 10

### 3. Amount of Time between the First and Third Shots

Defendants also move to exclude Dr. Abrous's testimony that between the first and third shots, between 2.15 and 2.93 seconds elapsed. (Mot. 1 (Dkt. No. 246).) Defendants motion, however, provides little explanation as to why Dr. Abrous's approximate time calculation is unreliable. As Dr. Abrous's Report explains, his time estimate is derived from the estimates of the car's speed at the time the first shot was fired, and the deceleration rate. (Abrous Report 7 (Dkt. No. 272-2 at 12).) The Court finds no valid basis to exclude Dr. Abrous's calculations, which are based on extrapolations from objective facts. If Defendants believe that Dr. Abrous's time calculations are overly specific (calculated to the 100th of a second) given the approximate nature of the data relied upon (*see* Reply 3 (Dkt. No. 278)), then they are free to explore this issue through cross-examination.

### 4. Animations

Finally, Defendants seek to exclude Dr. Abrous's animations depicting the movement of the vehicle. (Mot. 9-10 (Dkt. No. 246).) Dr. Abrous's computer-generated animations illustrate the movement and position of the car as it traveled through the parking lot, and are based on his calculations of time, distance, and speed that he derived from the investigative facts. (*See* 2008 Abrous Dep. 9, 11, 15, 19, 23 (Dkt. No. 272-3 at 22–25); Abrous Suppl. Report (Dkt. No. 272-4 at 2).) The animations are not meant to recreate the scene, but rather provide illustrative exhibits of the car's travel. (2008 Abrous Dep. 15:8–15 (Dkt. No. 272-3 at 23).) Dr. Abrous's calculations are grounded in the physical facts and the application of mathematical principles. (*Id.* at 19:23 (explaining that the animations are essentially a "mathematical modeling" of his previous calculations).) Accordingly, the Court finds there is no sound basis to exclude his animations that are meant to provide illustrative exhibits of the car's movement.

### C. Plaintiff's Motion to Limit the Testimony of Dr. Lewinski

Plaintiff moves to prevent Bill Lewinski, Ph.D. from testifying as to the accuracy of the animation created by defense expert, John Hunter, or to the significance of the spent cartridge locations. (Mot. 1 (Dkt. No. 253).) Plaintiff also seeks to exclude numerous demonstrative videos that Dr. Lewinski plans to

ORDER – 11

use to illustrate the fallibility of human perception. (*Id.*) Plaintiff does not challenge Dr. Lewinski's qualifications to testify on police psychology, and instead disputes his qualifications to testify on cartridge ejection patterns and the accuracy of Hunter's animation. (Reply 1 (Dkt. No. 285).)

Dr. Lewinski originally produced an expert report in June 2008 that focused on "the performance of Officer Jason Clift's behavior" during the shooting. (Lewinski Report 3 (Dkt. No. 254-5 at 4).) His opinion regarding Clift's behavior was based on "the perceptions, attention, behavior and reaction times of an average officer caught in this type of encounter." (*Id.* at 6.) After Plaintiff's expert, Dr. Abrous, produced animations depicting the sequence of the events during the shooting, Dr. Lewinski provided a supplemental report opining that Plaintiff's animations were "flawed" and that the defense animation accurately depicted the sequence of Officer Clift's shots and movement. (Lewinski Suppl. Report 1–2 (Dkt. No. 254-6 at 2).) Dr. Lewinski also opined that "any effort at including the spent shell casings as an anchor point [for the shooter's location] is fundamentally flawed," and that without a guarantee that the casings were not disturbed, "the presence of a spent shell casing is not helpful at all." (*Id.* at 2.)

### 1. Qualifications

Dr. Lewinski has a doctorate in police psychology, a master's degree in counseling, and a bachelor's degree in psychology and sociology. (Lewinski CV 1 (Dkt. No. 254-3 at 2).) Dr. Lewinski reports that he has qualified as an expert "on action/reaction, perception and memory in force or lethal force encounters" in numerous state and federal courts. (Lewinski Report 2 (Dkt. No. 254-5 at 3).) He states that his "forte is the dynamics and performance elements of the human behavior in this type of incident." (*Id.* at 3.) Dr. Lewinski further explains that recently, "I have focused my efforts on research relating to police officer shootings and the analysis of human perception, memory, reaction time, and other factors related to human performance in circumstances involving high stress that police officers often face." (Lewinski Decl. ¶ 5 (Dkt. No. 266 at 2).)

As his curriculum vitae evidences, Dr. Lewinski has considerable education, experience, and knowledge regarding officer reaction, perception and memory in lethal force encounters. (*See* Lewinski

ORDER – 12

CV (Dkt. No. 254-3).) The Court therefore agrees that Dr. Lewinski is qualified to testify on this subject area. However, conspicuously absent from his resume is any evidence of qualifications to provide an expert opinion as to the significance of spent cartridge locations at shooting scenes. (*See id.*) Dr. Lewinski has no degrees in physical sciences or engineering, (Lewinski Dep. 9:3–6, 10:7–11:19 (Dkt. No. 254-2 at 10, 12)), and has only participated in a "preliminary study" and an unpublished "field study" involving shell cartridge ejection patterns, (*see id.* 10:7–13:25; Lewinski Decl. ¶ 19 (Dkt. No. 266 at 5)). Dr. Lewinski's limited involvement in some field studies[4] is insufficient to qualify him to offer expert opinions as to matters outside his area of demonstrated expertise. *See United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (an expert must possess "appropriate qualifications—i.e., some special knowledge, skill, experience, training or education *on that subject matter*") (emphasis added) (*citing* FED. R. EVID. 702). Dr. Lewinski's degrees and experience are in social sciences, not physical sciences. His experience and knowledge with human performance in police shooting situations does not qualify him to opine as to the legitimacy of determining a shooter's location by the pattern of spent shell casings. Accordingly, Dr. Lewinski has insufficient qualifications to express an expert opinion as to the significance of cartridge ejection studies and cartridge locations at shooting scenes.

Plaintiff also contends that Dr. Lewinski is not qualified to testify as to Officer Clift's approximate location as depicted in an animation created by defense expert, John Hunter. (Mot. 8–9 (Dkt. No. 253).) In his supplemental report, Dr. Lewinski opines, "This animation reflects the approximate position of Officer Clift, the path of the vehicle and the time required for Officer Clift's perception of the change of direction of the vehicle toward him and the time required for him to broadcast that change, before he fired the first shot." (Lewinski Suppl. Report 1 (Dkt. No. 254-6 at 2).) He then explains that the animation accurately depicts Officer Clift's location and the timing as he fires the second and third shots. (*See id.* at 1–2.) Plaintiff points out, however, that Hunter's animation does not depict the firing of any

---

[4] None of these studies have been published or subjected to peer review. (Lewinski Dep. 10:7–11:12 (Dkt. No. 254-2 at 11–12).)

ORDER – 13

shots. (Mot. 3 (Dkt. No. 253); *see* Lewinski Dep. 22:9–23:7 (Dkt. No. 254-2 at 15–16).) Dr. Lewinski now admits that, when he provided his supplemental report, he had incorrectly assumed that Hunter would add specific shot locations to the animation. (Lewinski Decl. ¶ 15 (Dkt. No. 266 at 4).) But, he contends that his "incorrect assumption," does not undermine his conclusion "that the time intervals depicted in the revised Hunter simulation are consistent with the opinions stated in my reports." (*Id.* ¶ 16.)

As discussed above, Dr. Lewinski is not an expert in accident reconstruction, he is a police psychologist. Moreover, it is undisputed that the firing of shots was not depicted in the animation upon which Dr. Lewinski based his supplemental report. The Court therefore finds that Dr. Lewinski may not offer an expert opinion as to whether Hunter's animation accurately reflects Officer Clift's location when the three shots were fired. The Court fails to see how Dr. Lewinski could vouch for the accuracy of the "time sequence of shots," (*see id.* ¶ 14), in an animation that does not depict shot timing or location.[5] This Order does not, however, prohibit Dr. Lewinski from offering general testimony based on his knowledge of "the human performance and timing factors involved in Officer Clift's firing the three shots at issue in this case." (*See id.* ¶ 16.) Dr. Lewinski should limit his testimony to his self-declared area of expertise as "the leading researcher into human performance in lethal force encounters." (Lewinski Decl. ¶ 5 (Dkt. No. 266 at 2).)

### 2. Demonstrative Videos

Plaintiff also seeks to exclude a number of videos that Dr. Lewinski intends to show. (Mot. 9–10 Dkt. No. 253).) Defendants explain that these videos are meant to "demonstrate how even careful and focused observers routinely 'miss' important visual or verbal information." (Resp. 7 (Dkt. No. 264).) Dr. Lewinski states that the videos show that "you can be looking directly at something and—and because of

---

[5] Plaintiff apparently has not received a new or revised copy of Hunter's animation, and the copy that Defendants have offered into evidence does not depict the timing or location of any gunshots. (*See* Ford Decl. (Dkt. No. 284 at 1).)

ORDER – 14

your attentional processes, not know that other things are going on." (Lewinski Dep. 40:10–12 (Dkt. No. 254-2 at 17); *see* Resp. 7–8 (Dkt. No. 264) (citing the foregoing quotation as "the purpose of the videos")). For example, according to Dr. Lewinski, one of the videos shows a basketball game during which a person in a gorilla suit walks through the court. (Lewinski Dep. 40:2–20 (Dkt. No. 254-2 at 17).) When the viewers are asked to count the number of passes the team makes, "they often do not see the guy in the gorilla suit." (*Id.*) But if the viewers are alerted to the person in the gorilla suit, they have a hard time "counting the number of passes." (*Id.*)

Plaintiff argues that these videos should be excluded under Rules 401 and 403 because they are not relevant to a fact in issue and are distracting and a waste of time. The Court agrees, and finds that any marginal probative value of these videos is substantially outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* FED. R. EVID. 403. The jury does not need a series of videos to demonstrate the so-called "phenomenon" that a stressful situation may affect "the limits of human memory." (*See* Resp. 8 (Dkt. No. 264).) Dr. Lewinski is therefore prohibited from showing these demonstrative videos.

## IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1) Defendants' Motion to Exclude the Testimony of Van Blaricom (Dkt. No. 244) is DENIED. However, in providing expert testimony, Van Blaricom is prohibited from expressing his opinions in terms of: whether Officer Clift had "probable cause" to believe he was in imminent danger; whether Officer Clift acted "unconstitutionally"; whether Officer Clift's use of deadly force was "objectively unreasonable"; and whether the Chief of Police or the City "ratified" the alleged misconduct.

(2) Defendants' Motion to Exclude Certain Testimony of Dr. Abrous (Dkt. No. 246) is DENIED.

(3) Plaintiff's Motion to Limit the Testimony of Defense Witness Dr. Lewinski (Dkt. No. 253) is GRANTED. Accordingly,
    (a) Dr. Lewinski shall not express an opinion as to the significance of cartridge ejection studies and cartridge locations at shooting scenes;
    (b) Dr. Lewinski shall not express an opinion as to whether John Hunter's animation accurately reflects Officer Clift's location when the three shots were fired; and

ORDER – 15

` (c) Dr. Lewinski shall not show the jury the demonstrative videos titled Buzzershot1.mov, farm.mov, FSLondonPart1.mov, gorilla.mov, guncellphone.mov, GunfighterCommerical.mov, Street.mov, or any other video that is meant to illustrate the fallibility of human recall.

SO ORDERED this 12th day of May, 2009.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 16